**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
WEST VIRGINIA RIVERS COALITION,
and SIERRA CLUB,

        Plaintiffs,

v.                              CIVIL ACTION NO.   2:17-cv-03013

FOLA COAL COMPANY, LLC,

        Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This is a citizen suit for declaratory and injunctive relief against Defendant Fola Coal Company, LLC ("Fola") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (hereafter the Clean Water Act ("CWA")), and the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 et seq. (hereafter "SMCRA"), at its Surface Mine No. 4A and Bullpen Surface Mine in Clay and Nicholas Counties, West Virginia.

2.      As detailed below, Plaintiffs allege that Fola has discharged and continues to discharge pollutants into waters of the United States in violation of Sections 301 and 401 of the CWA, 33 U.S.C. §§ 1311, 1341, and the conditions and limitations of its West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") Permit Nos. WV1013815 and WV1017934 issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

3.      Plaintiffs further allege that Fola's discharges of pollutants into waters adjacent to Surface Mine No. 4A and the Bullpen Surface Mine violate the performance standards under

SMCRA and the terms and conditions of its surface mining permit Nos. S200502 and S200798.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 33 U.S.C. § 1365 (CWA citizen's suit provision), and 30 U.S.C. § 1270 (SMCRA citizens' suit provision).

5.     On March 1, 2017,  Plaintiffs gave notice of the violations and their intent to file suit to the Defendant, the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP"), as required by Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and Section 520(b)(1)(A) of SMCRA, 30 U.S.C. § 1270(b)(1)(A).

6.     More than sixty days have passed since the notice was sent.  EPA, OSMRE, and/or WVDEP have not commenced or diligently prosecuted a civil or criminal action to redress the violations.  Moreover, neither EPA nor WVDEP commenced an administrative penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or a comparable state law to redress the violations prior to the issuance of the March 1, 2017 notice letter.

7.     Venue in this District is proper pursuant to 33 U.S.C. § 1365(c)(1) because the sources of the CWA violations are located in this District, and pursuant to 30 U.S.C. § 1270(c) because the coal mining operations complained of are located in this District.

## PARTIES

8.     Fola is a West Virginia Limited Liability Company engaged in the business of mining coal.

9.     Fola is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and Section 701(19) of SMCRA, 30 U.S.C. § 1291(19).

10.     At all relevant times, Fola has owned and operated Surface Mine No. 4A and the Bullpen Surface Mine in Nicholas and Clay Counties of West Virginia.  The mines are regulated pursuant to Surface Mining Permit S200502 and S200798, respectively, and discharge pollutants into the Right Fork of Leatherwood Creek of the Elk River, subject to the effluent limits in WV/NPDES Permit Nos. WV1013815 and WV1017934, respectively.

11.     Plaintiff Ohio Valley Environmental Coalition is a nonprofit organization incorporated in Ohio.  Its principal place of business is in Huntington, West Virginia.  It has approximately 1,500 members.  Its mission is to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing, coalition building, leadership development, and media outreach.  The Coalition has focused on water quality issues and is a leading source of information about water pollution in West Virginia.

12.     The West Virginia Highlands Conservancy, Inc. is a nonprofit organization incorporated in West Virginia in 1967. Its volunteer board of directors and approximately 1,500 members work for the conservation and wise management of West Virginia's natural resources. As one of West Virginia's oldest environmental activist organizations the West Virginia Highlands Conservancy is dedicated to protecting our clean air, clean water, forests, streams, mountains, and the health and welfare of the people that live here and for those who visit to recreate.

13.     Plaintiff West Virginia Rivers Coalition makes its mission the conservation and restoration of West Virginia's exceptional rivers and streams.  It not only seeks preservation of high quality waters, but also the improvement of waters that should be of high quality.  It has approximately 2,500 members.

14.     Plaintiff Sierra Club is a nonprofit corporation incorporated in California, with more than 740,000 members and supporters nationwide including approximately 2,400 members who reside in West Virginia and belong to its West Virginia Chapter.  The Sierra Club is dedicated to exploring, enjoying, and protecting wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface water in West Virginia.

15.     Plaintiffs have members including Cindy Rank, James Tawney and Angie Rosser, who use, enjoy, and benefit from the water quality in Leatherwood Creek, its tributaries, and downstream portions of the Elk River.  They would like to recreate in areas downstream from the portion of the streams into which Fola's Surface Mine No. 4A and Bullpen Surface Mine discharge pollutants harmful to aquatic life, including total dissolved, conductivity and sulfate. Excessive amounts of these pollutants degrade the water quality of Leatherwood Creek and its tributaries, make the water aesthetically unpleasant and environmentally undesirable and impair its suitability for aquatic life.  Because of this pollution, Plaintiffs' members refrain from and/or restrict their usage of Leatherwood Creek, its tributaries, downstream portions of the Elk River and associated natural resources. As a result, the environmental, health, aesthetic, and recreational interests of these members are adversely affected by Fola's excessive discharges of these and other pollutants into Leatherwood Creek and its tributaries from its Surface Mine No. 4A and Bullpen Surface Mine in violation of its WV/NPDES permits, its Section 401 certifications, and its SMCRA permits.  If Fola's unlawful discharges ceased, the harm to the interests of Plaintiffs' members would be redressed.  An injunction would redress Plaintiffs'

4

members' injuries by preventing future violations of the limits in Fola's permits and certifications.

16.     At all relevant times, Plaintiffs were and are "persons" as that term is defined by the CWA, 33 U.S.C. § 1362(5) and SMCRA, 30 U.S.C. § 1291(19).

## STATUTORY AND REGULATORY FRAMEWORK

17.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as a NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

18.     Section 401 of the CWA, 33 U.S.C. § 1341, and 33 C.F.R. § 330.4(c), provide that before the U.S. Army Corps of Engineers (the Corps) may issue a nationwide permit under Section 404(e) of the CWA, 33 U.S.C. § 1344(e), authorizing discharges of fill material into waters of the United States, it must obtain a certification from the state that the discharges will not violate that state's water quality standards.

19.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the permit-issuing authority may issue a NPDES Permit that authorizes the discharge of any pollutant directly into waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

20.     Section 303(a) of the CWA, 33 U.S.C. § 1313(a) requires that states adopt ambient water quality standards and establish water quality criteria for particular water bodies that will protect designated uses of the water.

21.     The Administrator of EPA authorized WVDEP, pursuant to Section 402(a)(2) of the Act, 33 U.S.C. § 1342(a)(2), to issue NPDES permits on May 10, 1982. 47 Fed. Reg. 22363. The applicable West Virginia law for issuing NPDES permits is the Water Pollution Control Act ("WPCA"), W.Va. Code § 22-11-1, et seq.

22.     Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes any "citizen" to "commence a civil action on his own behalf . . .  against any person. . . who is alleged to be in violation of . . . .an effluent standard or limitation under this chapter."

23.     Section 505(f) of the CWA, 33 U.S.C. § 1365(f), defines an "effluent standard or limitation under this chapter," for purposes of the citizen suit provision in Section 505(a) of the CWA, 33 U.S.C. § 1365(a), to mean, among other things, an unlawful act under Section 301(a) of the CWA, 33 U.S.C. § 1311(a), a certification under Section 401 of the CWA, 33 U.S.C. § 1341, and "a permit or condition thereof issued" under Section 402 of the CWA, 33 U.S.C. § 1342.

24.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant to comply with the CWA.

25.     Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

26.     Section 506 of SMCRA, 30 U.S.C. § 1256, prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from OSMRE or from an approved state regulatory authority.

27.     At all relevant times, the State of West Virginia has administered an approved surface mining regulatory program under SMCRA.  *See* 30 C.F.R. § 948.10.

28.     Among the performance standards mandated by SMCRA and the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA") is that "[d]ischarge from areas disturbed by . . . mining shall not violate effluent limitations or cause a violation of applicable water quality standards."  30 C.F.R. §§ 816.42 and 817.42; 38 C.S.R. § 2-14.5.b.

29.     The performance standards further require that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside the permit area."  38 C.S.R. § 2-14.5.  At a minimum, "material damage" includes violations of water quality standards.

30.     The legislative rules promulgated under WVSCMRA provide that, as a general condition of all surface mining permits issued under the WVSCMRA, the permittee must comply with all applicable performance standards.  38 C.S.R. § 2-3.33.c.

31.     Section 520(a) of SMCRA, 30 U.S.C. § 1270(a), authorizes any person adversely affected to bring an action in federal court to compel compliance with SMCRA against any "person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]."

32.     Section 520(d) of SMCRA, 30 U.S.C. § 1270(d), authorizes the Court to award the costs of litigation, including attorney fees and expert witness fees, "to any party, whenever the court determines such an award is appropriate."

33.     WVDEP is the agency in the State of West Virginia that administers the State's CWA and SMCRA programs and issues WV/NPDES Permits, Section 401 certifications, and WVSCMRA Permits.

## FACTS

34.　Fola's mining activities at Surface Mine No. 4A are regulated under West Virginia Surface Mining Permit S200502. That Permit was renewed in 2014 and remains in effect.

35.　Fola's mining activities at its Bullpen Surface Mine are regulated under West Virginia Surface Mining Permit S200798.  That permit was renewed in 2014 and remains in effect.

36.　On October 24, 2003, the Corps issued an authorization to Fola under § 404(e) of the CWA, 33 U.S.C. § 1344(e), and the 2002 Nationwide Permit (NWP) 21 for Fola's stream-impacting activities at its Surface Mine No. 4a.

37.　On February 21, 1999, the Corps issued an authorization to Fola under § 404e) of the CWA, 33 U.S.C. § 1344(e), and the 1996 NWP 21 for Fola's stream-impacting activities at its Bullpen Surface Mine.

38.　Fola's water discharge activities at Surface Mine No. 4A are regulated under WV/NPDES Permit No. WV1013815.  That permit was reissued in 2014 and remains in effect.

39.　Fola's water discharge activities at its Bullpen Surface Mine are regulated under WV/NPDES Permit No. WV1017934.  That permit was reissued in 2014 and remains in effect.

40.　Part C of WV/NPDES Permit Nos. WV1013815 and WV1017934 incorporate by reference 47 C.S.R. § 30-5.1.f, which provides that: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards adopted by the Department of Environmental Protection, Title 47, Series 2." WVDEP's narrative water quality standards prohibit discharges of "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or that cause "significant

adverse impacts to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." 47 C.S.R. §§ 2-3.2.e & 2-3.2.i.

**Violations of Water Quality Standards at Fola's Surface Mine 4A**

41.     Permit No. WV1013815 regulates discharges from Outlets 020 through 031 of Surface Mine No. 4A, which discharge into two tributaries of Leatherwood Creek—Right Fork and Cannel Coal Hollow.  Leatherwood Creek is a tributary of the Elk River.

42.     Outlets 020-031 are divided between two streams—Cannel Coal Hollow and Right Fork.  Outlets 022 and 023 discharge into the upstream end of Right Fork.  Outlets 024, 021, 025, 020, and 028 are located on Right Fork downstream from those two Outlets.  Outlet 027 discharges into the upstream end of Cannel Coal Hollow.  Outlets 026, 031, 030, and 029 are located on Cannel Coal Hollow downstream from Outlet 027.  Outlets numbered less than 020, such as 001, 002, 003, and 004, were terminated in 1994-95 and 2006 and are no longer listed in the 2014 permit.  Fola's discharge monitoring reports since January 2015 show that the Outlets other than 022, 023 and 027 had no flow or were not constructed.  Thus, no outlet currently discharges into Cannel Coal Hollow, and only Outlets 022 and 023 currently discharge into Right Fork.

43.     Prior to mining at Surface Mine No. 4A, Right Fork was unimpaired. In its 2003 Cumulative Hydrogic Impact Assessment (CHIA) for that mine, WVDEP stated that though some sub-watersheds of Right Fork had elevated manganese and sulfates related to pre-Fola mining, the upper reaches of the watershed had low levels of sulfates. WVDEP also stated in the CHIA that "all [monitoring] stations provide adequate habitat and contain populations of benthic macroinvertebrates. All the stations have high EPT indices."  Prior to mining at Surface Mine No. 4A, the majority of water samples in Right Fork showed conductivity levels below 300

µS/cm.

44.    Prior to mining at Surface Mine No. 4A, WVDEP reported a WVSCI score of 84 for Right Fork. In 2000 and 2001, Fola's consultant collected a number of biological surveys from seventeen different sampling locations. Among thirty-three samples from those seventeen sites, only six had WVSCI scores below 68.

45.    Since Fola began mining activities at Surface Mine No. 4A in 2001, conductivity levels in Right Fork have been almost entirely above 1,500 µS/ cm, with jumps up to and exceeding 2,500 µS/cm. Similarly, since 2001, sulfate levels have been consistently above 600 mg/l, and sometimes as high as 1,200 mg/l.

46.    In 2011 and 2012, discharges from Outlets 022, 023, and 027 at Surface Mine No. 4A consistently ranged from 1,500 µS/cm to more than 3,000 µS/cm. In May and September 2014, conductivity from the three discharges ranged from 1820 to 2,958 µS/ cm, with sulfate levels between 920 and 1,800 mg/l.

47.    The following table summarizes pre- and post-mining water quality at Surface Mine No. 4A, with measurements from Boardtree Branch as a comparison point for water chemistry characteristic of alkaline mine drainage:

| Table 1.  Chemical Composition of Alkaline Mine Drainage | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Location | pH | Cond-uctivity | Alkalinity (as CaCO3) | Hardness (as CaCO3) | Ca | Mg | Na | K | Cl | SO₄ |
| Pre-mining | FOLA-6 (2001) | 7.15 | 461 | 22 | 189 | 34 | 25 | 8 | 3 | 3 | 120 |
| | FOLA-7 (2001) | 7.35 | 367 | 22 | 396 | 34 | 75 | 2 | 3 | 1 | 110 |
| Post-mining | BASD3RLW (2012) | 8.38 | 1689 | 124 | n/a | 265 | 211 | 30 | 16 | n/a | 1150 |
| | BASD1RLW (2012) | 8.17 | 1538 | 93 | n/a | 202 | 156 | 31 | 14 | n/a | 942 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Outlet 022 (Hansen 2014) | 7.9 | 1820 | 120 | | 140 | 120 | 62 | 12 | 32 | 920 |
| | Outlet 023 (Hansen 2014) | 8.1 | 2720 | 150 | | 280 | 260 | 100 | 16 | ND | 180 |
| Referen ce | Boardtree Branch | 8.0 | 2367 | 72 | 1408 | 241 | 260 | 12 | 21 | 11 | 1580 |

48.     High levels of conductivity, dissolved solids, alkalinity, and ionic chemicals (including sulfates, bicarbonate, magnesium and calcium) are a primary cause of water quality impairments downstream from mine discharges.

49.     In 2011, EPA scientists summarized the existing science connecting conductivity and biological degradation in an EPA report entitled, "A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams." That report, which was peer-reviewed by scientists on EPA's Science Advisory Board, used EPA's standard method for deriving water quality criteria to derive a conductivity benchmark of 300 μS/cm. *Id*. at xiv-xv.  According to the species sensitivity distribution in the benchmark, on average, five percent of species are lost when conductivity rises to 295 μS/cm, over 50% are lost at 2000 μS/cm, and close to 60% are lost at 3000 μS/cm. *Id*. at 18. EPA found that the loss of aquatic species from increased conductivity was "a severe and clear effect." *Id*. at A-37. A statistical analysis included in the benchmark determined that at a conductivity level of 300 μS/cm a stream has a59% likelihood of beingbe impaired and at 500 μS/cm a stream has a 72% likelihood of being impaired. *Id*. at A-36.

50.     The EPA Benchmark report is supported by more recent peer-reviewed studies. Cormier, et al., Derivation of a Benchmark for Freshwater Ionic Strength, Environmental Toxicology and Chemistry, 32(2): 263-271 (2013), and references cited therein; Bernhardt, et al., "How Many Mountains Can We Mine? Assessing the Regional Degradation of Central Appalachian Rivers by Surface Coal Mining," Environmental Science & Technology, 46 (15), pp. 8115–8122 (2012).  The latter study's authors found that:

The extent of surface mining within catchments is highly correlated with the ionic strength and sulfate concentrations of receiving streams. Generalized additive models were used to estimate the amount of watershed mining, stream ionic strength, or sulfate concentrations beyond which biological impairment (based on state biocriteria) is likely. We find this threshold is reached once surface coal mines occupy >5.4% of their contributing watershed area, ionic strength exceeds 308 $\mu$S cm$^{-1}$, or sulfate concentrations exceed 50 mg/L.

51.    The ions found coming out of Outlets 022 and 023 are consistent with those associated with coal mining pollution in this region (Pond et al. 2008; Palmer et al. 2010; Bernhardt and Palmer 2011; Lindberg et al. 2012; Pond et al. 2010; Pond et al. 2012; Pond et al. 2014; Kunz 2013). The ionic mixture of calcium, magnesium, sulfate, and biocarbonate in alkaline mine water causes the loss of aquatic macroinvertebrates in Appalachian areas where surface coal mining is prevalent; it is the mixture of ions that causes the biological impairment (Cormier et al. 2013b; Cormier and Suter 2013). This mixture also has significant adverse effects on fish assemblages (Hitt 2014; Hopkins 2013) and has toxic effects on aquatic life, including mayflies (Kunz 2013; Echols 2010; Kennedy 2004).

52.    On May 9, 2014, Dr. Christopher Swan conducted field sampling downstream of Outlets 022 and 023 and measured a WVSCI score of 38.21 and a GLIMPSS score of 25.79.

53.    WVDEP has listed Right Fork and Leatherwood Creek as biologically impaired due to mining on its 2012 and 2014 CWA Section 303(d) Lists.

54.    WVDEP stated in its Elk River Watershed TMDL that "[i]n [Right Fork/Leatherwood Creek] ..., the [stressor identification] process determined ionic toxicity to be a significant stressor. A strong presence of sulfates and other dissolved solids exists in those waters and in all other streams where ionic toxicity has been determined to be a significant biological stressor."

55.    Since January 2015, Fola has discharged the following average conductivity (in μS/cm) from Outlets 022 and 023:

| Table 2 | | |
|---|---|---|
| Average Conductivity | | |
| | 023 | 022 |
| Jan-15 | 1985 | 1450 |
| Feb-15 | 3510 | 2075 |
| Mar-15 | 2715 | 1790 |
| Apr-15 | 2925 | 1820 |
| May-15 | 2955 | 2235 |
| Jun-15 | 3185 | 2030 |
| Jul-15 | 2290 | 1750 |
| Aug-15 | 2725 | 1930 |
| Sep-15 | 2690 | 1805 |
| Oct-15 | 2555 | 1940 |
| Nov-15 | 2210 | 1620 |
| Dec-15 | 3235 | 1885 |
| Jan-16 | 2325 | 1645 |
| Feb-16 | 2030 | 1440 |
| Mar-16 | 3030 | 1820 |
| Apr-16 | 2750 | 1855 |
| May-16 | 2850 | 1745 |
| Jun-16 | 2870 | 1690 |
| Jul-16 | 2760 | 1755 |
| Aug-16 | 2935 | 1705 |
| Sep-16 | 3065 | 1865 |

56.    Thus, Fola is continuing to discharge high levels of ionic pollutants, measured as conductivity, from Outlets 022 and 023 and that those discharges are causing or materially contributing to biological impairment in Right Fork.

**Violations of Water Quality Standards at Bullpen Surface Mine**

57.    Fola's WV/NPDES Permit No. WV1017934 regulates discharges from Outlets 001 through 009, which are located on or near Bullpen Fork.  Bullpen Fork is a tributary of Right Fork, and enters that stream downstream from the stream in Cannel Coal Hollow

13

58.     Fola's discharge monitoring reports since January 2015 show that the Outlets 002, 003, 004, and 005 had no flow or were not constructed.  Outlets 007 and 008 are not listed on Fola's DMRs or in its permit.  Thus, Outlets 001 and 009 are the only reported contributors to flow in Bullpen Fork.

59.     The 2005 CHIA for the Bullpen Surface Mine stated that "[t]he major drainage control structure for Permit S-2007-98 is Pond #1 (NPDES Outlet 009), an in-stream pond in Bullpen Fork."

60.     This CHIA also stated that prior to mining, "Bullpen Fork shows very little impact from previous mining."  Pre-mining, sulfates in that stream were from 18-60 mg/l.  On October 27, 1998, a pre-mining benthic survey in Bullpen Fork and Right Fork found that "Bullpen Fork supports a healthy population of pollution 'intolerant' families of benthic macroinvertebrates including mayflies, stoneflies and caddisflies" and was non-impaired.  That survey further found that "there are no significant sources of pollution or other environmental stress factors within either of the streams sampled," and "[a]ll of the stations appear to represent 'normal' stream conditions that have not been impacted by previous mining activities and/or other form of impairment."

61.     In May 2014, EnviroScience sampled benthic macroinvertebrates at three sites on Bullpen Fork and Right Fork.  Site DBAS-BP was at the mouth of Bullpen Fork just upstream of its confluence with Right Fork.  Site UBAS1-RFLC was on Right Fork upstream of its confluence with Bullpen Fork.  Site DBAS1-RFLC was on Right Fork downstream of its confluence with Bullpen Fork.  EnviroScience measured the WVSCI scores at these three sites as 48.8, 53.1, and 49.1, respectively, which are all less than a passing score of 68 and demonstrate biological impairment in violation of water quality standard and Fola's permit condition.

14

62.     At the time of the May 2014 sampling, EnviroScience measured the water quality

at these three locations as shown below:

| Table 3 | | | | | | | | |
|---------|-----|--------------|------------|-----|-----|------|------|-----|
| **Site** | **pH** | **Conductivity** | **Alkalinity** | **Ca** | **Mg** | **Na** | **K** | **SO₄** |
| DBAS-BP | 6.91 | 1360 | ND | 138 | 101 | 5.6 | 8.19 | 635 |
| UBAS-RFLC | 7.83 | 2390 | 90.5 | 249 | 204 | 76.5 | 14.7 | 1070 |
| DBAS-RFLC | 7.79 | 2250 | 78.6 | 233 | 187 | 62 | 13.6 | 1210 |

63.     Since January 2015, Fola has reported the following levels of conductivity (in

$\mu$S/cm) at Outlets 001 and 009:

| Table 4 | | |
|---------|-----|-----|
| **Average Conductivity** | | |
|  | **001** | **009** |
| Jan-15 | 849 | 1805 |
| Feb-15 | 709 | 1740 |
| Mar-15 | 596 | 1380 |
| Apr-15 | 651 | 1590 |
| May-15 | 733 | 2068 |
| Jun-15 | 920 | 2255 |
| Jul-15 | 845 | 1915 |
| Aug-15 | 865 | 1980 |
| Sep-15 | 1010 | 2024 |
| Oct-15 | 1090 | 1790 |
| Nov-15 | 1080 | 2360 |
| Dec-15 | 1170 | 2145 |
| Jan-16 | 916 | 1825 |
| Feb-16 | 668 | 1723 |
| Mar-16 | 721 | 1760 |
| Apr-16 | 835 | 1740 |
| May-16 | 685 | 1750 |
| Jun-16 | 893 | 1840 |
| Jul-16 | 766 | 1860 |
| Aug-16 | 955 | 1800 |
| Sep-16 | 1090 | 2006 |

64.     These recent conductivity levels are far above EPA's benchmark of 300 µS/cm. Fola's discharges of these high levels of ionic pollutants, measured as conductivity, are causing or materially contributing to biological impairment in Bullpen Fork, Right Fork and Leatherwood Creek.

65.     In its most recent DMRs, Fola has reported the levels of instream conductivity listed below.  From top to bottom, the table lists values starting at the upper reaches of Right Fork and then moves downstream to Leatherwood Creek, into which Right Fork flows.  The table shows that throughout this entire reach, the conductivity is consistently over 1500 µS/cm, far in excess of EPA's benchmark of 300 µS/cm:

| Table 5—Instream Conductivity Measurements | | | | | | |
|---|---|---|---|---|---|---|
| Site | Location | Months | | | | |
| | | 6/16 | 7/16 | 8/16 | 9/16 | |
| DCCH (P-9) | Near mouth of Cannel Coal Hollow | 2160 | 2475 | 2300 | 2335 | |
| DRFLC (P-10) | On Right Fork below Cannel Coal Hollow | 2150 | 2475 | 2175 | 2565 | |
| DSBF | Near the mouth of Bullpen Fork | 1810 | n/a | 1580 | 2405 | |
| DRFLC (P-11) | Near the mouth of Right Fork and below Bullpen Fork | 2150 | 2105 | 2145 | 2285 | |
| DRLC (P-12) | On Leatherwood Creek below its confluence with Right Fork | 2150 | 2045 | 2175 | 2275 | |

66.     Thus, Fola's discharges of ionic pollutants, measured as conductivity, are causing or materially contributing to violations of water quality standards in Right Fork of Leatherwood Creek, Bullpen Fork and Leatherwood Creek.

### FIRST CLAIM FOR RELIEF
### (CWA Permit Violations)

67.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 66 above.

68.     Since at least January 2015, Fola's Surface Mine No. 4A and Bullpen Surface Mine have discharged pollutants from their mining operations through point sources, i.e. Outlets

16

022 and 023 at Surface Mine No. 4A and Outlets 001 and 009 at Bullpen Surface Mine, into

Right Fork of Leatherwood Creek, Bullpen Fork, and Leatherwood Creek pursuant to

WV/NPDES Permit Nos. WV1013815 and WV1017934.

69.     Right Fork of Leatherwood Creek, Bullpen Fork, and Leatherwood Creek are

waters of the United States within the meaning of 33 U.S.C. § 1362(7).

70.     Since at least January 2015, Fola has discharged and continues to discharge

pollutants which cause ionic stress and biological impairment in Right Fork of Leatherwood

Creek, Bullpen Fork, and Leatherwood Creek in violation of the narrative water quality

standards for biological integrity and aquatic life protection. 47 C.S.R. §§ 2-3.2.e & 2-3.2.i.

71.     The narrative water quality standards for biological integrity and aquatic life

protection incorporated by reference into Part C of Fola's WV/NPDES Permit Nos. WV1013815

and WV1017934 are "effluent standards or limitations" for purposes of Section 505(a)(1) and

505(f)(6) of the Clean Water Act because they are a condition of a permit issued under Section

402 of the Act.  33 U.S.C. §§ 1342, 1365(a)(1), 1365(f)(6).

72.     Based on the WVSCI scores and measured concentrations of specific conductivity

and sulfates in Fola's discharges, and its failures to take corrective actions to address those

conditions, Plaintiffs believe and allege that Fola is in continuing and/or intermittent violation of

its WV/NPDES Permit Nos. WV1013815 and WV1017934 and the CWA.

73.     Fola is subject to an injunction under the CWA ordering it to cease its permit

violations.

### SECOND CLAIM FOR RELIEF
### (CWA Certification Violations)

74.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1

through 66 above.

75.     Before the Corps may issue a § 404 permit, it must obtain a certification from the state that the project will not violate that state's water quality standards.  33 U.S.C. § 1341 (CWA § 401).

76.     WVDEP's § 401 certifications to the Corps for the 1996 and 2002 NWPs contained standard conditions that must be met at mines with NWP authorizations.

77.     As shown above, Fola is violating Standard Conditions 3, 5 and 13 in WVDEP's two certifications for those NWPs.  Condition 3 is that "[s]poil materials from the watercourse or onshore operations, including sludge deposits, will not be dumped into the watercourse or deposited in wetlands or other areas where deposit may adversely affect surface or ground waters of the state."  Condition 5 is that "[f]ill is to be clean, nonhazardous, and of such composition that it will not adversely affect the biological, chemical or physical property of the receiving waters."  Condition 13 is that "[t]he permittee will comply with water quality standards as contained in the West Virginia Code of State Regulations, Requirements Governing Water Quality Standards, Title 46, Series."

78.     Fola's discharges and mining activities are violating these conditions by causing or materially contributing to chemical and biological impairment of the downstream waters, in violation of West Virginia water quality standards set forth at 47 C.S.R. §§ 2-3.2.e & 2-3.2.i.

79.     Based on the WVSCI scores and measured concentrations of specific conductivity and sulfates in Fola's discharges, and its failures to take corrective actions to address those conditions, Plaintiffs believe and allege that Fola is in continuing and/or intermittent violation of the conditions in its § 401 certifications for its Surface Mine No. 4A and Bullpen Surface Mine.

80.     Each violation of Fola's certifications is a violation of the CWA and is enforceable under the citizen suit provision of the CWA, 33 U.S.C. §§ 1365(a), (f)(5).

81.     Fola is subject to an injunction under the CWA ordering it to cease its certification violations.

### THIRD CLAIM FOR RELIEF
### (SMCRA Violations)

82.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 66 above.

83.     Fola's WVSCMRA Permits S200502 and S200798 require it to comply with performance standards of the WVSCMRA.  38 C.S.R. § 2-3.33(c).

84.     Those performance standards provide that "discharge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards."  38 C.S.R. § 2-14.5.b.

85.     West Virginia water quality standards prohibit discharges of "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or that cause "significant adverse impacts to the chemical, physical, hydrologic, or biological components of aquatic ecosystems."  47 C.S.R. §§ 2-3.2.e & 2-3.2.i.

86.     WVSCMRA performance standards also provide that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside of the permit area."  38 U.S.C. § 2-14.5.  "Material damage," at a minimum includes violations of water quality standards.

87.     By violating West Virginia water quality standards for biological integrity and aquatic life protection at its Surface Mine No. 4A and Bullpen Surface Mine, Fola has also violated, and is continuing to violate, the performance standards incorporated as conditions in its WVSCMRA Permits S200502 and S200798.

88.     Federal and State performance standards require that, "[i]f drainage control, restabilization and revegetation of disturbed areas, diversion of runoff, mulching, or other reclamation and remedial practices are not adequate to meet the requirements of this section and § 816.42, the operator shall use and maintain the necessary water-treatment facilities or water quality controls." 30 C.F.R. § 816.41(d)(1); *see also,* 38 C.S.R. § 2-14.5.c ("Adequate facilities shall be installed, operated and maintained using the best technology currently available in accordance with the approved preplan to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection.").

89.     The violations identified herein show that Fola's existing treatment methods are insufficient to meet that requirement.  Thus the performance standards require Fola to construct a system that will effectively treat its effluent to levels that comply with all applicable water quality standards.

90.     Each violation of Fola's WVSCMRA permits is a violation of SMCRA and is enforceable under the citizen suit provision of SMCRA, 30 U.S.C. § 1270(a).

91.     Fola is subject to an injunction under SMCRA ordering it to cease its permit violations.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

1.     Declaring that Fola has violated and is in continuing violation of the CWA and SMCRA;

2.     Enjoining Fola from operating Surface Mine No. 4A and Bullpen Surface Mine in such a manner as will result in further violations of WV/NPDES Permit Nos. WV1013815 and WV1017934 and WVSCMRA permits S200502 and S200798;

3.      Ordering Fola to immediately comply with the effluent limitations in WV/NPDES permit WV1013825 and WV1017934;

4.      Ordering Fola to immediately comply with the terms and conditions of WVSCMRA permit S200502 and S200798;

5.      Ordering Fola to conduct monitoring and sampling to determine the environmental effects of its violation, to remedy and repair environmental contamination and/or degradation caused by its violations, and restore the environment to its prior uncontaminated condition;

6.      Awarding Plaintiffs their attorney and expert witness fees and all other reasonable expenses incurred in pursuit of this action; and

7.      Granting other such relief as the Court deems just and proper.

Respectfully submitted,

/s/ J. Michael Becher
J. Michael Becher (WV Bar No. 10588)
Joseph M. Lovett (WV Bar No. 6926)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org
jlovett@appalmad.org

Counsel for Plaintiffs