IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
WEST VIRGINIA RIVERS COALITION,
and SIERRA CLUB,

    Plaintiffs,

v.                                                CIVIL ACTION NO. 2:17-cv-03013

FOLA COAL COMPANY, LLC,

    Defendant.

**MEMORANDUM IN SUPPORT OF FOLA COAL COMPANY, LLC'S MOTION TO DISMISS COMPLAINT AS PRECLUDED**

Fola Coal Company, LLC ("Fola") submits this memorandum in support of its Motion to Dismiss Plaintiffs' (jointly "OVEC") Complaint pursuant to Fed. R. Civ. P. 12(b)(6) because the claims are precluded by the doctrine of *res judicata* and are barred by the prohibition on claim splitting. The Fourth Circuit has previously upheld the assertion of *res judicata* in a motion to dismiss. *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000). When entertaining a motion to dismiss on the ground of *res judicata*, a court may take judicial notice of facts from prior judicial proceedings. *Id.*

## I.    INTRODUCTION

**A.    The Mines and Outlets at Issue in the Current Action**

OVEC has advanced a citizen suit against Fola under both the Federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and the Federal Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201-1328. *Complaint* (ECF # 1), ¶ 1. OVEC's suit involves two mines in Clay County, West Virginia – one is known as Surface Mine 4A and the other as the

Bullpen Surface Mine. Fola ceased mining at both years ago, but still holds permits for both sites.[1] Specifically, Fola holds surface mining permits as well as two CWA permits for each mine site: a "fill" permit issued by the United States Army Corps of Engineers under § 404 of the CWA [33 U.S.C. § 1344] and an "National Pollutant Discharge Elimination System" ("NPDES") permit issued by the WVDEP pursuant to a federally-approved program under CWA § 402 [33 U.S.C. § 1342] for the discharge of "pollutants" into stormwater.[2]

OVEC claims that stormwater discharges from outlets in sediment control ponds at the two mines contain elevated levels of salts dissolved from broken rock as measured by "specific conductivity."[3] It claims that the conductivity is causing or contributing to a violation of the State's "narrative" water quality criteria, and that the violation extends to Fola's NPDES and surface mining permits and to the CWA §401 water quality certifications issued by the State in connection with its §404 permits. *Complaint*, ¶¶ 44-48, 55-66, 72, 80 & 90.

In particular, OVEC identifies four discharge points from sediment control structures[4] -- two at each of the mines. *Complaint*, ¶ 68. The two outlets at Mine 4A are identified in NPDES Permit No. WV1013815 as Outlets 022 and 023. *Id.* The outlets at the Bullpen Mine are

---

[1] Discharges from the mines are not the product of any ongoing activity at the mines, all of which was completed prior to the conclusion of the prior litigation (*see Fola I* and *Fola II*, *infra*); all discharges are passive events caused only by rainfall on the inactive mines.

[2] At Mine 4A, Fola holds Surface Mining Permit No. S-2005-02; NPDES Permit No. WV1013815; and a CWA § 404 permit from the Corps of Engineers. *Complaint*, ¶¶ 34, 36 & 38. At the Bullpen Mine, Fola holds Surface Mining Permit No. S-2007-98; NPDES Permit No. WV1017934 and a § 404 permit from the Corps. *Complaint*, ¶¶ 35, 37 & 39.

[3] Specific conductivity is a measure of the ability of a fluid to conduct electricity and is frequently used as an indicator of dissolved solids or salts. Conductivity is typically measured in microsiemens per centimeter (μS/cm).

[4] Surface mines are required by the federally-approved state surface mining program to pass all surface water from areas disturbed by surface mining through sediment control structures designed to settle and control the discharge of pollutants from surface mines. *See OVEC v. Aracoma Coal Co.*, 556 F.3d 177, 186 (4th Cir. 2009). The outlets from these structures are considered "point sources" subject to the NPDES program under the CWA.

identified in NPDES Permit No. WV1017934 as Outlets 001 and 009. *Id.* A map generated by WVDEP's website shows the location of all four outlets. *See* Exhibit 1.

**B.     Prior Citizen Suits Involving the Same Mines and Outlets**

   **1.     Mine 4A**

Discharges from Outlets 022 and 023 at Mine 4A have been the subject of two prior citizen suits by OVEC. In the first, OVEC alleged that stormwater discharges from the two discharge points contained concentrations of selenium that violated Fola's NPDES and surface mining permits. *See OVEC v. Fola Coal Co., LLC*, No. 2:12-cv-3750 (S.D. W. Va.) ("*Fola I*"), Complaint, ¶¶ 45, 46 & 57 (ECF #1) (attached as Exhibit 2); *OVEC v. Fola Coal Co., LLC*, No. 2:12-cv-3750, 2013 WL 6709957, *3 (S.D. W. Va. Dec. 19, 2013) (listing permits and outlets). In that suit, OVEC did not allege that Fola's discharges contained conductivity levels in violation of any permit or Act, but certainly could have based on information available to OVEC at that time.[5] On December 19, 2013, the Court ruled for OVEC as to liability. *OVEC*, 2013 WL 6709957 at *27. The remedy phase was resolved by a consent decree, which established a schedule for Fola to design and install large "biochemical-reactors" in the watershed. *OVEC v. Fola*, No. 2:12-cv-3750 (S.D. W. Va.), Consent Decree (ECF # 116), ¶¶ 16-18 (attached as Exhibit 4).

Later, OVEC sued Fola again over Outlets 022 and 023. This time, OVEC claimed that on-going discharges of conductivity from three mines, including from Outlets 022 and 023 at

---

[5]     OVEC filed its *Fola I* Complaint in July 2012. *See Fola I*, ECF # 1 (July 26, 2012). Although that Complaint only claimed that Fola's discharges of selenium violated the CWA, information was already available to OVEC showing both elevated conductivity in the Mine 4A outlets and Bullpen's 009 outlet, and "failing" West Virginia Stream Condition Index ("WVSCI") scores in downstream waters. *See OVEC v. Fola Coal Co., LLC*, 120 F.Supp.3d 509 (S.D. W. Va. 2015) ("*Fola II*"), Complaint, ¶¶ 40 (alleging conductivity levels of ~ 1,700-3,500 µS/cm from Outlets 022, 023, 025 and 027 at Mine 4A **starting in 2011**); 41 (showing elevated conductivity in downstream waters) & 42 (alleging WVSCI scores below 68 in downstream waters for period **between 2007-2012**) (ECF # 1) (Complaint attached as Exhibit 3). Thus, at the time OVEC filed *Fola I* in 2012, the information concerning conductivity in ongoing discharges from the Mine 4A outlets and Bullpen outlets existed and was already available to OVEC.

Mine 4A, were causing violations of Fola's permits. *See OVEC v. Fola Coal Co., LLC*, 120 F.Supp.3d 509 (S.D. W. Va. 2015) ("*Fola II*")[6]. After a bench trial, the Court found that "Plaintiffs have not met their burden of proving that discharges from Outlets 022, 023 and 027 cause or materially contribute to biological impairment of Right Fork [of Leatherwood Creek], and [Fola] is therefore entitled to judgment as a matter of law regarding alleged violations of WV/NPDES Permit WV1013815, governing Fola Surface Mine 4A." *Id.* at 543-44.

  2.  **Bullpen Mine: Outlet 009**

OVEC has also previously sued Fola alleging that discharges of selenium from Bullpen's Outlet 009 contributed to on-going permit violations. These claims were asserted in the *Fola I* case, in which OVEC also made claims regarding selenium discharges from Mine 4A. *See* Ex. 2 at ¶ 57; *OVEC*, 2013 WL 6709957 at *3 (listing permits and outlets). As was the case concerning selenium discharges from Outlets 022 and 023 at Mine 4A, the Court ruled in OVEC's favor concerning Fola's liability for discharges of selenium from Outlet 009 at the Bullpen Mine. *See OVEC*, 2013 WL 6709957. The remedy with respect to Outlet 009 was addressed in the same consent order that established the remedy for the selenium discharges from Outlets 022 and 023 at Mine 4A. *See* Ex. 4 at ¶¶ 22-23.

  II.  **ARGUMENT**

  A.  **OVEC's Claims are Precluded by the Principle of *Res Judicata***

OVEC's latest lawsuit is barred by the doctrine of *res judicata*, also known as claim preclusion. Both mines have been the prior subject of one or more citizen suits by OVEC for the same on-going conditions arising from wholly past mining operations. In response to one of the prior actions (*Fola I*), Fola has constructed large bioreactors to treat selenium at three of the four

---

[6] *Fola II* was Civil Action No. 2:13-21588, which was consolidated with Civil Action No. 2:13-16044.

outlets identified in the present action. Those bioreactors create "reducing conditions" that treat selenium but do little to treat conductivity. Had Fola been apprised at the time the parties were considering an appropriate remedy in *Fola I* that OVEC also intended to sue for discharges of conductivity, it would have been able to consider a treatment or abatement system capable of addressing both selenium and conductivity. Instead, it is now faced with having spent millions of dollars on bioreactors that cannot treat conductivity and which take up much of the available room near the outlets.

In a second citizen suit involving Mine 4A (*Fola II*), OVEC claimed that two of the very same outlets identified in the present action, Outlets 022 and 023, were discharging unlawful concentrations of conductivity (the same claim as in the present action), but failed to present sufficient evidence to prevail on those claims on the merits. Nothing has changed materially since OVEC unsuccessfully pursued the same conductivity claims regarding Outlets 022 and 023 that it seeks to pursue again in this action; OVEC simply seeks to bring more evidence to the table to remedy the evidentiary failures that resulted in its loss on the merits in *Fola II*. However, because mining at Mine 4A ceased years ago, there is nothing inherently different about the nature of discharges from Outlets 022 and 023 since the Court rejected OVEC's claims in *Fola II*. Those discharges are driven by storm water flowing across the same inactive mine site, and continue with the same flows and water chemistry as shown in the evidence presented in OVEC's prior failed action. The only change is that OVEC now seeks to present additional evidence to remedy the gaps in its prior presentation of the same claims. This is the "second bite at the apple" that the doctrine of *res judicata* is intended to prevent.

When a court has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound not only as to every matter which was offered

and received to sustain or defend the claim or demand, but as to any other admissible matter which might have been offered for that purpose. *Adkins v. Allstate Insurance Co.*, 729 F.2d 974, 976 (4th Cir. 1984) (quoting *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 578-79 (1974)). The rule that a prior judgment acts as a bar to a second action on the same claim or cause of action is based largely on the ground that fairness to the defendant, and sound judicial administration, require that at some point litigation over a controversy must come to an end. "These considerations may impose such a requirement even though the substantive issues have not been tried, especially if the plaintiff has failed to avail himself of opportunities to pursue [its] remedies in the first proceeding." *Adkins*, 729 F.2d at 976 (citing Restatement (Second) of Judgments, § 19 (1982), comment (a)). Thus, *res judicata* "bars re-litigation of any claims that were *or could have been raised* in a prior proceeding between the same parties." *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008).

**B.    The Elements of *Res Judicata* Have Been Met**

The successful application of *res judicata* relies on three elements: (1) "a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Keith v. Aldridge*, 900 F.2d 736, 739 (4th Cir. 1990). Each of these elements is met in this case.

**1.    There Has Been a Prior Adjudication on the Merits**

"What constitutes a final decision is well established in American jurisprudence." *Seventeenth Street Associates, LLC v. Cole ex rel. Hayne*, 855 F.Supp.2d 606, 610 (S.D. W. Va. 2012). A final decision is one "that ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 86 (2000). Both *Fola I* and *Fola II* resulted in final judgments. In *Fola I*, the ultimate entry of a

consent decree remedying the selenium claims constitutes a final adjudication on the merits. *See Nash County Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484, 487 (4th Cir. 1981), *cert. denied*, 454 U.S. 878 (1981) (Consent decrees are considered final adjudications for purposes of *res judicata*); *In re Gilson*, 250 B.R. 226, 240 (Bankr. E.D. Va. 2000) (For purposes of *res judicata*, consent decrees have the same preclusive effect as fully litigated judgments). *See also* Ex. 4 at ¶ 50 ("Upon approval and entry of this Consent Decree by the Court, this Decree shall constitute a final judgment of the Court as to Plaintiffs and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Rules 54 and 58 of the Federal Rules of Civil Procedure.")

Both mines at issue have been the source of prior citizen suits. The claims raised in the present action involve discharges that : (i) were specifically addressed in *Fola I* and/or *Fola II*; or (ii) involve claims over conductivity for which discharge data for the same permits were publicly available to OVEC at the time OVEC brought those prior actions but OVEC failed or chose not to address. Under both scenarios, OVEC is estopped from making claims based on the same or similar ongoing discharges in the present complaint.

    a.    **Mine 4A.**

Fola completed all mining, reclamation, and spoil placement at Mine 4A before OVEC initiated its lawsuit in *Fola I*. *Fola I* addressed impairment of water quality in Right Fork and specifically included Outlets 022 and 023 at Mine 4A. *Fola I*, 2013 WL 6709957 at *2. It resulted in a finding of liability by this Court and a subsequent consent order. In *Fola II*, OVEC pursued claims concerning biological impairment allegedly caused by elevated conductivity in discharges from Mine 4A, including from Outlets 022 and 023 – the very same claims made in the present action. After a trial, the Court issued a summary judgment on the merits in favor of

Fola as to Outlets 022 and 023, finding that OVEC had failed to present sufficient evidence to support its claims.

   b.   **Bullpen Mine.**

Fola completed all mining, reclamation, and spoil placement at Bullpen before OVEC settled its lawsuit in *Fola I*. *Fola I* addressed selenium discharges and specifically included Outlet 009 at Bullpen. *Fola I*, 2013 WL 6709957 at *2. It also resulted in a finding of liability by this Court and a subsequent consent order. Even though *Fola I* targeted selenium instead of conductivity, conductivity data for the watershed receiving discharge from this outlet were available to OVEC at the time *Fola I* was filed. OVEC then specifically addressed conductivity in discharges from Fola's mines in *Fola II*, further demonstrating OVEC's awareness of conductivity concerns at Fola's mines. Even though Outlet 001 was not specifically addressed in *Fola I* or *Fola II*, Outlet 001 is part of the same NPDES permit as Outlet 009, and conductivity data were publicly available to OVEC for the receiving watershed for Outlet 001, as well as Outlet 009, at the time of both *Fola I* and *Fola II*. *See* fn. 5, *supra*.

Both mines at issue in this action have been the source of prior citizen suits that alleged that Fola was causing biological impairment in two tributaries of Leatherwood Creek - Right Fork and Bullpen Fork. Final decisions on liability were entered in those lawsuits. In the present lawsuit, the plaintiffs are alleging biological impairment in Right Fork and Bullpen Fork, as a result of discharges from NPDES outlets that were either specifically addressed in *Fola I* and/or *Fola II* or are substantially similar to the discharges that were addressed in *Fola I* and/or *Fola II*. In short, the plaintiffs have had ample opportunity to present, and in fact have presented, to this Court their arguments regarding the biological impairment of Right Fork and

Bullpen Fork allegedly caused by Fola's mines, and those allegations have been resolved on the merits.

### 2. Identity of Claim

Identity of claims exists when some or all of a new suit's underlying "transaction," defined as a "natural grouping or common nucleus of operative facts," is the same as the operative facts presented in a prior adjudication rendered on the merits. Disparate harms, theories of liability, or desired relief are irrelevant if they are rooted in the same underlying "transaction." As set forth below, there is a "common nucleus of operative facts" in both *Fola I* and *Fola II* that is being relied upon by OVEC in this present action. It follows, therefore, that OVEC's present claims are barred and must be dismissed.

The principle of *res judicata* "bars re-litigation of claims that were *or could have been* raised in a prior proceeding between the same parties." *Sartin*, 535 F.3d at 287 (emphasis supplied). New claims are barred when they raise additional facts that existed at the time the prior suit was filed. *See, e.g.*, 50 C.J.S. Judgments § 988 ("additional facts which existed at the time of the first suit and which might have been urged therein do not permit the bringing of a new suit"); *Chevron U.S.A., Inc. v. State*, 993 So.2d 187 (La. 2008) (*Res judicata* only appropriate when the cause of action asserted in the second suit existed at the time of the original final judgment). In other words, a new suit is only appropriate when "new wrongs" have been committed. *See Eichman v. Fotomat Corp.*, 147 Cal.App.3d 1170, 197 Cal.Rptr. 612 (4th Dist. 1983).

The Fourth Circuit has adopted a transactional approach for determining if the identity of the first action is the same as the subsequent action. *Keith v. Aldridge*, 900 F.2d at 740. *Res judicata* precludes a plaintiff from litigating a subsequent claim that includes "all or part of the

transaction, or series of transactions, or series of connected transactions out of which the first action arose." Restatement (Second) of Judgments § 24(1) (1982); *Harnett*, 800 F.2d at 1314 (4th Cir. 1986) (reaffirming support for adoption of the Restatement rule). Even if both suits involve different harms, different theories, or different measures of relief, a claim is barred if it arises from the same transaction or series of transactions. *See* Restatement (Second) of Judgments § 24(2) (1982).

The expression "transaction" in the claim preclusion context "connotes a natural grouping or common nucleus of operative facts." *Pittston Company v. U.S.*, 199 F.3d 694, 704 (4th Cir. 1999). The approach looks to whether the operative nucleus of facts arises from the same transaction or series of transaction. *See Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2005); *see also Alvear-Velez v. Mukasey*, 540 F.3d 672 (7th Cir. 2008). The present claim arises out of on-going discharges from the same mining operations subject to the prior adjudications, with no material change or alteration in the circumstances surrounding those ongoing discharges since the prior adjudications. While discharges of conductivity continued after the prior adjudication, those discharges were substantially similar to the discharges subject to that prior action and were the inevitable result of prior and wholly completed valley fills and mining operations. Fola has undertaken no new actions at any of the four outlets since the resolution of *Fola II* that would affect the conductivity levels of those discharges. Thus, the prior actions and this action involve the same "transaction" to which the doctrine applies, and no "new wrong" has been committed.

The common nucleus of operative fact that is relevant in this matter is the alleged biological impairment of Right Fork and Bullpen Fork due to high conductivity levels in discharges from Fola's mines. Those claims were raised, or could have been raised, in *Fola I*

and *Fola II*. This can be seen by a closer examination of the previous cases and the allegations in the *Complaint*.

### a. Mine 4A

In *Fola II,* the plaintiffs alleged that discharges from Mine 4A were contributing to biological impairment in Right Fork due to, among other conditions, high levels of instream conductivity. The source of that contamination was allegedly Outlets 022, 023 and 027. A hearing on the merits was held in *Fola II* on June 1-4, 2015, at which time the plaintiffs offered extensive testimony and documentation related to the effect of elevated conductivity that they believed was caused by discharges from Outlets 022 and 023. *Fola II,* 120 F. Supp. 3d at 511, 539-541. OVEC presented the expert testimony of Dr. Margaret Palmer to show the relatively permanent and on-going impacts of mining on downstream conductivity levels without any on-going operational conduct by the mine owner. There, she testified that:

- Surface mining and associated valley fills in Appalachia expose unweathered rock surface to air and rain, which mobilizes ions and causes biological impairment. June 2, 2015 Tr., 93 (*Fola II*, ECF # 100) (relevant pages included as Exhibit 5).

- Valley fills and mountaintop mines are associated with increased levels of dissolved ions in downstream waters and those increases in turn are associated with changes in the biological composition of the streams. *Id.* at 113.

- A paper by Lindberg, et al. shows additive effect of mining on conductivity levels. *Id.* at 118-19.

- A paper by Bernhardt, et al. (How Many Mountains….) found a relationship between area mined and water chemistry.

In the present case, the plaintiffs are making the same claims of biological impairment in Right Fork due to high-conductivity discharges from Outlets 022 and 023 that they made, or could have made, in *Fola II*. The conductivity levels in the water discharged from Outlets 022 and 023 that are identified in the *Complaint* are similar to those that were identified at the

hearing in June, 2015. *Complaint* ¶¶ 55; 120 F. Supp. 3d at 540-541. The plaintiffs report that conductivity levels have been above 1,500 uS/cm since mining began in the area around 2001, and conductivity and sulfate data are referenced from 2011, 2012 and 2014. *Complaint* ¶¶ 45-46. The plaintiffs refer to field samples from 2014, and the listing of Right Fork on the State's 303(d) list of impaired streams in 2012 and 2014. *Complaint* ¶¶ 52-53

Mine 4A, and the discharges from Outlets 022 and 023, have not changed since *Fola II* was filed. There are ongoing discharges, but they come from a completed action; i.e., land area that is unchanged from the time that the plaintiffs first brought their claims of biological impairment due to conductivity. Where, as here, the on-going discharges are the product of a completed action, there is no "new wrong" that allows OVEC to escape the application of *res judicata*. *See, e.g., Supporters to Oppose Pollution, Inc. v. The Heritage Group*, 973 F.2d 1320, 1326 (7th Cir. 1990) (threat from "ongoing releases" known at the time of the original action are not "new wrongs," but are part of the same claim resolved by prior adjudication and are therefore precluded); *Northern California River Watch v. Redwood Oil Co., Inc.*, No. C08-02141 WHA, 2008 WL 4601016 (N.D. Cal. Oct. 15, 2008) (dismissing RCRA action for on-going violations caused by continuing releases from underground storage tanks where the original leaks were subject to prior RCRA/CWA action resolved by consent decree). Thus, where discharges of "conductivity" continue to occur without any affirmative action by Fola except that of wholly past deposits of soil and fill material from mining, there is no new "transaction" or wrong that was not the subject of the prior litigation. *See, e.g., U.S. v. Gurley*, 43 F.3d 1188, 1196-97 (8th Cir. 1994) (dumping of waste in pit was actionable wrong, but subsequent contamination resulting from precipitation-induced overflow was part of original occurrence, thereby precluding litigation over later contamination).

Further evidence that the *Fola II* claims and the claims in this case constitute the same action is found in the relief sought by OVEC in both cases. The remedies sought by the plaintiffs in Fola II and in this case are nearly identical: declarations that Fola is violating the CWA and SMCRA; injunctions against further permit violations; an order requiring compliance with permits; and an order to undertake remedial actions.[7] *Complaint* pp. 20-21; *Fola II* Complaint (ECF #1) pp.19-20. The previous lawsuit was brought for the same purpose as this lawsuit, sought the same result, and relied on the same type of operative facts. The similarity in allegations, foundational evidence and the relief sought demonstrate a clear identity of claims between the *Fola II* lawsuit and this action. The only difference is that OVEC now seeks to bring forward additional evidence to prove the claims that it failed to prove in the prior action. This is the very kind of re-litigation of the same claims that the doctrine of *res judicata* is intended to prevent.

### b. Bullpen Mine

Plaintiffs' claims related to discharges from Bullpen Mine are similar to those in *Fola I*, when plaintiffs alleged impairment of Bullpen Fork as a result of selenium discharges from Outlet 009.[8] The fact that selenium discharges were at issue in *Fola I* does not render the ongoing ionic discharges from the relevant outlets "new wrongs" sufficient to avoid the preclusive effect of *res judicata*. Even though that prior suit targeted a different parameter than the current suit (selenium instead of conductivity), conductivity data for this outlet were available at the time *Fola I* was filed. Indeed, OVEC even cited such data in *Fola II*. *See*

---

[7] The only difference appears to be that, in the present action, the plaintiffs are not requesting civil penalties.

[8] This action involves allegations regarding Outlets 009 and 001, but, as stated in the *Complaint*, they are "the only reported contributors to flow in Bullpen Fork" and therefore can be considered together for purposes of this action. *Complaint* ¶ 58.

footnote 5, *supra*. Because OVEC could have included conductivity claims as to Outlets 001 and 009 when it filed its prior suit concerning alleged biological impairment of Right Fork and Bullpen Fork, it is precluded from doing so now. *See Spence v. Erwin*, 200 Ga. 672, 38 S.E.2d 394 (1946); *Winchester v. W.A. Foote Memorial Hosp., Inc.*, 153 Mich.App. 489 (1986) (both supporting the proposition that a party cannot avoid estoppel of a former judgment where such additional matter could have been pleaded and adjudicated in the prior action). OVEC's actual awareness of this conductivity data at the time of the prior suit is immaterial. *See Meekins v. United Transp. Union*, 946 F.2d 1054 (4th Cir. 1991) (It is the existence of the claim, and not party awareness of it, that is controlling); *Doe v. Allied-Signal, Inc.*, 985 F.2d 908 (7th Cir. 1993) (party cannot avoid preclusive effect of prior judgment where, by exercising due diligence, the party could have discovered the relevant information before filing the initial suit); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752 (8th Cir. 2003) (When the first and second actions are both based on an evaluation of the same historical facts, a litigant seeking to introduce newly discovered evidence otherwise in existence at the time of the first suit may not argue that the facts have changed in the time period between the two actions in order to avoid the preclusive effect of the first decision). Accordingly, OVEC is now barred from bringing the instant claims against Fola.

### 3. Fola and OVEC Were Parties in the Prior Adjudications

In both of the prior actions, OVEC was a plaintiff and Fola was the defendant. Accordingly, the parties to those actions are identical to the parties in the current suit.

## CONCLUSION

Outlets 022 and 023 at Mine 4A have been the subject of two prior citizen suits by OVEC, first alleging violations of its NPDES and SMCRA permits for discharges of selenium,

and then alleging violations of the narrative water quality criteria for conductivity. OVEC has also previously sued Fola over discharges of selenium from Bullpen Mine's Outlet 009, alleging they contributed to on-going NPDES and SMCRA permit violations. Bullpen's Outlet 001, although not specifically named in the earlier litigation, is nevertheless part of the same NPDES permit as Outlet 009, and Outlet 001's conductivity data were fully available to OVEC at that time. In both *Fola I* and *Fola II*, the same parties were involved, and they addressed substantially the same discharges through the same outlets into the same streams, alleging the same or substantially similar biological impairments. A common nucleus of operative facts was involved, and all issues related to those discharges could have been, ***and should have been***, raised in the prior litigation. OVEC cannot now return to this Court to present the evidence that it should have, but did not, present in advancing those prior claims. OVEC's claims in the present lawsuit are therefore barred by *res judicata*, and this lawsuit should be dismissed.

Respectfully submitted,

/s/ Nicholas S. Preservati
David L. Yaussy - WV Bar No. 4156
Nicholas S. Preservati - WV Bar No. 8050
John C. Wilkinson - WV Bar No. 8869
Lara R. Brandfass - WV Bar No. 12962
SPILMAN THOMAS & BATTLE, PLLC
P.O. Box 273
Charleston, WV 25321-0273
Telephone: 304.340.3800

Prepared: October 12, 2017

Fax: 304.340.3801

*Counsel for Defendant*