IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC., and
SIERRA CLUB,

         Plaintiffs,

v.                              CIVIL ACTION NO. 2:13-21588

FOLA COAL COMPANY, LLC,

                              Huntington, West Virginia
              Defendant.       June 2, 2015


AMENDED TRANSCRIPT

TRANSCRIPT OF BENCH TRIAL - DAY 2
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:            **J. MICHAEL BECHER, ESQ.**
                            **JOSEPH M. LOVETT, ESQ.**
                            APPALACHIAN MOUNTAIN ADVOCATES
                            P. O. Box 507
                            Lewisburg, WV  24901

                            **JAMES M. HECKER, ESQ.**
                            TRIAL LAWYERS FOR PUBLIC JUSTICE
                            Suite 200
                            1825 K Street, NW
                            Washington, DC  20006-1202

For the Defendant:            **M. SHANE HARVEY, ESQ.**
                              **MATTHEW S. TYREE, ESQ.**
                              **ROBERT G. MCLUSKY, ESQ.**
                            JACKSON KELLY
                            1600 Laidley Tower
                            P. O. Box 553
                            Charleston, WV  25322

```
Court Reporter:               Teresa M. Ruffner, RPR
                              Sidney Christie Federal Building
                              845 5th Avenue, Room 101
                              Huntington, WV  25701
                              (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

 1  Tuesday, June 2, 2015, at 9:05 a.m. in open court

 2          THE COURT:  Good morning.  Are we ready to proceed?

 3          MR. LOVETT:  We are, Your Honor.

 4          MR. HARVEY:  Your Honor --

 5          THE COURT:  Do you want to deal with your defense

 6  exhibits first?

 7          MR. HARVEY:  Yes, Your Honor.  Thank you.

 8      Defendants would like to move the admission of Joint

 9  Exhibit 17, which is the benchmark, and Defendant's Exhibit

10  19, 38 --

11          THE COURT:  Go slow.

12          MR. HARVEY:  Sorry.  19, 38, 43, 30, 45, 32, 46, 33,

13  47, 34, 48, 39, 36, and 40.

14          THE COURT:  All right.  Any objection?

15          MR. BECHER:  Your Honor, Mr. Harvey has represented

16  to me that these are the exhibits that were introduced by

17  Dr. Garabrant yesterday.  To the extent that they are, I have

18  no objection.  I haven't had a chance to double check the

19  numbers, but I don't think there will be any problem.  But if

20  you could just give us the opportunity to double check the

21  numbers.

22          THE COURT:  All right.  All right.  Those are

23  consistent with what we have being identified during his

24  testimony.  I'm going to go ahead and admit them.

25      If you discover later on that one is something different

 1   from those that were discussed in the testimony, you can raise

 2   it.

 3                MR. BECHER:  Thank you, Your Honor.

 4                THE COURT:  All right.  Plaintiffs ready to call

 5   their first witness?

 6                MR. LOVETT:  Yes, Your Honor.

 7           Call Dr. Steven Wing.

 8                THE COURT:  All right.  Doctor, if you'll step up

 9   here, my clerk will administer the oath and you can take the

10   witness stand.

11                STEVEN WING, PLAINTIFFS' WITNESS, SWORN

12                MR. LOVETT:  May I approach, Your Honor?

13                THE COURT:  You may.

14           Hold on just a moment.

15           (The Court and court reporter conferred privately off the

16   record.)

17                THE COURT:  All right.  Let's go ahead.

18                MR. LOVETT:  Thank you.

19                        DIRECT EXAMINATION

20   BY MR. LOVETT:

21   Q.   Dr. Wing, what is your full name for the record, please?

22   A.   Steven Bennett Wing.

23   Q.   And you have two notebooks there beside you.  Would you

24   pick up the notebook that's marked Plaintiffs' Exhibits and

25   turn to Plaintiffs' 72, which I think should be a copy of your

Wing - Direct

1    CV.

2    A.    72 did you say?

3            MR. LOVETT:  May I approach, Your Honor?

4            THE COURT:  You may.

5            THE WITNESS:  It says Plaintiffs' Copy.

6            MR. LOVETT:  Okay.  Your Honor, for the record, let

7    me note, just so you'll understand too, Dr. Wing is a rebuttal

8    witness for Dr. Garabrant from yesterday.  We're going out of

9    order with these two witnesses.

10           THE COURT:  Right.

11           MR. LOVETT:  And then we'll go back to our normal --

12           THE COURT:  I understand.  Okay.

13   BY MR. LOVETT:

14   Q.    Do you have your CV before you that's Plaintiffs' Exhibit

15   72?

16   A.    Yes.

17   Q.    Did you prepare this?

18   A.    I did.

19   Q.    When did you prepare it?

20   A.    Earlier this year.

21   Q.    Okay.  Is it still an accurate reflection of your

22   experience and qualifications?

23   A.    Yes.

24           MR. LOVETT:  Your Honor, this is the only exhibit I

25   think that we will move for admission.  So let me do it before

Wing - Direct

1    I forget and move admission --

2              THE COURT:  All right.  Any objection?

3              MR. HARVEY:  No objection.

4              THE COURT:  It's admitted.

5    BY MR. LOVETT:

6    Q.    Do you consider yourself an expert in epidemiology?

7    A.    Yes.

8    Q.    Okay.  Have you testified in court before and been

9    qualified as an expert in epidemiology?

10   A.    Yes.

11   Q.    How many times?

12   A.    At trial, I believe twice.

13   Q.    And was one of those in federal court?

14   A.    Yes.

15   Q.    And the other in state court?

16   A.    Yes.

17   Q.    Okay.  How many times have you been hired as an expert

18   witness, as an epidemiologist, in your career?

19   A.    Approximately 10 or 12 times.

20   Q.    Okay.  And have you worked for plaintiffs on all those

21   occasions?

22   A.    No.

23   Q.    Okay.  Now, would you just briefly describe your

24   education, I guess starting with your masters.  Do you have a

25   masters from Duke?

Wing - Direct

1    A.    I have a masters from Duke in sociology with a

2    specialization in demography.

3    Q.    And that was in 1980?

4    A.    Correct.

5    Q.    And then you have a Ph.D. in epidemiology from the

6    University of North Carolina in Chapel Hill?

7    A.    Yes.

8    Q.    You received that in 1983?

9    A.    That's right.

10   Q.    How is it that you went from a masters in sociology to a

11   Ph.D. in epidemiology?

12   A.    My work in sociology was in the area of demography, which

13   has -- is one of the root disciplines of epidemiology.

14   Q.    What is demography?

15   A.    Demography is the study of human populations.

16   Q.    Okay.  Are there other people that enter the Ph.D.

17   program in epidemiology from undergraduate or masters programs

18   that are not epidemiology-specific?

19   A.    Typically that's the case.

20   Q.    Does UNC have a graduate program in epidemiology?

21   A.    Yes.

22   Q.    Does it have an undergraduate program in epidemiology?

23   A.    No.

24   Q.    And is that unusual?

25   A.    No, it's not.

Wing - Direct

1   Q.   Okay.  Now, you're currently an associate professor in

2   the Department of Epidemiology at UNC at Chapel Hill; is that

3   right?

4   A.   Correct.

5   Q.   And are you tenured?

6   A.   Yes.

7   Q.   And how long have you been an associate-tenured

8   professor?

9   A.   Since 1995.

10  Q.   Okay.  Have you published in top-tier epidemiology

11  journals?

12  A.   Yes.

13  Q.   Approximately how many publications do you have?

14  A.   I would say maybe 110 in peer-reviewed journals and

15  perhaps a couple of dozen book chapters.

16  Q.   Okay.  And what is your area of specialization within

17  epidemiology?

18  A.   It's environmental and occupational health.

19  Q.   Okay.  And what classes do you teach?  Let me ask, first

20  of all --

21  A.   Yes.

22  Q.   -- are they graduate-level courses for the most part?

23  A.   I teach graduate-level courses that are for students in

24  public health and medicine and other health science fields.

25  Q.   In the Department of Epidemiology?

Wing - Direct

1    A.   Yes.

2    Q.   Okay.  And what courses do you teach, generally?

3    A.   I, over the last several years, have taught a class in

4    community-driven epidemiology and environmental justice, a

5    class of epidemiology and public health, environmental

6    epidemiology, occupational epidemiology, and history and

7    philosophy of epidemiology.

8    Q.   Okay.  So what are your areas of concentration within

9    epidemiology for purposes of publication?

10   A.   I have several areas that I've worked on in some detail.

11   For the longest time, beginning in the late 1980s, I've worked

12   on the health effects of exposure to ionizing radiation

13   primarily among workers in the United States nuclear weapons

14   complex.

15       I've also worked on other radiation studies involving

16   environmental exposures.

17   Q.   Have you published in that area?

18   A.   Yes, I have.

19   Q.   About how many articles have you published in that area?

20   A.   Maybe several dozen articles.

21   Q.   And, again, in top-tier journals?

22   A.   Some of them are in top-tier journals.  Others are in

23   more specialty medical journals.

24   Q.   Okay.  And when you do your research and teaching, do you

25   use the tools that Dr. Garabrant testified about yesterday,

Wing - Direct

1    like confounding, causation, and effect modification?

2    A.    Those are concepts that I work with routinely in the

3    classes I teach, as well as in conducting the empirical

4    research that is funded by grants or contracts.

5    Q.    As I understand your resume, you have sort of two areas

6    of specialization.  One is empirical research that you've just

7    described, right?

8    A.    Yes.

9    Q.    You also testified that you teach history and philosophy

10   of epidemiology, right?

11   A.    That's one of the areas, yes.

12   Q.    Do you supervise graduate student research?

13   A.    I do.

14   Q.    And how many graduate students do you have in

15   epidemiology that you're supervising now?

16   A.    Currently I have about ten Ph.D. advisees.

17   Q.    Okay.  Have you taught classes on epidemiological

18   methods?

19   A.    Yes, I have.

20   Q.    Okay.  Have you been a reviewer in peer-reviewed

21   journals?

22   A.    Yes.

23   Q.    Which ones?

24   A.    *American Journal* -- I'll give you some examples.

25   *American Journal of Epidemiology, American Journal of*

Wing - Direct

1   *Industrial Medicine*, *American Journal of Public Health*,

2   *Environmental Health*, *Environmental Health Perspectives*,

3   *Epidemiology*, *Journal of Epidemiology and Community Health*,

4   *Science of the Total Environment*, *New England Journal of*

5   *Medicine*.

6   Q.   You've been reviewers for all of those journals?

7   A.   I've been -- that's about a quarter of the journals that

8   I've reviewed for.

9   Q.   And, again, those are among the most reputable journals

10  in your field?

11  A.   They are all reputable journals.

12  Q.   Okay.  Do you keep up with current research and ideas in

13  the field of epidemiology?

14  A.   I do.

15  Q.   Is that part of your teaching and research

16  responsibilities?

17  A.   It certainly is.  If I didn't keep up, I would be in

18  trouble with the graduate students in my department.

19  Q.   Okay.  Now, you have a couple of awards listed.  I won't

20  belabor the point, but did you receive in 2011 the Homer

21  Calvert Award and Lecture at the -- from the APHA?

22  A.   I did.

23  Q.   What is the APHA?

24  A.   It's the American Public Health Association, which is the

25  largest public health association in the United States.

Wing - Direct

1    Q.    And what was that award and lecture for?

2    A.    It was for contributions to environmental health, and it

3    was -- it's given by the Environment Section of the American

4    Public Health Association.

5    Q.    Did you also receive the Research Integrity Award in

6    2009?

7    A.    I did.

8    Q.    And who awarded that?

9    A.    That was awarded by the International Society for

10    Environmental Epidemiology.

11    Q.    Okay.  And lastly, do you have -- and I see several

12    awards from UNC, but is one of them the Bernard Greenberg

13    Award --

14    A.    Yes, it is.

15    Q.    -- in 2004 for teaching, research, and service?

16    A.    Yes, that's correct.

17          MR. LOVETT:  Your Honor, I'd move to qualify

18    Dr. Wing as an epidemiologist.

19          THE COURT:  All right.  I'm satisfied.  He can be

20    cross-examined as to his qualifications.

21    BY MR. LOVETT:

22    Q.    To prepare for your testimony today, did you read the EPA

23    benchmark on which Dr. Garabrant's testimony was based?

24    A.    Yes.

25    Q.    Did you also look at the review of the Scientific

Wing - Direct

1   Advisory Board of the benchmark?

2   A.   I don't recall the Scientific Advisory Board document.

3   Q.   All right.  Do you intend to offer opinions on stream

4   ecology here today?

5   A.   No, I don't.

6   Q.   Can an epidemiologist who is not an expert in stream

7   ecology in your opinion perform the kind of analyses and reach

8   the kinds of conclusions that EPA reached in the benchmark?

9   A.   No.  I think it's important to have substantive knowledge

10   in the area in which one conducts analyses and draws opinions.

11   Q.   Okay.  We'll get into that as we move forward.

12   Could an epidemiologist without expertise in the field of

13   stream ecology conduct an analysis of causation in relation to

14   the kinds of things that EPA did in its benchmark?

15   A.   Not without knowledge from the field --

16   Q.   Why not?

17   A.   -- of study.  Because science involves more than data

18   analysis.  There's an important distinction between a data

19   analyst and a scientist because variables and data don't speak

20   for themselves.  They require interpretation and understanding

21   of mechanisms, theories in the field, and so on.

22   Q.   Well, I think -- didn't Dr. Garabrant yesterday say just

23   that, the data speak for themselves?

24   A.   He -- I may not have used those words precisely, but my

25   interpretation of his testimony was that he was able to draw

Wing - Direct

1   conclusions based on analysis of a dataset.

2   Q.    And you believe that you have -- that data doesn't speak

3   for -- data don't speak for themselves, but one has to be

4   informed about some particular subject to be able to interpret

5   those data, right?

6   A.    That's my opinion.

7   Q.    Okay.  Do you understand -- let me ask you, first of all,

8   what is epidemiology?

9   A.    Epidemiology at its root epidemiologically is the study

10  of epidemics.  And it includes not only infectious disease,

11  although that's its roots, but it now more generally is the

12  study of disease both epidemic and endemic in human

13  populations.

14  Q.    Okay.  Do you understand the benchmark to be a purely

15  epidemiological analysis?

16  A.    No.

17  Q.    Okay.  And is it appropriate for the benchmark or any

18  kind of scientific causal reasoning to not be specifically an

19  epidemiological analysis?

20  A.    Yes.

21  Q.    It's common in scientific research, is it not, not to

22  engage in epidemiological system, right?

23  A.    Most scientific research is -- if we were to take the

24  body of scientific research and knowledge and classify it into

25  two groups, epidemiology and not epidemiology, the not

Wing - Direct

1   epidemiology group would constitute the vast majority of the

2   research and knowledge.

3   Q.    So epidemiology is not some super science that is the

4   king of all sciences that can be used to criticize and

5   critique other sciences, correct?

6   A.    That's correct.

7   Q.    You heard Dr. Garabrant's testimony yesterday, didn't

8   you?

9   A.    I did.

10  Q.    Can you summarize your understanding of how he approached

11  causal reasoning?

12  A.    He approached it as a data analyst, meaning that he

13  approached the topic at hand, the benchmark, as a problem

14  of -- that could be addressed simply by conducting statistical

15  analyses of a single dataset.

16  Q.    So it's something that anyone could do who's familiar

17  with statistical and epidemiological tools without any

18  substantive knowledge in the area.

19  A.    Well, yes, anyone can analyze data.  Whether those

20  analyses result in something that is meaningful and reliable

21  and actually useful in environmental protection or in science

22  or in legal matters, for that matter, is another question.

23  Q.    Do you agree or disagree with the approach that

24  Dr. Garabrant took here yesterday?

25  A.    Overall --

Wing - Direct

1   Q.   In terms of causation.

2   A.   In terms of causation, I found it to be very much

3   lacking.

4   Q.   Okay.  Is there a rule or rules in epidemiology that can

5   be used in all cases to determine causation?

6   A.   Epidemiology shares with other branches of science the

7   characteristic that it's not a cookbook.  It's not a matter of

8   following a recipe which guarantees that you get reliable or

9   valid results if followed.

10  Q.   Would you turn to the plaintiffs' notebook, which is --

11  should be in front of you.

12  A.   Yes.

13  Q.   Tab 167.

14  A.   Yes, I have it.

15  Q.   Do you have a paper entitled "Scientific Evidence and

16  Public Policy" there?

17  A.   Yes.

18  Q.   And have you seen this before?

19  A.   I have.

20  Q.   And who wrote it?

21  A.   It was written by an epidemiologist by the name of David

22  Michaels.

23  Q.   Does Dr. Michaels have a good reputation in the field of

24  epidemiology?

25  A.   He does.  He's a professor at George Washington

Wing - Direct

1  University and he's currently the Director of the United

2  States Occupational Safety and Health Administration.

3  Q.   Okay.  And this is published in the *American Journal of*

4  *Public Health*?  Is that a flagship journal in the field of

5  public health?

6  A.   It's the flagship journal specifically of the American

7  Public Health Association and perhaps the best known general

8  journal in public health.

9  Q.   I'm going to ask you to read into the record two

10  quotations and comment on them.

11      The first bottom one is at the first page, and it

12  begins -- the paragraph begins, "Close analysis."  Do you see

13  that?

14  A.   Yes.

15  Q.   Beginning just most of the way through that first column

16  where it says, "no absolute criteria," could you read from

17  that point to the end of the sentence?

18  A.   Yes.  Dr. Michaels writes, "no absolute criteria exists

19  for assessing the validity of scientific evidence.  Scientific

20  reasoning is no more susceptible to a mechanical approach than

21  legal reasoning."

22  Q.   Okay.  And then let's turn to the next page, page 56, or

23  2146 Bates number, and the paragraph beginning, "Manufacturing

24  Uncertainty."

25      Do you see that?

Wing - Direct

1   A.   The heading?

2   Q.   The heading.

3   A.   Yes.

4   Q.   Could you read the first sentence into the record from

5   that, please?

6   A.   "Magnifying or manufacturing scientific uncertainty is

7   another tactic used to delay or prevent public health and

8   environmental protection."

9   Q.   I'm sorry.  Continue through --

10   A.   "The approach was used with great success by the tobacco

11   industry and other manufacturers of dangerous products; now,

12   it is rare for proposed regulations not to be challenged with

13   claims that the scientific evidence is flawed or otherwise

14   imperfect."

15   Q.   Now, do you agree with Dr. Michaels' statement that

16   there's no absolute criteria that exists for validating

17   scientific evidence?

18   A.   I do.

19   Q.   And I mean, I don't know why Dr. Michaels wrote this, but

20   is a problem in your field generally that people use

21   epidemiological principles to, as he says, manufacture

22   uncertainty?

23   A.   It is a general problem, and it's one that arises out of

24   actually teaching in epidemiology such as in a program like

25   the one I'm part of.  Students are required to understand the

Wing - Direct

1   characteristics of study design and the limitations of designs

2   and the flaws that occur in analysis of data.  And one of the

3   problems is that that can become nitpicking or flaw-catching

4   and confused.  And the existence of incomplete data or

5   knowledge or minor disagreements about methods can become an

6   excuse for thinking we don't know anything.  And that's been

7   exploited for the purpose of preventing environmental and

8   health protections.

9   Q.   Okay.  Let's move -- what is it -- you heard

10  Dr. Garabrant talk -- testify about effect modification

11  yesterday, right?

12  A.   Yes.

13  Q.   What is effect modification?

14  A.   Effect modification is a term that comes from the field

15  of epidemiology.  Other fields deal with the same concept, but

16  they use different terminology.

17  Q.   What terminology might other fields use?

18  A.   Other fields often use the term "interaction," meaning

19  that -- and the definition is very similar, meaning that the

20  effect of some exposure differs according to some other

21  factor.

22  Q.   Okay.  And you heard Dr. Garabrant testify yesterday

23  about effect modification, did you not?

24  A.   I did.

25  Q.   And did you agree with his testimony about the definition

Wing - Direct

1    and use of "effect modification"?

2    A.    I think his definition was mostly accurate.

3    Q.    Uh-huh.

4    A.    I believe his evaluation was not appropriate at all.

5    Q.    Why not?

6    A.    Because in order to make a decision about interaction or

7    effect modification, it's first necessary to have some idea

8    about the topic one is investigating because without that, one

9    can make egregious mistakes about an analysis which can be

10   done by someone who doesn't know anything about the topic but

11   could result in essentially meaningless conclusions or

12   actually conclusions that are misleading.

13   Q.    Dr. Garabrant testified that EPA didn't assess effect

14   modification by any factor or any association that it studied.

15        Do you agree with that?  I think he said that was a flaw

16   in the benchmark.

17   A.    I believe that the issue of effect modification or

18   interaction is one that should be made based on substantive

19   knowledge in the area, and it's not one that's simply a

20   statistical requirement or rule.

21   Q.    Even within the field of epidemiology, there's

22   specialties, right?

23   A.    Of course.

24   Q.    It's like medicine in that respect.

25   A.    In fact, the specialization of areas within epidemiology

Wing - Direct

1   largely follows the specializations in medicine.

2   Q.   And you would tread with great care into another area of

3   specialization even within epidemiology; is that true?

4   A.   That is true.

5   Q.   And if you were to do that, the specialists in that field

6   would be skeptical of your qualifications.

7        Is that your understanding?

8   A.   Well, I work in several areas of epidemiology by myself.

9   Q.   Right.  But if you went outside of those areas into

10   another area of epidemiology --

11   A.   Right.  And over my career, I have worked in different

12   areas over time.

13        When I move into a new area, I do so gradually and with

14   care and always in close collaboration with people who have a

15   lot of experience in that area.

16   Q.   Do you believe it's even more problematic to take

17   epidemiological tools and move them outside of the field of

18   epidemiology into a completely different discipline?

19   A.   I think the further one goes from one's substantive

20   knowledge, the more difficulty one would have even if the

21   methods used, for example, in statistics were the same.

22        I could give you an example --

23   Q.   Okay.

24   A.   -- or an analogy, perhaps, that would be commonly

25   understood.  Suppose I was about to take a flight on an

Wing - Direct

1   airplane.  I would like to know that the mechanic or the

2   mechanics that checked the airplane were airplane mechanics.

3        Now, if I were going in my car, I would like an

4   automobile mechanic.  Now, their training may overlap a lot

5   and may use some of the same tools and concepts, but they have

6   different specializations.  And it would be very important for

7   the safety of the passengers to have a mechanic with knowledge

8   about the type of machinery, the specific machinery, not just

9   a general assignment of an airplane mechanic to an automobile

10  or vice versa.

11  Q.   In your field of epidemiology, how does an epidemiologist

12  determine whether or not there is effect modification?

13  A.   Well, the first step is to have some idea of a causal

14  model --

15  Q.   Okay.

16  A.   -- typically.  And actually I could back up and say there

17  are two kinds of approach to data analysis in which there

18  might be interaction or effect modification.  And one

19  approach, we simply refer to this as having a predictive

20  model.  In that approach, there's no implication about

21  causality.  There's no interest in the mechanisms or

22  understanding why.  It's only about having a statistical

23  prediction.  That's called a predictive model.

24  Q.   Okay.

25  A.   And the more common approach, which is more useful for

Wing - Direct

1  public policy or for medical treatments and so on, is there's

2  interest in causality, what's really important and why.

3      In order to do that, variables in a dataset aren't all

4  the same.  They're just not chosen out of a hat as though they

5  have equal status.  One has to have some theory and mechanisms

6  that one understands about the process under investigation in

7  order to decide the status of these factors.  And it's typical

8  that some kind of diagram would be drawn -- and they're often

9  called a causal diagram -- that would summarize the

10  relationships between the variables.

11      For example, an outcome might have -- an outcome might be

12  Y, and we might have potential -- several potential variables

13  related to the outcome Y; say, X1, X2, and X3.  It could be

14  that X1 causes X2 which then causes Y.  Or it could be that X1

15  causes Y, and X2 is a separate cause of Y that doesn't have to

16  do with X1.  Or it could be that X3 is a factor which X1 has

17  an important effect at one level of X3 but not an important

18  effect at another level.

19      And those are the decisions -- such decisions recognizing

20  those relationships is not a statistical decision.  It's based

21  on understanding the processes and mechanisms of disease or,

22  in the case of the court today, about stream ecology.

23  Q.   Okay.  Can you give an example, though, of how an

24  epidemiologist would determine whether an effect modification

25  is present?

Wing - Direct

1   A.    Yes.   Let me use an example from the field of cardio-

2   vascular epidemiology.   An epidemiologist in cardiovascular

3   disease might be interested in whether obesity is a cause of

4   heart disease.

5       Now, the cardiovascular epidemiologist might be using

6   information from a study that collected information on a lot

7   of factors, such as cigarette-smoking, blood pressure, blood

8   cholesterol, diabetes, and other factors.

9       Now, it could be that the cardiovascular epidemiologist

10  would, because of understanding how these factors relate to

11  each other, would see that obesity would potentially cause a

12  heart attack because it affects blood pressure, blood

13  cholesterol, diabetes, and other factors.   Those would, in

14  that case, be intervening factors.

15      The cardiovascular epidemiologist wouldn't control for

16  those factors because they're the mechanisms through which

17  obesity leads to heart disease.

18      So that's the kind of substantive knowledge that is

19  critically important in constructing a statistical analysis

20  that makes sense.

21  Q.    Now let's move to confounding.   You heard Dr. Garabrant

22  testify yesterday about confounding, didn't you?

23  A.    I did.

24  Q.    Do you agree or disagree with his analysis of what

25  confounding is?

Wing - Direct

1    A.    I think -- I think I have -- his description of what

2    confounding is was not inaccurate, but it was incomplete.

3    Q.    Is there, in fact, a settled definition of "confounding"

4    in the field of epidemiology?

5    A.    Actually, confounding, like many concepts in science, is

6    a basic concept, but it's not a settled concept, meaning that

7    there are disagreements between epidemiologists, even in

8    textbooks, about exactly how to define "confounding."

9    Q.    Dr. Garabrant's testimony from yesterday is based on the

10   premise that there's a settled definition of "confounding,"

11   isn't it?

12   A.    Yes, it is.  He used a very specific criterion, and he

13   believes that confounding exists if the difference between a

14   crude estimate and an adjusted estimate is greater than

15   10 percent.

16   Q.    Okay.  How did he come up with that?  Do you know?

17   A.    Well, first, I think it would be helpful for us to

18   revisit what is confounding.

19   Q.    Okay.  Let's do that.

20          Would you turn to Plaintiffs' Exhibit 170 in the book?

21   A.    Yes, I have it here.

22   Q.    And is that an article entitled "Toward a Clarification

23   of the Taxonomy of 'Bias' in Epidemiological Textbooks"?

24   A.    Yes, it is.

25   Q.    And is the author of that Sharon Schwartz et al.?

Wing - Direct

1    A.    It's Schwartz et al.  And I would note that it was

2    published in March of 2015.  It's very current.

3    Q.    Uh-huh.

4    A.    And that it was published in a highly respected journal

5    in the field.

6    Q.    What's the journal?

7    A.    It's called *Epidemiology*.

8    Q.    Okay.  Would you turn to the second page of that exhibit,

9    which is PE 2189.

10   A.    Yes.

11   Q.    Do you see the paragraph beginning, "We identified"?

12   A.    Yes.

13   Q.    Would you read that paragraph into the record, please?

14   A.    "We identified and reviewed 28 textbooks that met the

15   inclusion criteria (Table 1).  Our review verified the norm of

16   categorizing bias into confounding, selection bias, and

17   information bias.  All textbooks that included an organizing

18   scheme (24 of 28) used these categories.  However, only one

19   textbook articulated the 2 elements of a consistent taxonomy -

20   a feature that unites confounding, selection bias, and

21   information bias and a feature that differentiates them.

22   There was variation across textbooks as to how close they came

23   to a clear description of the structure of their schema."

24   Q.    So what does that mean?

25   A.    That means that -- so the authors used the concept of

Wing - Direct

1  taxonomy which is general to scientific disciplines and to

2  other disciplines, I would imagine the law and history as

3  well, essentially creating a systematics in which there's a

4  root category defined by characteristics that are properties

5  of all its subcategories, and there are subcategories, each of

6  which is clearly distinguishable and separate from or

7  different from the other subcategories.

8      The authors of this article who reviewed this taxonomy in

9  the 28 epidemiology textbooks found that that -- those

10 definitions differed and were unclear.  They didn't all meet,

11 most of them -- only one of them met this criteria -- both of

12 these criteria that the -- that biases defined in confounding

13 were all derived from a common set of properties, the root of

14 the taxonomy, and that they were clearly distinguished from

15 each other.

16 Q.  So, again, that's just -- that's another way of saying

17 that there's not a settled definition of "confounding" within

18 the field.

19 A.  For me, it makes clear that not only does -- is there

20 not -- there is not a set of rules for saying whether or not

21 there's confounding, quantitative statistical rules.  There is

22 not a set of rules.  And, furthermore, that different

23 textbooks and different epidemiologists have somewhat

24 different definitions of "confounding."

25     So even if there were rules, they would have different

Wing - Direct

1    rules.

2    Q.    And, again, that pushes you further into your earlier

3    testimony that in order to make an informed -- to do an

4    informed analysis of a piece of science, you have to

5    understand the science you're critiquing, right?

6    A.    You have to understand the substance of the topic.

7    There's no generic analytic method which produces reliable

8    science.

9    Q.    There's not a set of rules that you get up in the morning

10   and you follow one, two, three and four, and it generates its

11   own answer after following the rules, right?

12   A.    That's correct.

13   Q.    Is confounding a concept that was developed in the

14   context of controlled experimentation?

15   A.    Yes.  That's a very key idea.  So nature is complex; and

16   to understand it, we have many different approaches.  One of

17   those approaches, one tool for understanding nature is the

18   experiment.  And by an experiment, I mean a method of making

19   observations in which one factor is varied and everything else

20   is held constant and we observe the result.

21        Classically, in my field, this takes place in clinical

22   trials where patients are randomized to either receive or not

23   receive a pharmacologic agent and they are chosen to be

24   similar so that there's not a lot of variation from other

25   factors.  There's selection criteria or admission criteria,

Wing - Direct

1    and they're treated in other ways the same.  And the idea here

2    is that we can isolate the effect of this exposure from all

3    the other complexities of nature.

4         Now, what's key here is that nature doesn't work like an

5    experiment.

6    Q.    Right.

7    A.    So the experiment is a model.  It's a very useful model

8    for investigation, but it's only a model.  From that model,

9    which we use all the time -- and even if we're not conducting

10   an experiment, we typically, in an analysis of non-

11   experimental studies, sometimes called observational studies,

12   we use the same analytic methods.  We're trying to imitate the

13   experiment.

14        And this is where the idea of confounding comes from.

15   Confounding would occur if the experimental group that

16   receives the treatment is in some other way different from the

17   control group that doesn't receive the intervention.  And if

18   that difference, if the difference between, in this other

19   factor, could explain the outcome, it means that the outcome

20   is not necessarily due to our intervention, and we would need

21   to develop methods to identify that situation, which

22   epidemiologists call confounding.

23   Q.    And the controlled experiment model that you just

24   described where you hold one factor constant in an area of

25   investigation like the benchmark is investigating isn't

Wing - Direct

1    practical, is it?

2    A.   It is clearly impractical.  And one of the criticisms

3    that exists within epidemiology and I think is sometimes

4    misapplied to -- within the field, as well as to other fields,

5    is the idea that the only approach to science that is reliable

6    and valid is to conduct an experiment.

7         And what's -- what we have to recognize is that some of

8    the greatest scientific accomplishments of all times have been

9    totally without any kind of experiment.

10   Q.   Like what?

11   A.   So, for example, we used to believe that the continents

12   on the earth didn't move.  Now we have, through geology, since

13   the 1950s or '60s, an understanding of plate tectonics, that

14   continents move around and that this is a critical part of the

15   history of our planet.  There were no experiments done.

16        Similarly, with my understanding of evolution and

17   biology, that wasn't based on experiments.  Our understanding

18   of most aspects of astronomy and astrophysics, those are not

19   experimental disciplines.

20        Even within my field, the conclusion that cigarette-

21   smoking is a cause of many diseases is not based on

22   experiments.

23        So what's clear is that this -- although it's an

24   important tool, it's not a *sine qua non* of scientific

25   investigation.

Wing - Direct

1    Q.   And has that model of experimentation been sometimes

2    inappropriately applied to critique and cast doubt on science

3    that's not based on that kind of experimentation?

4    A.   Absolutely.  And that's become more common in recent

5    decades in this country.

6    Q.   What are some controversies that are now settled

7    questions scientifically that were subjected to great scrutiny

8    by the scientific, you know, the scientific method kind of

9    approach or the experimental method kind of approach?

10   A.   I'll use -- I'll start with an example from my field --

11   Q.   Okay.

12   A.   -- which is the health effects of cigarette-smoking --

13   Q.   Okay.

14   A.   -- which have, for the most part, been identified in

15   their general form by the early 1960s, which is when the U. S.

16   Surgeon General produced this major report identifying

17   cigarette-smoking as a cause of lung cancer and other cancers

18   and cardiovascular diseases.

19        For decades, epidemiologists dealt with this idea of,

20   well, there could be some factor that differs between smokers

21   and non-smokers that causes these other diseases and we just

22   haven't found it, and no experiment was done.  And, of course,

23   later we learned that --

24   Q.   You can't really experiment because you can't experiment

25   on humans.

Wing - Direct

1   A.   Well, you can't experiment on humans with agents that are

2   believed to be toxic.  So we routinely experiment on humans

3   with, for example, drugs or other therapies that might

4   actually help them and we don't know.

5        But things that we know to be harmful or we strongly

6   suspect to be harmful, we have ethical principles that

7   prohibit us from experimenting on people.

8   Q.   So in the tobacco debates of 10, 20 years ago, many

9   epidemiologists were hired by the tobacco industry to make

10  just the kinds of arguments with confounding and lack of

11  experimentation that we heard Dr. Garabrant give yesterday.

12       Is that fair?

13  A.   The tobacco industry is perhaps the best example of a

14  highly developed approach to manufacturing doubt.

15  Q.   Would you say the same is true of climate change today?

16  A.   It's another famous example, yes.

17  Q.   Now, yesterday Dr. Garabrant testified about EPA's hiding

18  the data.  Do you recall that?

19  A.   I do.

20  Q.   Is there an example you can think of that shows that

21  EPA's -- and I think the word used is "truncation" of data in

22  the benchmark is actually a standard method within the field

23  of epidemiology and other scientific fields?

24  A.   I can give you an example from my own work.  One of the

25  topics that I've been investigating for some time, over maybe

Wing - Direct

1    about the last 10 or 15 years, has to do with the health

2    effects of air pollution from industrial animal production

3    facilities that release toxic gases and particles.

4        When we have conducted studies of the human health

5    impacts of exposure to these plumes of air pollution, we have,

6    for example, excluded smokers.  And there's a reason for doing

7    that, for removing, either by design or analysis, data from

8    smokers, because smoking is a known cause of respiratory

9    disease.  It affects human olfaction and other systems related

10   that are very important in terms of determining the health

11   effects of exposure to these air pollution plumes.

12       So if I removed data from smokers just to look at

13   non-smokers, I wouldn't describe that as hiding the data.

14   Q.   And, in fact, somebody looking at it from the outside

15   who's not part of your discipline may not understand why you

16   excluded the smokers, right?

17   A.   They might not, unless I explained it to them.

18   Q.   So something that could be fairly common knowledge within

19   a discipline, within one discipline, may be okay to someone

20   looking from the outside who may not understand why things

21   were done unless he or she is part of that discipline, right?

22   A.   Right.  And this comes about commonly because in graduate

23   school, we teach how to communicate with other specialists,

24   but we don't either teach or encourage students to learn about

25   and practice more general communication.

Wing - Direct

1    Q.    So the benchmark, for example, is a specialist's

2    document, isn't it?  It's not intended for a general audience.

3         Is that fair?

4    A.    That's very fair.

5    Q.    Has the need to make judgments about complex mixtures

6    factors been recognized in epidemiology?

7    A.    It's a recognized problem, yes.

8    Q.    Okay.  And let's just use your smoking example.  How does

9    that play out in the field of smoking --

10   A.    Right.

11   Q.    -- research?

12   A.    Well, cigarette smoke is not a single chemical or a

13   physical agent.  It's a complex mixture that contains many

14   toxic gases.  It contains radioactive particles.  It contains

15   physical particles of different sizes that penetrate the

16   respiratory tract at different depths from the nose and throat

17   down to the very small airways, depending on the sizes of the

18   particles.  So it's a very complex mixture.

19        In the case of studies of smoking, we typically assess

20   human exposure by asking people how much they smoke.  So it's

21   fairly convenient.  But if we needed -- if we made an analogy

22   to, say, air pollution released by a factory, which could also

23   be similarly complex, we might pick a particular component of

24   that mixture to measure.

25        In my own work on animal factories, we have used hydrogen

Wing - Direct

1    sulfide, a toxic gas, as a marker of a complex mixture because

2    it -- we have instruments that can measure that at the ambient

3    concentrations to which people are exposed.

4        Now, the mixture that produces the responses that we have

5    identified in our studies and that other people have

6    identified, it is not hydrogen sulfide as a pure gas.  That's

7    just a part of a mixture.  And a benchmark or a tool for

8    regulating exposure to the mixture might be a particular

9    component, something that's easy to measure.

10       And from my reading of this topic, which is new to me and

11   I read because of your asking me to review Dr. Garabrant's

12   document, we have a similar situation with conductivity.

13       Conductivity is something that's measurable.  It can be

14   evaluated quickly in the field.  It represents something about

15   the ionic concentration in water and surface waters.  It's not

16   by itself the only thing that's going on, but it's useful as a

17   marker.

18   Q.   Now, a few minutes ago, you said, I think, that

19   Dr. Garabrant's view is that the only way to adjust

20   confounding is to compare a crude estimate and an adjusted

21   estimate, but you wanted to wait until we talked a little bit

22   more about confounding to criticize or to critique that.

23   A.   Yes.

24   Q.   What did Dr. Garabrant mean by that, and do you agree or

25   disagree with it?

Wing - Direct

1   A.   So in his report and in his testimony, Dr. Garabrant

2   argued that the way to evaluate confounding is to first

3   estimate the relationship between an exposure or a variable

4   and the outcome in a crude form, meaning ignoring all other

5   factors that may be important --

6   Q.   Right.

7   A.   -- and then to reevaluate that relationship, adjusting

8   for some other factor.  And if there's more than a 10-percent

9   difference in the estimate, Dr. Garabrant argues then

10  there's -- confounding is present and that EPA's benchmark is

11  invalid because they didn't use that method.  Now --

12  Q.   What do you think of that?

13  A.   Now, the fact is that there are other approaches to

14  evaluating confounding, this idea.

15  Q.   Right.

16  A.   And I'll give you an example.  Suppose we were interested

17  in whether the death rate depends on what state you live in.

18  So is the death rate higher in State 1 compared to State 2?

19       We might compute -- begin by computing the crude death

20  rate, which would simply be the number of deaths divided by

21  the number of people who live in the state in a particular

22  year.  And we might see that State 1 has a higher death rate

23  than State 2.

24       However, we might think, well, suppose people in State 1

25  are not the same age as people in State 2; there's a different

Wing - Direct

1    age distribution.  And so, for example, if State 1 were

2    Florida and State 2 were Alaska, we would see Florida has a

3    higher death rate, but it has an older population.

4        So the first -- a first step we might take to evaluate

5    whether age is a confounder of the relationship between state

6    of residence and the death rate, we might begin by looking at

7    age-specific death rates.  This is done all the time.

8        So we would look at the death rate for children and for

9    young adults and middle-aged and older adults separately.  And

10   actually if we did that, we would see that the death rate in

11   Alaska is higher within each age group.

12       Now, that right there would tell us there's confounding

13   because the direction of the difference in the death rates has

14   reversed depending on whether we're just looking at everyone

15   all together or whether we subdivide the population by age.

16       We could also use the method that Dr. Garabrant argued

17   for, which would be adjusting for age, or we could restrict,

18   which is what EPA did in their benchmark.  They looked at just

19   within a level.  They said for a factor, well, let's examine

20   waters that have the same pH, for example.

21   Q.   Okay.  So different methods to the same question?

22   A.   Yes.  And so what I disagree with is not that

23   Dr. Garabrant's method is inappropriate, but it's not the only

24   method.  There are several ways that epidemiologists approach

25   this, and they are very well-known and have been described in

Wing - Direct

1    textbooks for many decades.

2    Q.   Well, what about the 10 percent that you mentioned that

3    Dr. Garabrant used as a threshold?  Where did he come up with

4    that, and do you see that as a valid number?

5    A.   It's an arbitrary number.  It's one that I've heard other

6    people use, but it's not used all the time.  And I think

7    Dr. Garabrant actually said that yesterday and suggested some

8    other values.

9        And the fact is that there are other considerations; for

10   example, sample size.  If one is dealing with small studies,

11   then there tends to be a lot of variability because the

12   presence or absence of one data point might make a big

13   difference if there's a small sample size, whereas if there's

14   a large sample size, removing or introducing one or two data

15   points makes very little difference because one has a lot of

16   data.

17   Q.   Okay.  Dr. Garabrant testified yesterday -- and I think

18   this is a quote.  It's close if it's not.  "You can't say what

19   the -- you can't say that the data -- you can't say what the

20   data might say when you don't have the data."

21       Do you recall him testifying to something at least close

22   to that?

23   A.   I do.  I do.

24   Q.   And have epidemiologists -- we'll go back to the

25   cigarette example.  Have epidemiologists now concluded that

Wing - Direct

1  cigarette-smoking causes heart disease?

2  A.   Yes.  So with respect to Dr. Garabrant's testimony, he's

3  saying that he was able to make firm conclusions because he

4  had the EPA data --

5  Q.   Right.

6  A.   -- and other scientists didn't have the data and didn't

7  conduct the analyses that he conducted.

8  Q.   Well, he's missing data too, right?  Dr. Garabrant

9  testifies that there was hidden data.

10      Well, strike the question.  Withdraw the question.

11  A.   Okay.  So just to continue --

12  Q.   He's looked at data that -- data that others haven't

13  looked at.

14  A.   Yes, and he's also -- but he's only looked at data that

15  others have looked at.

16  Q.   Right.

17  A.   Specifically, the EPA investigators who developed the

18  benchmark.

19  Q.   His testimony is that they looked at it and then hid it,

20  right?

21  A.   Well, that was part of his testimony.  But he was arguing

22  that unless you have complete information, you can't come to a

23  conclusion.

24  Q.   Right.

25  A.   And what I would say is that we never ever have complete

Wing - Direct

1   information, yet we must come to conclusions, and we are

2   responsible to come to conclusions in order to ever do

3   anything.  And the cigarette-smoking example is a great one.

4        We never have been able to show, for example, that people

5   who smoke versus people who don't smoke have -- that they

6   might have different diets, they might have different

7   genetics, yet we have concluded based on an overwhelming body

8   of evidence, even though we don't have the data that

9   cigarette-smoking causes a wide range of diseases.

10       So this gets back to the manufacturing doubt issue.  We

11   can always identify something that we wish we had measured

12   that we couldn't measure.  But it shouldn't paralyze us.

13   Q.   And are there still epidemiologists that are doubtful

14   about whether cigarette-smoking causes heart disease?

15   A.   Well, I haven't done a survey of epidemiologists, but I

16   would say if there are, they are very uncommon.

17   Q.   Okay.  Now, you weren't asked to analyze the validity of

18   the benchmark, were you?

19   A.   No, I wasn't.

20   Q.   And you're not qualified to do that as an epidemiologist,

21   are you?

22   A.   I am certainly not qualified.

23   Q.   What opinions do you think Dr. Garabrant offered

24   yesterday that are beyond the expertise of an epidemiologist

25   without a thorough knowledge of stream ecology?

Wing - Direct

1    A.    In my assessment, his statistical analysis and his

2    opinions about the benchmark are uninformed for the most part

3    by a nuanced and thorough understanding of the topic of stream

4    ecology, which would be necessary for a proper evaluation of

5    that topic.

6    Q.    Okay.  And you mentioned that epidemiology isn't just

7    data analysis.  I think probably would you agree that ecology

8    is not just data analysis either?

9    A.    I would agree with that.

10   Q.    So what is the difference between epidemiology and data

11   analysis?

12   A.    Epidemiology requires substantive knowledge about a

13   topic; and as we discussed earlier, the field of epidemiology

14   is very broad.  And my preparation is suitable for my work in

15   environmental and occupational health, but I'm not a pharmaco-

16   epidemiologist.  I'm not a genetic epidemiologist.  I know

17   something about those areas, but I don't proffer myself as an

18   expert in those topics.

19   Q.    Let's turn to the defendant's exhibit book and look at

20   the figures that Dr. Garabrant -- may I approach, Your Honor?

21            THE COURT:  You may.

22   BY MR. LOVETT:

23   Q.    -- the figures that Dr. Garabrant testified about

24   yesterday.  I think he prepared these figures.

25            If you would turn to Exhibit 33, which is figure 6.  I

Wing - Direct

1   hope I'm right in the exhibit numbers.  There was some

2   confusion, but I think we've got them straight now.

3       So look to make sure that Defendant's Exhibit 33 is

4   figure 6.

5   A.   Yes, that's correct.

6   Q.   Did you hear Dr. Garabrant testify about this figure

7   yesterday?

8   A.   I did.

9   Q.   Is it your understanding that he prepared it as part of

10   his expert report?

11   A.   This is definitely part of his second report that I saw.

12   Q.   Okay.

13           THE COURT:  Excuse me.  Can you -- I've got

14   Dr. Garabrant's report.  I don't have all these --

15           MR. LOVETT:  Figure 6.

16           THE COURT:  Which of the charts is that, to make

17   sure I get the right one?

18           MR. LOVETT:  The percent of sites --

19           THE WITNESS:  It looks like this.  (Indicating)

20           MR. LOVETT:  "Percent of sites with Ephemeroptera by

21   conductivity and dissolved oxygen."

22           THE COURT:  All right.  Thank you.

23           MR. LOVETT:  And then I think we'll go through 6, 7,

24   8, 9, and we'll be finished.

25   BY MR. LOVETT:

Wing - Direct

1   Q.    So what does this figure depict?

2   A.    So what we see here on the vertical axis is the percent

3   of sites with Ephemeroptera present; and on the horizontal

4   axis, we have conductivity.   And --

5   Q.    Did Dr. Garabrant -- I'm sorry.   Go ahead.

6   A.    And the graph gives us information about the relationship

7   between conductivity and the presence of Ephemeroptera

8   according to the levels of dissolved oxygen.

9          And so there are three lines in this figure, and the

10   figure is depicting the relationships for the three levels of

11   dissolved oxygen, and it's the relationship between

12   conductivity and Ephemeroptera.

13   Q.    Is there information that's missing here just in labeling

14   that should be on any epidemiological graph of this sort?

15   A.    Well, first, let's -- let me comment that Dr. Garabrant

16   created this figure and used it in his critique of the EPA

17   benchmark and argued that the figure shows evidence of effect

18   modification --

19   Q.    Right.

20   A.    -- and that if effect modification is present, then their

21   benchmark is invalid.   And he argued that this figure shows

22   there's effect modification.

23          Now, let me respond to your question, is there anything

24   missing here.

25   Q.    Yes.

Wing - Direct

1   A.   Now, as an epidemiologist, I look at graphs like this all

2   the time.

3   Q.   For a journal --

4   A.   And if I were a reviewer for a journal, I would be

5   looking at a graph like this, except instead of Ephemeroptera

6   on the vertical axis, it might be the cancer rate; and instead

7   of conductivity on the horizontal axis, it might be exposure

8   to a toxin.  That would be something that I would commonly

9   see.

10       Now, what's missing from this graph, well,

11   epidemiologists typically indicate something about the

12   precision or the sample size for the estimates.  So the graph

13   here, the percent of sites with Ephemeroptera at the different

14   levels of dissolved oxygen are represented by a blue circle or

15   a red cross or a green X.

16       So if we look vertically at any point in the graph, there

17   are three symbols, and they represent the percent of

18   Ephemeroptera at different levels of dissolved oxygen for a

19   single level of conductivity.  But there's no sample size.

20   There's no error bars or other estimates of precision.

21       So that's very important to interpreting this graph, and

22   it's missing.  That information is missing.

23       And then to evaluate whether or not there is effect

24   modification or, in the language of other disciplines,

25   interaction, one might -- what we typically do is we estimate

Wing - Direct

1    the average trend across all the levels of conductivity for

2    each level of oxygen, and we would come up with what we call a

3    slope.  And this is the method that is called linear

4    regression, and it's used in most fields of science.

5        So we would compare the slopes to see if they're the same

6    or different.  And they would always be different by some

7    amount because we never have exactly the same slope.  So if

8    one were really ignorant about the methods of presenting data

9    with estimates of precision, one might say, oh, well, they're

10   different and say 1.2 is different than 1.3 or 1.1.

11       But if the precision is not very high, what an

12   epidemiologist and I think other analysts would typically

13   conclude is there's not enough information to conclude that

14   they're really different.

15       What I see when I look at this graph is that the trend is

16   similar in all three groups, that the percent of sites with

17   Ephemeroptera declines at each level of dissolved oxygen.  And

18   if I were looking at a topic which I work on, for example, if

19   I were looking at the percent of people with difficulty

20   breathing according to their exposure to air pollution and I

21   saw a graph like that, I would say it looks to me like there's

22   no effect modification.  The trend is similar.  It's not

23   exactly the same.  It's never exactly the same in groups when

24   we subdivide the data.

25   Q.   So you don't believe that if this -- this graph depicted

Wing - Direct

1   something that -- an area of your specialty, if you were

2   looking at a graph like this where you understood the data,

3   you would not say that this was effect modification being

4   shown in the graph?

5   A.   I doubt -- well, I would say, just based on the graph, I

6   don't have enough information because there's no information

7   about sample size or precision.   There are no slope estimates.

8   There are no standard error estimates for the slopes.   So

9   that's all missing.

10       But just seeing this, I certainly wouldn't conclude that

11  there's effect modification and -- because at the very least,

12  the general trend is similar in the three groups.

13  Q.   Okay.   Let's turn to the next figure, figure 7, "Percent

14  of sites with Ephemeroptera by conductivity and total iron,

15  limited to streams with" --

16  A.   Yes.

17  Q.   -- "pH greater than 6."

18  A.   So --

19  Q.   Dr. Garabrant again uses this as an example of effect

20  modification?

21  A.   He did.

22  Q.   And what do you think about that?

23  A.   Well, just to review, the figure has the same vertical

24  and horizontal axes.   So, again, we're talking about percent

25  of sites with Ephemeroptera and conductivity, this time at

Wing - Direct

1   levels of total iron.  And, again, we have no information

2   about precision or sample size or we have no slope estimates.

3   But, again, it's clear that the trend is a downward trend for

4   all three groups.  And so at least qualitatively, I would say

5   it doesn't look like there's interaction or effect

6   modification.

7   Q.   How is it that you can look at one chart and

8   Dr. Garabrant look at the same chart and you come to

9   completely different conclusions about it?

10  A.   It goes --

11  Q.   You're both specialists in your area.

12  A.   Yes.  Well, it goes back to the principle that the data

13  don't speak for themselves, that they require some a priori

14  knowledge, some assumptions, some context.  And so applying my

15  context, I would not conclude based on this figure that

16  there's effect modification.

17       I would also, if I may raise one other issue about what's

18  a concern I have about this assessment of effect modification,

19  we teach in our introductory epidemiologic classes -- and this

20  is part of the exams for the first- and second-year

21  students -- we teach that you can't evaluate effect

22  modification without choosing some scale on which to measure

23  it.

24       And so here's an example.  Suppose I'm interested in the

25  occurrence of cancer in relation to exposure to some toxin,

Wing - Direct

1    and the -- among people, for example, in one age group, the

2    people exposed to the toxin have a cancer rate of 20 per

3    thousand and the unexposed people have a rate of 10 per

4    thousand.  That's a difference of 10 per thousand.

5        And suppose at another age group, the exposed -- people

6    exposed to the toxin have a disease, a cancer rate of 110 per

7    thousand and the unexposed people have a rate of 100 per

8    thousand.

9        Well, if our scale of assessing effect modification is

10   the absolute difference, there's no effect modification

11   because the difference between 10 and 20 and between 100 and

12   110 is 10 in both cases.  It's the same effect.  But if our

13   scale for measuring is a ratio scale or a percent difference,

14   in the first age group, the rate is doubled.  Twenty is twice

15   as much as ten; whereas in the second age group, 110 is only

16   10 percent, not 100 percent more.  And we would say there's

17   interaction or effect modification.

18       What I don't see from Dr. Garabrant is any specification

19   of whether his supposed effect modification is on an absolute

20   scale or on a relative scale.  And at least in our department

21   and from what I can tell with students coming from other

22   graduate schools, it's common, even in introductory courses,

23   that the students learn that we have to choose -- we make a

24   choice, because our assessment of whether or not there's

25   effect modification depends on the scale we choose.

Wing - Direct

1   Q.    So you can't tell looking at this document what scale was

2   used.

3   A.    Well, Dr. Garabrant hasn't told us.

4            MR. HARVEY:   Your Honor -- Your Honor, I hate to

5   object.   I've let this go on for a while, but none of this was

6   discussed at Dr. Wing's deposition, this issue about the scale

7   of the graph.   He had every opportunity to talk about the

8   graphs and he didn't.

9            MR. LOVETT:   He wasn't asked about --

10           MR. HARVEY:   He most certainly was, Your Honor.

11           THE COURT:   Well, he's called as a rebuttal expert

12   to the defense expert.   So I think he's allowed to testify in

13   rebuttal.

14           THE WITNESS:   And just for the record, I would note

15   that I did comment on these graphs in response to the

16   defendant's attorney at deposition.

17           THE COURT:   Well --

18   BY MR. LOVETT:

19   Q.    So I think I asked you the question about missing scale

20   and if that made it difficult to interpret the graph.

21   A.    Well, I would -- it would be important to any assessment

22   of effect modification to specify whether it's -- what the

23   scale of the modification is.

24   Q.    Okay.   But still you're able to look at it -- I just want

25   to get to this one issue that I really don't understand.   You

Wing - Direct

1   look at it, even though there's information missing that makes

2   it difficult to interpret, and you say, just looking at the

3   slopes, no effect modification.

4   A.   And so let me explain how I'm doing that.

5   Q.   Yeah.

6   A.   Okay.  So I don't have the dataset, and I'm not -- I

7   don't have the software to conduct what's called a linear

8   regression analysis to calculate the slopes.  But what we do

9   all the time when we look at data is we eyeball the data.

10  That's what we -- the typical term.

11       So I would look at these points, say the blue line with

12  the circles in this figure 6, and I would say, well, what

13  happened -- what would happen if I drew a straight line that

14  minimized the distance between the line and these points so

15  that it goes through the points rather than around them, and I

16  did the same for the red line and the green line.

17       Well, the slopes are different.  The slopes would be

18  different, that's true.  But they're all negative.  The trend

19  is the same.  And so from a substantive standpoint, the effect

20  of conductivity is to result in a decrease in the percent of

21  sites with Ephemeroptera in all three groups.

22  Q.   And did Dr. Garabrant describe and explain, as you just

23  have, why he thought that this was an example of effect

24  modification?

25  A.   I didn't hear him.  So I don't understand -- I don't

Wing - Direct

1  believe he's given us adequate information to support his

2  conclusion that there's effect modification.

3  Q.   And, lastly, let's just turn quickly to figure 9, which

4  should be the next one, and I'm going to ask you the same

5  questions about figure 9.

6  A.   Okay.  The next one actually is figure 8.

7  Q.   Let me ask you about figures 8 and 9.

8  A.   Okay.

9  Q.   I'll ask you just -- you can answer for both now the same

10 question.

11      Dr. Garabrant in both cases testified that they were

12 examples of effect modification, and do you agree with him

13 about that?

14 A.   Figure 8, he testified again that this was effect

15 modification.  My assessment is the same as for the prior

16 figures.  We lack critical information, but the slopes look

17 like they're in the same direction.  They show a decline in

18 the percent of sites with Ephemeroptera for increases in

19 conductivity for figure 8 at three levels of total aluminum

20 and for figure 9 at three levels of total manganese.  So I

21 disagree with Dr. Garabrant's interpretation.

22 Q.   As an epidemiologist, you aren't qualified to give the

23 testimony that Dr. Garabrant provided yesterday to this Court,

24 are you, about the benchmark?

25 A.   I'm not qualified in ecology or -- and I don't know the

Wing - Direct

1    field.

2    Q.    Is it your opinion, having heard Dr. Garabrant's

3    testimony and knowing your field of epidemiology, that he was

4    not qualified to offer the testimony that he offered here

5    yesterday?

6    A.    Well, I heard Dr. Garabrant describe his entry into the

7    field of stream ecology, and what I heard him say was that he

8    had not studied it prior to this case but he read a textbook

9    and that he consulted with an ecologist who does know the

10   field.

11        And I guess, based on my academic experience, I do not --

12   I would not present myself as an expert in other departments

13   based on reading an introductory textbook and talking with a

14   scientist who's in that department.  I would not consider

15   myself competent to advise doctoral students or to write

16   articles for peer-reviewed journals or to chair committees in

17   that other field based on reading an introductory textbook and

18   consulting with one person who has expertise in the field.

19   Q.    Did Dr. Garabrant testify yesterday that he asked any

20   ecologist to review his expert report?

21   A.    I don't recall that.

22   Q.    Okay.  If you were writing something like this, would you

23   at least ask an epidemi -- I mean, excuse me, an ecologist to

24   review it?

25   A.    Actually, I wouldn't write something like this in the

Wing - Direct

1    first place without engaging collaboration with people who

2    have expertise in the field.

3    Q.    One last question -- or two questions.   I'll ask one

4    penultimate question.   Just because data has no effect, has an

5    effect modification or is confounding, that doesn't mean it's

6    useless data, does it?

7    A.    No, it doesn't mean it's useless.   In fact, effect

8    modification, which means that there's some variability in the

9    impact of the exposure between different population groups,

10   it's a universal phenomenon.   There's always effect

11   modification.

12       This -- it's a basic principle, and it goes back to the

13   difference between statistics and the individual causation,

14   that statistics -- this kind of statistical analysis is

15   entirely about averages.   But each person, each stream, each

16   species, potentially the same species in different

17   environments, they're different from each other.

18       So there's always effect modification, yet we typically

19   decide that we can make some useful conclusion about how some

20   factor affects those populations because it's similar enough

21   between groups.

22       So we don't say just because the heart disease rate

23   difference between smokers and non-smokers is different for

24   men and women, we don't say, well, so we can't conclude that

25   cigarette-smoking is dangerous for both.   That's not -- it's a

Wing - Direct

1    universal phenomenon.

2         And the same thing, there's an analogous history with

3    confounding.  There's always factors that we haven't measured

4    that might affect the relation between an exposure and an

5    outcome, but at some point we use our judgment about the topic

6    and our knowledge of the field and multiple studies, not just

7    one dataset, but we draw conclusions based on a history of

8    research in a topic in order to take actions that are

9    important for public policy.

10   Q.   And do you hold all of the opinions that you've expressed

11   here today to a reasonable degree of scientific certainty?

12   A.   I do.

13             MR. LOVETT:   Thank you.

14             THE COURT:   All right.  Let's take a ten-minute

15   recess before cross-examination.

16        You can step down.  Don't discuss your testimony.

17        (Recess from 10:37 a.m. to 10:58 a.m.)

18             THE COURT:   All right.  Are we ready to resume?

19             MR. LOVETT:   Yes, Your Honor.  Before Mr. Harvey

20   begins, I'd like to move the admission of Plaintiffs'

21   Exhibit 167 and 170, which were the two articles, to the

22   extent of what was read into the record by Dr. Wing.

23             THE COURT:   All right.  Any objection?

24             MR. HARVEY:   No objection.

25             THE COURT:   All right.  Those portions, then, of

Wing - Cross

1    each of the exhibits are admitted.

2         And what exactly are you tendering as the exhibit?  The

3    whole article?

4              MR. LOVETT:  Well, I would tender the whole article,

5    but I think that all that's admitted --

6              THE COURT:  Right.

7              MR. LOVETT:  All that can actually be admitted into

8    evidence are the passages read by the witness.

9              THE COURT:  That's fine.

10              MR. LOVETT:  And one other thing I didn't realize,

11    figure 8, which is Exhibit 35, Defendant's Exhibit 35, is one

12    of the graphs that Dr. Wing testified to, defendants omitted

13    that yesterday.  So I'd like to move the admission of

14    Defendant's Exhibit 35.

15              THE COURT:  Any objection?

16              MR. HARVEY:  No objection to its admittance, Your

17    Honor.  I think Dr. Wing testified what he heard Dr. Garabrant

18    say about it.

19              THE COURT:  Well, it's admitted.

20              MR. HARVEY:  As far as I'm concerned, it can be

21    admitted.

22              THE COURT:  All right.  Ready for cross-examination?

23              MR. HARVEY:  Yes, Your Honor.

24              THE COURT:  Go ahead.

25                              CROSS EXAMINATION

Wing - Cross

1    BY MR. HARVEY:

2    Q.    Good morning, Dr. Wing.

3    A.    Good morning.

4    Q.    Let me start by thanking you for adjusting your schedule

5    as Dr. Garabrant did to be here yesterday and today.   I

6    appreciate that.

7    A.    You're welcome.

8    Q.    Dr. Wing, you have been an associate professor at the

9    University of North Carolina since 1995, correct?

10   A.    Correct.

11   Q.    And do you recall your deposition of April 7, 2015?

12   A.    That was when we met?  Is that the date?

13   Q.    That is correct.

14   A.    Yes, I do.

15   Q.    And at your deposition, I asked you if you were qualified

16   to be a full professor at the University of North Carolina.

17        Do you recall that conversation?

18   A.    I recall our discussion of the professorial ranks, yes.

19   Q.    And at the time, I believe you told me that you believe

20   you would, quote, meet the criterion in the view of some but

21   perhaps not in the view of others.

22        Do you recall that?

23   A.    I don't recall saying those particular words, but that

24   sounds -- but I recall the discussion, yes.

25   Q.    Okay.  Is that an accurate reflection of our discussion?

Wing - Cross

1    A.    I think so.

2    Q.    Okay.  And you told me at your deposition that in the 20

3    years you've been an associate professor, you've simply never

4    initiated the paperwork to become a full professor; is that

5    correct?

6    A.    That's correct.

7    Q.    Okay.  As I think you and Mr. Lovett discussed, Dr. Wing,

8    epidemiologists often have backgrounds in human medicine,

9    correct?

10   A.    Many do.

11   Q.    Yes.  And I think you told me at the University of North

12   Carolina, for instance, there are a large number of students

13   in the Department of Epidemiology who are medical doctors,

14   correct?

15   A.    That we commonly have medical doctors or medical students

16   in our program, yes.

17   Q.    Okay.  But you also have people in the program who have

18   other backgrounds such as engineering I believe you told me,

19   correct?

20   A.    That's one, yes.

21   Q.    Or demography such as yourself, correct?

22   A.    That's correct.

23   Q.    Okay.  Dr. Wing, I would like to discuss with you an

24   article that we discussed at your deposition.  It's entitled

25   "The People's Professor."

Wing - Cross

1          Do you recall our discussion of that article?

2     A.   Oh, yes, I do.

3     Q.   Okay.  Mr. Tyree is going to put that up on the screen.

4          And that was Exhibit 4 to your deposition.  Do you recall

5     us talking about this exhibit?

6     A.   I do.

7     Q.   Okay.

8               THE COURT:  You can see it down by the monitor to

9     your left.

10              THE WITNESS:  Thank you.

11              THE COURT:  Unfortunately, that monitor doesn't

12    move.

13              MR. HARVEY:  Dr. Wing, let me do this.  I have a

14    copy of your deposition.

15         May I approach, Your Honor?

16              THE COURT:  Yes.

17    BY MR. HARVEY:

18    Q.   This will be easier.

19    A.   Thank you.

20    Q.   You're welcome.  And this appeared in the *North Carolina*

21    *Health News*.  Is that correct, Dr. Wing?

22    A.   Correct.

23    Q.   Okay.  And it's an article about you, correct?

24    A.   Yes.

25    Q.   From January of this year?

Wing - Cross

1  A.    I don't see the date, but I accept that, yes.

2  Q.    Okay.  I'd like to discuss certain passages from this

3  article, if you will.

4      The first one Mr. Tyree will highlight on the bottom of

5  the -- or on the screen is near the bottom of, I think, the

6  page I gave you.

7      Do you see the one that starts with "Wing's career," that

8  paragraph, Dr. Wing?

9  A.    Yes, I see that.

10 Q.    And it says, "Wing's career at UNC has been marked by

11 similarly contrarian work, a body of research that reevaluates

12 official orthodoxy and that focuses on a kind of social

13 activism that's rare in academia.  Though nested in a premier

14 research university, Wing believes his work to be in the

15 public's interest.  He researches underrepresented and often

16 ignored populations and at times his work blurs the

17 conventional lines between detached university researchers and

18 community advocates."

19     Do you recall us discussing that paragraph?

20 A.    I do.

21 Q.    And I asked you about the highlighted portion; that is, I

22 asked you whether you were -- blurs the conventional lines

23 between detached university researchers and community

24 advocates.

25     Do you recall our discussion of that?

Wing - Cross

1    A.    I recall that you raised it.  I don't recall the details

2    of our discussion.

3    Q.    Okay.  I think you told me during your deposition that

4    university researchers are typically attached to the interests

5    of people who fund research.

6          Do you recall saying that?

7    A.    I don't recall the specific words, but that's something

8    that I believe.

9    Q.    Okay.  And I asked you if that was true of yourself, and

10   you said yes, correct?

11   A.    Correct.

12   Q.    Okay.  Later, the article poses a question which we also

13   discussed.

14         Mr. Tyree, can you scroll down?  Continue scrolling,

15   Mr. Tyree.  Keep going, Mr. Tyree.

16         Okay.  Do you see, Dr. Wing, the paragraph that starts

17   with "Yet Wing's style raises a question"?

18   A.    Which page are we on?

19   Q.    Let me see if I can help you with that.

20         May I approach, Your Honor?

21             THE COURT:  Yes, you may.

22   BY MR. HARVEY:

23   Q.    Are you with me now, Dr. Wing?

24   A.    I am.

25   Q.    Okay.  The article raises this question:  "Yet Wing's

Wing - Cross

1    style raises a question.  Is it a breach of objectivity if a

2    researcher explicitly advocates the mission of a community

3    organization, as does Wing?"

4        And then it quotes you as saying, "Wing said that pure

5    objectivity is a misguided aim.  'Scientists are driven by

6    ideologies and interests, whether they're partnering with a

7    pharmaceutical company or a nonprofit organization,' he said.

8    'The important part,' he added, 'is to be clear about your

9    affiliations and to follow proper scientific research

10   methods.'"

11       Is that an accurate quote of your view?

12   A.   I probably said something more like "pure objectivity is

13   a misguided concept" rather than "aim."  But basically it's

14   correct.

15   Q.   And you agree that in your view -- your view is that

16   scientists are driven by ideologies and interests.

17   A.   I wouldn't say it that way.  First, I would say that

18   objectivity is not a state of detachment from the world,

19   meaning having no point of view.

20       Objectivity is a process of understanding the basis of

21   forming knowledge so that influences that are necessary to

22   create science are understood and recognized and evaluated,

23   rather than the idea that objectivity -- I think it's

24   misguided that the concept of objectivity as being able to

25   remove oneself from the history of knowledge and language and

Wing - Cross

1    other background; rather, it's to explicate that background.

2         And I would not say that scientists are driven by

3    ideologies, but rather we -- all of us, whether scientists or

4    not, have some point of view which might be an ideology.  It

5    might be described in other ways.  But I don't think we can

6    even approach science without having a point of view.

7    Q.   Okay.  These are complicated concepts.  Let's see what

8    you said at your deposition.

9         Mr. Tyree, could you return to Dr. Wing's deposition?

10   Page 74.

11        There's a question.  Do you see that, Dr. Wing, that

12   starts, "Okay.  Did you say that" -- do you see that question

13   in the deposition?

14   A.   I do.

15   Q.   Okay.  So I'll play the part, just to make it easy, of

16   me, and you play you, okay?

17        The question:  I said, "Okay.  Did you say that

18   scientists are driven by ideologies and interests, whether

19   they're partnering with a pharmaceutical company or a

20   nonprofit organization?"

21        And you answered?

22   A.   "That's a -- that could be a paraphrase of something that

23   I said."

24   Q.   Okay.  Okay.  And you have personally called for a

25   moratorium on mountaintop removal mining, correct?

Wing - Cross

1   A.   I was part of a group that issued a report on that.  I

2   wouldn't say it was personal, but it was part of a group.

3   Q.   Okay.  Let's discuss that.

4        I'd like to show you a document that we discussed also at

5   your deposition.  It's entitled "The Health Impacts of

6   Mountaintop Removal Mining," and it's described as a report to

7   the National Commission on the health impacts of mountaintop

8   removal mining.

9        Do you recall that document?

10  A.   I do.

11  Q.   It was Exhibit 2 to your deposition, if you'd like to

12  find it in the deposition transcript I gave you.

13       May I approach, Your Honor?

14            THE COURT:  Yes, you may.

15            THE WITNESS:  Exhibit 2.  Right here?  Thank you.

16  BY MR. HARVEY:

17  Q.   According to the page behind the cover page, Dr. Wing --

18  you skipped down too many pages, Mr. Tyree.

19       Keep going up, Mr. Tyree.  Keep going.

20       Mr. Tyree, if you could go to the page right behind the

21  cover page that we were just looking at.  On up.

22       Okay.  This was something prepared in April of 2013 by

23  the Center for Health, Environment & Justice, correct?

24  A.   Correct.

25  Q.   Who are they?

Wing - Cross

1  A.    The Center for Health, Environment & Justice is, my

2  understanding, is a nonprofit organization that was started by

3  Lois Gibbs, I think several decades ago, and they -- they're

4  headquartered in the Washington, D. C. area.

5  Q.    Okay.  And this is a report from the Center for Health,

6  Environment & Justice to the National Commission on the health

7  impacts of mountaintop removal mining, correct?

8  A.    Yes.

9  Q.    Okay.  And if we could turn to page 2 of the document,

10 there's a list of Commission members, members of this National

11 Commission that the report was sent to.

12     Do you see that?

13 A.    Yes.  You're referring to -- oh, I see.  Hold on.  I'm

14 not on the right page.

15 Q.    Cynthia Bearer is the first Commission member.  Do you

16 see that?

17 A.    Yes.  I don't -- I'm not on the right page of the report.

18 Which page is it?

19 Q.    It's complicated because it's paginated very oddly.

20 That's why Mr. Tyree and you and I are having trouble.

21     May I approach, Judge?

22          THE COURT:  Go ahead.

23          THE WITNESS:  Oh, great.  Okay.  Thank you.

24 BY MR. HARVEY:

25 Q.    So beginning on page 2, there's a list of Commission

Wing - Cross

1   members, correct?

2   A.    Correct.

3   Q.    And if we turn to page 3, you're listed as one of the

4   Commission members, correct?

5   A.    Correct.

6   Q.    Okay.  And so you were on the National Commission?

7   A.    Yes.

8   Q.    Okay.  And the National Commission made certain

9   recommendations.  Do you recall that?

10   A.    I do.

11   Q.    Okay.  And those are on page 1 of the document; is that

12   correct?

13   A.    I believe they're on pages 1 and 2.

14   Q.    Okay.  And the first of the Commission's recommendations,

15   of which you were a part, is that there be an immediate

16   moratorium on mountaintop removal mining; is that correct?

17   A.    Yes.  It begins, "Preventative action in the face of

18   uncertainty is warranted."

19   Q.    You can continue to read.

20   A.    "The findings in this report make clear that there is

21   sufficient documentation of the hazards of MTR, mountaintop

22   removal, mining to place an immediate moratorium on MTR mining

23   until such time as health studies have been conducted that

24   provide a clearer understanding of the associations between

25   adverse health impacts, notably adverse reproductive outcomes,

Wing - Cross

1   and MTR mining."

2   Q.   Okay.   Thank you.

3        And as we discussed at your deposition, there were news

4   reports about this Commission finding and Commission report.

5        Do you recall that?

6   A.   Yes.

7   Q.   Okay.   Let's turn to one of those.

8        And, Dr. Wing, this is Exhibit 3 to your deposition, if

9   it helps you.

10       This was published by the Institute for Southern Studies.

11   You're familiar with them, correct?

12   A.   Yes, I am.

13   Q.   Okay.   And it quotes you as saying the following:

14       "'The evidence shows that mountaintop removal threatens

15   public health and the environment,' said Dr. Steven Wing, an

16   associate professor of epidemiology at the University of North

17   Carolina and a member of the Commission.   'It's time to act to

18   protect rural communities.'"

19   A.   That's correct.

20   Q.   And I believe you told me at your deposition that's an

21   accurate quote by you.

22   A.   As far as I remember.

23   Q.   Okay.   And you told me at your deposition that this is an

24   issue of social justice to you.

25       Do you recall that?

Wing - Cross

1    A.    I don't recall specifically, but that's reasonable, I

2    believe.

3    Q.    Okay.  And in reaching this conclusion and calling for

4    this moratorium, I believe you told me at your deposition that

5    you didn't collect or analyze any data, correct?

6    A.    I didn't conduct statistical analyses of data, that's

7    correct.

8    Q.    Okay.  You didn't conduct an epidemiological analysis at

9    all, correct?

10   A.    This was based on a review of literature of studies

11   produced by others.

12   Q.    Studies sent to you by the Center for Health and

13   Environmental Justice?

14   A.    They sent me articles, and I also saw other articles they

15   did not send me.

16   Q.    Oh, okay.  I think that's different than what you

17   testified at your deposition, but I'll accept that.

18   A.    Okay.

19   Q.    So you had some articles and you called for a moratorium,

20   correct?

21   A.    Not personally, but as part of this group of scientists

22   who reviewed the literature.

23   Q.    Did you work with the other scientists?

24   A.    I never met them personally, and there were no meetings

25   of this Commission.  I worked directly with the Center for

Wing - Cross

1   Health and Environmental Justice staff.

2   Q.    Okay.  So there was no collaboration with the other

3   experts on the National Commission.

4   A.    There were draft copies that we reviewed.  So to the

5   extent that there was collaboration, it was through electronic

6   communication.

7   Q.    Okay.  But you've never met these other Commission

8   members.  That's what you told me at your deposition, that you

9   did not.

10  A.    We didn't meet as a commission.  Now, if I've ever met

11  any of the members, I'm not so sure about that.

12  Q.    You can look at your deposition if you want, but you told

13  me you had never met them.

14  A.    Dr. Wartenberg I do know at least by --

15  Q.    Reputation?

16  A.    -- reputation.  And I'm not remembering whether I've met

17  him at professional societies or not.

18  Q.    Okay.  Let's switch gears and talk about epidemiology.

19      There are recognized techniques for identifying effect

20  modifiers; is that correct?

21  A.    There are a number of methods, yes.

22  Q.    And most epidemiology textbooks have discussions of

23  effect modifiers and describe those techniques, correct?

24  A.    Correct.

25  Q.    Okay.  And I believe you told me at your deposition

Wing - Cross

1    effect modification is something that can happen not just with

2    humans and human data, but also with data regarding plants and

3    animals and bugs, correct?

4    A.    Correct.

5    Q.    So effect modification is something that can impact the

6    dataset that EPA worked with.

7    A.    I believe I said effect modification is universal, so

8    it's present everywhere.

9    Q.    Thank you.

10          And the same is true of confounding, correct?

11   A.    Confounding, as I said earlier, is a consequence of a

12   model in which we posit that a particular factor has an

13   independent effect on an outcome, holding everything else

14   constant.

15          So within that model of investigation, confounding may or

16   may not occur, but it's always something that we would want to

17   evaluate.

18   Q.    But it is present in not just data relating to human

19   systems, but also data relating to other ecological systems.

20   A.    Well, confounding isn't a property of data.  Confounding

21   is a property of a model of understanding nature in which we

22   begin with or we posit the assumption that a factor has a

23   unique effect on some outcome, holding everything else

24   constant.

25          And that doesn't happen in nature, but it's a useful

Wing - Cross

1   model.  It's the model of the experiment for investigating

2   mechanisms.

3   Q.   But it does occur with other systems other than human

4   systems, correct?

5   A.   Yeah, it occurs -- under this model, it could occur in

6   any aspect of nature that we might investigate.

7   Q.   Okay.  And there are recognized techniques for addressing

8   confounding, correct?

9   A.   Yes.

10  Q.   Okay.  And do you agree that it's important to identify

11  and control for confounding when conducting studies?

12  A.   Yes.

13  Q.   Okay.  And I think Mr. Lovett and you talked about this,

14  but you don't have any opinions on whether EPA properly

15  conducted epidemiology when they created the benchmark,

16  correct?

17  A.   I don't have opinions about the ecology, the discipline

18  of ecology which is at issue here.

19  Q.   And you don't have any opinions as to whether they

20  properly evaluated confounding.

21  A.   That's correct.

22  Q.   Okay.  So if EPA got the epidemiology wrong, you don't

23  know; you haven't looked at it.

24  A.   Well, I guess I wouldn't call what EPA was doing

25  epidemiology because epidemiology is the study of health and

Wing - Cross

1   disease in human populations, and that's not what EPA was

2   doing.

3   Q.   Are you aware that's what EPA claimed it was doing?

4   A.   My understanding is they presented some of their methods

5   as being derived from epidemiology.

6   Q.   Have you attempted to replicate any of EPA's findings?

7   A.   No.

8   Q.   Did you seek to collaborate with any ecologists to

9   analyze the benchmark?

10  A.   No.

11  Q.   You could have done that, though, correct?

12  A.   I could have, yes.

13  Q.   Could EPA have collaborated with epidemiologists?

14  A.   Yes.

15  Q.   But they did not, did they?

16  A.   I don't know the history of their work and what led up to

17  their final publication, so I can't comment on that.

18  Q.   Okay.  And you haven't looked at the underlying EPA data,

19  have you?

20  A.   I have not.

21  Q.   And you've done no calculations with respect to

22  Dr. Garabrant's conclusions, correct?

23  A.   Correct.

24  Q.   You've not tried to disprove or replicate his work in any

25  way?

Wing - Cross

1    A.    That's correct.

2    Q.    Okay.

3    A.    I would say specifically I have not tried to replicate

4    any of his calculations.  I haven't worked with his -- with

5    the dataset that he used.

6    Q.    Okay.  But you had that opportunity.

7    A.    I didn't ask for the opportunity to analyze the data.

8    Q.    Okay.

9          Mr. Tyree, can you go to page 116 of the deposition

10   transcript?

11         Do you recall -- I'll give you a moment, Dr. Wing.  Tell

12   me when you've found it.

13   A.    Yes.

14   Q.    And earlier, you and Mr. Lovett discussed certain figures

15   prepared by Dr. Garabrant.  Do you recall that?

16   A.    I do.

17   Q.    And you criticized those and said they lacked scale, and

18   had other comments.  Do you recall that?

19   A.    I recall our discussing these figures that are the same

20   ones on page 116 here --

21   Q.    Yes.

22   A.    -- that we just discussed earlier and Dr. Garabrant

23   discussed yesterday.

24   Q.    Let's do what you and I did earlier, and I'll play me and

25   you play you.

Wing - Cross

1    A.    Okay.

2    Q.    And we'll talk about the discussion you and I had about

3    these figures at your deposition, okay?

4         Question:   "Okay.   Did you form any other opinions after

5    reading Dr. Garabrant's report?"

6    A.    "I did look at a number of the graphs in his report,

7    beginning on page 7.   So there's figure 2, 3, figure 5, 6, 7,

8    8, 9, are all figures that evaluate the relationship between

9    conductivity and Ephemeroptera.   And what I noticed is that

10   all of Dr. Garabrant's figures suggest that there's a decline

11   in Ephemeroptera with increased conductivity in every one of

12   those figures."

13   Q.    Okay.   And I say, "Okay.   Why is that important?"

14        And you respond?

15   A.    "It's my understanding that Dr. Garabrant is presenting

16   this as evidence that conductivity is not important as a

17   measure of water quality that's associated with Ephemeroptera,

18   and I believe that the figures he produces here generally

19   support the position that it is important."

20   Q.    And then I ask, "Do you think the figures also show that

21   the importance varies depending on what other factors are

22   present?"

23        And you said?

24   A.    "That's one possible interpretation.   Yes."

25   Q.    And I said, "Okay.   Is that not important?"

Wing - Cross

1    A.    "It could be."

2    Q.    Okay.   Then I said, "Have you developed any other

3    opinions about the report of Dr. Garabrant, the second

4    report?"

5    A.    "Not that I recall right now."

6    Q.    Okay.   You and Mr. Lovett began your conversation

7    of these figures with a discussion of figure 6 from

8    Dr. Garabrant's report.

9        Do you recall that?

10   A.    We did, although if I can just clarify that at this point

11   in the deposition when you asked about any other opinions, we

12   had already discussed table 2.   So when I said I didn't have

13   other opinions about the report, it wasn't other -- just other

14   than those figures; it was also including table 2.

15   Q.    I understand that, but table 2, our discussion didn't

16   talk about the scale or anything related to these figures, did

17   it?

18   A.    Correct.   Table 2 is a different topic.

19   Q.    Correct.

20   A.    But I did have opinions about -- I just wanted to make

21   clear that this wasn't referring to table 2.

22   Q.    Thank you.

23   A.    You're welcome.

24   Q.    Mr. Tyree, could you pull up Defendant's Exhibit 32?

25       Now, you and Mr. Lovett skipped straight to figure 6 and

Wing - Cross

1    didn't talk about figure 5.

2         What is this figure looking at, Dr. Wing?

3    A.    This figure presents the relationship between the percent

4    of sites with Ephemeroptera -- that's on the vertical axis --

5    and conductivity on the horizontal axis according to the

6    catchment area in square kilometers for three categories of

7    catchment area.

8    Q.    Okay.  And at conductivities of 1500, how often do we

9    find mayflies in the larger streams?  That's the green line.

10   A.    So at conductivities of greater than 1500, which is the

11   last data point on the right --

12   Q.    I'm sorry.  I'm sorry, Dr. Garabrant [sic].  In the range

13   of twelve -- let me -- may I approach, Your Honor?

14        THE COURT:  You may.

15   BY MR. HARVEY:

16   Q.    Dr. Wing, here at conductivities of -- would you agree

17   with me this is somewhere in the 1200-to-1500 range?

18   A.    That is the category, 1200 to 1500.

19   Q.    Okay.  And according to Dr. Garabrant's graph, how often

20   do we find Ephemeroptera at those conductivity ranges?  What

21   percent of the time?

22   A.    In that group, there are -- the percentages range from

23   roughly 50 percent in the catchment group zero to 15.5 to a

24   hundred percent in the catchment group greater than 155 square

25   kilometers.

Wing - Cross

1  Q.   That's a large difference based on stream size, correct?

2  A.   It's -- between 50 percent and 100 percent is a large

3  difference, and it's -- the interpretation of that difference

4  depends in part on the sample size.  So if there were only two

5  observations, or three, there would be different -- it would

6  be important to note and compare, for example, if there were

7  hundreds of observations.

8  Q.   But this is one of those areas whereas you testified it

9  could be important, correct?

10 A.   It could be important depending on sample size, the

11 precision of the estimates here.

12         MR. HARVEY:  Okay.  Just a minute, Your Honor.

13 BY MR. HARVEY:

14 Q.   A couple of small finishing points, Dr. Wing.

15       Do you still have Plaintiffs' Exhibit 167 with you?

16 A.   Would that be in the binder?  Oh, plaintiffs' exhibit?

17         MR. HARVEY:  May I approach, Your Honor?

18         THE COURT:  You may.

19         THE WITNESS:  These are joint exhibits.  This is

20 defendant's exhibits.

21         MR. HARVEY:  You and Mr. Lovett had it earlier.  I'm

22 trying to help you find it here.  I don't think we have it

23 now.

24       May I approach, Your Honor?

25         THE COURT:  Yes, you may.

Wing - Cross

1    BY MR. HARVEY:

2    Q.   Dr. Wing, this is Plaintiffs' Exhibit 167.   Earlier,

3    Mr. Lovett had you read part of this paragraph.

4         Do you recall that?

5    A.   I do.

6    Q.   Okay.  He had you read the last half of the paragraph.

7    Do you recall that?

8    A.   I do.

9    Q.   Can you read the full paragraph for me?

10   A.   Yes, I can read the full paragraph.

11        "Close analysis of the Supreme Court decision reveals a

12   series of concerns.  The requirements *Daubert* imposes on

13   federal judges are unreachable - no absolute criteria exist

14   for assessing the validity of scientific evidence.  Scientific

15   reasoning is no more susceptible to a mechanical approach than

16   legal reasoning.  Checklists of criteria, although appealing

17   in their convenience, are inadequate tools for assessing

18   causation.  Alternatively, judges may rely on their own

19   experience and 'common sense,' which has inherent biases and

20   limitations."

21   Q.   Okay.  And how is that article described at the very top

22   caption of the article?  What is that?

23   A.   It's an editorial.

24   Q.   Okay.  So Plaintiffs' Exhibit 167 is essentially an

25   editorial complaining about the difficulty in meeting the

Wing - Cross/Redirect

1  *Daubert* process, correct?

2  A.   I wouldn't describe it as complaining.

3  Q.   Okay.  They would like the standard to be changed,

4  correct?

5  A.   It's an analysis of logical problems in the *Daubert*

6  decision or the *Daubert* rule.

7           MR. HARVEY:  Okay.  Just a minute, Your Honor.

8           THE COURT:  Yes.

9           MR. HARVEY:  Thank you, Dr. Wing.  No further

10  questions.

11           THE COURT:  All right.  Any redirect?

12           MR. LOVETT:  Very brief, Your Honor.

13                     REDIRECT EXAMINATION

14  BY MR. LOVETT:

15  Q.   Dr. Wing, Mr. Harvey asked you if you had an opportunity

16  to analyze EPA data.  Do you recall that?

17  A.   I do.

18  Q.   And you said, "Yes, I had the opportunity," but you

19  didn't do it, right?

20  A.   Well, I didn't -- I said I didn't ask for the data.

21  Q.   Why wouldn't you have asked for it?

22  A.   I'm not an ecologist.

23  Q.   So the data -- you wouldn't have felt competent to

24  analyze the data on your own, right?

25  A.   Correct.

Wing - Redirect

1    Q.   Let's turn to figure 5 which Mr. Harvey just asked you

2    about.  It's Defendant's Exhibit 30-something.

3         May I approach, Your Honor?

4              THE COURT:   You may.

5    BY MR. LOVETT:

6    Q.   So figure 5 is Defendant's Exhibit 32.

7         Do you remember Mr. Harvey asking you questions about

8    that just now?

9    A.   Yes.

10   Q.   And he asked you about the -- how often Ephemeroptera

11   occur in the twelve-to-fifteen-hundred range?

12   A.   He did.

13   Q.   You're not able to draw any conclusion about whether

14   that's an important finding or not from an ecological

15   perspective, are you?

16   A.   No.

17   Q.   You don't know what Ephemeroptera are, do you?

18   A.   Well, I know they're macroinvertebrates.

19   Q.   You don't know, for instance, if there are sensitive

20   Ephemeroptera and tolerant Ephemeroptera, do you?

21   A.   I don't know.

22   Q.   Because you're not an expert in ecology, right?

23   A.   That's correct.

24   Q.   It would take an expert in ecology really to understand

25   the importance of that figure, wouldn't it?

Wing - Redirect

1    A.    It would.

2    Q.    Okay.  And, lastly, the editorial --

3    A.    Yes.

4    Q.    -- which is Plaintiffs' Exhibit 167, it is an editorial,

5    but as you stated, it's a very reputable journal, correct?

6    A.    Correct.

7    Q.    And it is -- do you understand it to be a group of

8    scientists giving their opinion about how courts should use

9    *Daubert*?

10   A.    I can explain that this is an editorial written by David

11   Michaels who was invited to be a special editor of this

12   supplement to the *American Journal of Public Health* devoted to

13   the topic of the *Daubert* rule and how scientific evidence is

14   considered by courts.

15           MR. LOVETT:  Okay.  Thank you, Your Honor.  That's

16   all I have.

17           THE COURT:  All right.  Any other questions?

18           MR. HARVEY:  No follow-up, Your Honor.

19           THE COURT:  All right.  Thank you, Doctor.  You may

20   step down.

21      Do you want to leave this notebook up here, Mr. Lovett,

22   or --

23           MR. LOVETT:  Let me see what's up there, Your Honor.

24           THE COURT:  All right.

25           MR. LOVETT:  I doubt that we'll need it before

Palmer - Direct

1    lunch.  We don't need this.  (Indicating)

2        Call a witness?

3              THE COURT:  Yes.

4              MR. LOVETT:  Call Dr. Margaret Palmer.

5              MR. BECHER:  She's currently sequestered, Your

6    Honor.  I'll have to go downstairs to fetch her.

7              THE COURT:  All right.  That's fine.

8        Doctor, if you'll step up here, my clerk will administer

9    the oath.

10             MARGARET PALMER, PLAINTIFFS' WITNESS, SWORN

11                      DIRECT EXAMINATION

12   BY MR. LOVETT:

13   Q.   Good morning, Dr. Palmer.  Would you state your name,

14   please?

15   A.   Margaret Palmer.

16   Q.   And you have open before you Plaintiffs' Exhibit 33,

17   which is your CV, I believe.

18   A.   Yes.

19   Q.   Did you prepare that CV?

20   A.   I did.

21   Q.   Is it an accurate representation of your education and

22   experience?

23   A.   It is.

24   Q.   Are there any -- when was it prepared?

25   A.   I don't remember the exact date, but it was when I

Palmer - Direct

1   submitted the first testimony for this.

2   Q.    Several months ago?

3   A.    Oh, yes, yes, several months.

4   Q.    And have you -- are there publications that you'd like to

5   tell the Court about since the preparation of the resume or

6   CV?

7   A.    So do you want me to tell you what has been published?

8   Q.    Yeah.  What are among the more important publications

9   that you've published since the CV was prepared?

10  A.    Well, I had a paper on restoration that was in *Science*.

11  I had a --

12  Q.    *Science Magazine*?

13  A.    Yes.

14  Q.    *Science Journal*?

15  A.    *Science Journal*, yes.  I had a paper on temporary streams

16  that was also in *Science*.  I had a paper on the outcome of

17  mining mitigation projects that was in *Environmental Science*

18  *and Technology*.

19  Q.    Okay.

20  A.    I had a paper that was on the flux of dissolved organic

21  carbonate and its composition below -- and in temporary

22  streams below restored wetlands.  I had a paper that was on

23  the efficiencies of different types of best management

24  practices in urban watersheds.

25  Q.    Okay.

Palmer - Direct

1    A.    And I had, I think, a paper in -- I think this was before

2    this; was in the *Proceedings of the National Academy* on

3    basically the use of types of hydrologic modeling in

4    estimating the effect of reforestation on water flow.

5    Q.    Okay.  Let's just talk briefly about one of those, which

6    is that you said that you published an article in

7    *Environmental Science and Technology* I believe on mitigation

8    outcomes related to surface mining in Appalachia?

9    A.    That's correct.

10   Q.    And did that deal with conductivity at all?

11   A.    Yes, it did.

12   Q.    What did it conclude?

13   A.    That the vast majority of the mitigation projects that

14   were being done to mitigate for surface mining were failures.

15   Q.    And did that have something to do with conductivity?

16   A.    Yes, conductivity.  There were data on conductivity for a

17   subset of the mitigation reports, as well as there was

18   biological data for a subset of the mitigation reports.

19        So these are reports prepared and submitted by the coal

20   company to the Army Corps of Engineers.

21   Q.    Now, you've testified before this Court before, haven't

22   you?

23   A.    I have.

24   Q.    And since -- I mean, how long has that been going back?

25   A.    Almost 10 years.

Palmer - Direct

1    Q.   Almost 10 years.

2         And in that 10 years, or nearly 10 years, you've followed

3    the science around coal mining in Appalachia extremely

4    carefully, haven't you?

5    A.   I have.

6    Q.   In fact, you've published on it yourself, right?

7    A.   A little, yes.

8    Q.   Okay.  Did this Court qualify you as an expert in aquatic

9    ecology in the past?

10   A.   It has.

11   Q.   And you're still a professor at the University of

12   Maryland?

13   A.   I am.

14   Q.   Obviously you still do research there, right?

15   A.   I still do research in addition to directing the center I

16   run, but, yes, I have an active group of graduate students and

17   we do research.

18   Q.   You have a lab as well as a center.

19   A.   That's correct.

20   Q.   You've published hundreds of papers on aquatic ecology in

21   peer-reviewed journals?

22   A.   That's correct.

23   Q.   And also you mentioned briefly the Socio-Economic

24   Synthesis Center, right?  You run that?

25   A.   Socio-Environmental Synthesis Center.  Yes, I do.  I

Palmer - Direct

1    direct that.

2    Q.   How is that funded?

3    A.   By the National Science Foundation.

4    Q.   And I believe you've testified here in the past that that

5    was funded with a $50-million grant; is that right?

6    A.   It was initially funded by a 27-1/2 million-dollar grant

7    for five years, and then we just had a major review and we've

8    been invited to send in a non-competitive renewal for

9    $30 million.  So it will be almost 60 million.

10   Q.   Is a non-competitive renewal something you expect to get

11   unless something unusual happens?

12   A.   Oh, yes, but it was a very, very rigorous review with

13   external evaluators over many days, so -- getting us to that

14   point.

15   Q.   What is the purpose of the Socio-Economic Synthesis

16   Center?

17   A.   The Socio-Environmental Synthesis Center is designed to

18   fund researchers from all over the world to come together in

19   small groups or teams, interdisciplinary teams, to address

20   problems using existing data and models.

21   Q.   Okay.  Now, you've said that you published on ionic

22   stress in Appalachian streams related to mining.

23        Have you also given presentations on that topic?

24   A.   Yes, I've given some presentations, talks at universities

25   and a few presentations at national conferences on this.

Palmer - Direct

1    Q.   To academic audiences?

2    A.   Yes.

3    Q.   Do you follow closely the literature in the area?

4    A.   I do my best.

5    Q.   And you've visited Appalachian streams how many times?

6    A.   Many times.  Not a lot of times to mine sites, but some,

7    but we have a home in West Virginia on a river, and so I was

8    there weekend before last, and I grew up going to those

9    streams.

10   Q.   You're familiar with the benthic macroinvertebrates in

11   Appalachian streams?

12   A.   Oh, yeah.

13   Q.   How many times have you been to mine sites?

14   A.   I think three times I want to say.

15            MR. LOVETT:   Okay.  I move to qualify Dr. Palmer as

16   an expert in aquatic ecology, particularly for this case as it

17   relates to ionic stress below surface mines.

18            THE COURT:   All right.  I'm satisfied she has the

19   necessary expertise.  She can be cross-examined about her

20   qualifications.

21   BY MR. LOVETT:

22   Q.   One question I -- did you just get an award last week?

23   A.   I did.

24   Q.   And what was that?

25   A.   It was an Award for Excellence in Research by the Society

Palmer - Direct

1    for Freshwater Science.

2    Q.    Is that an important society in your field?

3    A.    Of course, yes.

4    Q.    Yes.  Okay.

5         So what is the most common scientific method for

6    measuring the health of freshwater streams in the United

7    States?

8    A.    Well, throughout the United States and, in fact, in most

9    developed countries, the way it's measured and evaluated is by

10   taking samples of the benthic invertebrates and looking at

11   particularly species and genera that are known to be sensitive

12   to pollutants.

13   Q.    And from those reviews comes stream condition indices

14   like the WVSCI or the GLIMPSS, right?

15   A.    That's right.  Those are West Virginia's, yes.

16   Q.    And why are benthic macroinvertebrates particularly

17   useful for measuring stream health?

18   A.    Well, for one thing, you know, they're in all streams

19   unless they are, you know, there's some sort of problem in the

20   stream, and then also because they are in the stream for

21   fairly long periods of time typically.

22        They basically -- you can think of them as averaging the

23   effects of changing conditions over that entire period that

24   they're in the stream.  So they're sort of integrating the

25   effects over a long time period.  And when I say long, I mean

Palmer - Direct

1    eight months to several -- many years, the larvae, before they

2    emerge as tracheal adults.

3    Q.    So as an expert in the field of stream ecology, you

4    believe that the stream condition, benthic macroinvertebrates

5    stream condition indices are a valid way to measure stream

6    health.

7    A.    Yes, I do.

8    Q.    Okay.  Let's turn to Plaintiffs' Exhibit 129, which is in

9    the same notebook, especially to pages 1487, 1489.

10   A.    Yes.

11   Q.    Do you see the sentence beginning the fourth paragraph,

12   "Using WVDEP's methodology"?

13   A.    Yes.

14   Q.    Would you read that sentence, please?

15   A.    "Using WVDEP's methodology from the 2010 Section 303(d)

16   list, EPA considered waters with a WVSCI score greater than 68

17   as unimpaired.  Waters with a WVSCI score below 60.6 were

18   placed on the list that EPA proposes to add to the Section

19   303(d) list."

20   Q.    Okay.  Let me ask you before -- I don't want to rush

21   through this too much.  This is a letter from -- a May 25th,

22   2013 letter from EPA to Randy Huffman, Secretary of the State

23   DEP, right?

24   A.    That's correct.

25   Q.    Okay.  And then if you would turn to page 1489 and read

Palmer - Direct

1    into the record, if you would, the paragraph beginning -- the

2    very first paragraph beginning, "Because."

3    A.    "Because, as described above, EPA has determined that

4    West Virginia DEP's use of the 'gray zone' is statistically

5    unsupported, EPA finds that WVSCI scores from 60.6 to 68

6    indicate that waters do not achieve the West Virginia

7    narrative criteria as applied to the aquatic life uses."

8    Q.    So EPA, did it adopt -- is it telling the state that it

9    must adopt a certain threshold for impairment under the WVSCI

10   index?

11   A.    Yes.  I mean, my interpretation of this is that the state

12   is to use 68, not anything lower, as an impairment index for a

13   303(d) listing.

14   Q.    Okay.  How is the WVSCI score determined generally?

15   A.    Well, it's a multi-metric index, and it has a combination

16   of different sub-indices that look at things like the

17   composition of the community and the fraction of sensitive

18   species and things like that.

19   Q.    And it's a family-based -- the WVSCI is a family-based

20   metric; is that correct?

21   A.    It is.  It's all at the family level.

22   Q.    And did you -- do you know if EPA recommended for West

23   Virginia to move from a family-based metric to a genus-based

24   metric calls GLIMPSS?

25   A.    I believe they have, and GLIMPSS has been developed and

Palmer - Direct

1   has been validated.

2   Q.    Okay.  And that's just a more -- I think we've heard it

3   described in this court as a finer tool that would allow a

4   more accurate level of impairment.

5        Is that your view of it?

6   A.    Yeah, I think I wouldn't just say more finer.  It is more

7   appropriate because it doesn't mix sort of apples and oranges.

8   You can have multiple genera within a single family that have

9   extremely different kinds of tolerances and sensitivities.

10  Q.    And how does a change in insect population affect the

11  aquatic environment as a whole?

12  A.    Well, it has a very large impact.  It's the base of the

13  food web for higher forms, such as fish.  Also larger

14  invertebrates like crayfish and so forth rely on the benthic

15  invertebrates.

16       It also -- they are major players in terms of processing

17  particulate organic matter, leaves and material that, in fact,

18  that fall into streams.  So you can have accumulation of

19  organic matter which can cause oxygen to crash if it's not

20  processed.

21       So there are a vast number of ways in which they

22  influence it.

23  Q.    Does it affect bird populations, for instance?

24  A.    Yeah.  You asked about aquatic.  There's also --

25            MR. MCLUSKY:  I'm going to object at this point.

Palmer - Direct

1    Her report does not offer opinions about effects on birds,

2    fish, or anything other than bugs.

3             THE COURT:  Is that right?

4             MR. LOVETT:  Hold on, Your Honor.

5         No, it does discuss fish.

6             THE COURT:  It does?

7             MR. LOVETT:  Fish, yes.  I'm not sure about birds.

8    It's just a general introduction.

9             THE COURT:  Well, nonetheless, I'll sustain the

10   objection.  It appears there wasn't any discussion or

11   identification of the effect on birds in the report, but

12   you're free to go on to other areas.

13            MR. LOVETT:  Well, let me -- Mr. Becher will look.

14   If I find anything about birds, I'll come back.  But otherwise

15   I'll skip over that.

16            THE COURT:  Sure.

17   BY MR. LOVETT:

18   Q.   What is alkaline mine drainage?

19   A.   It's just drainage below a mine site that has a high pH,

20   alkaline waters.

21   Q.   Okay.  And what is ionic pollution?

22   A.   It refers to water that has a high concentration of ions;

23   and in this case, it's things like sulfate, bicarbonate, all

24   the things we typically focus on with respect to this case.

25   Q.   And what is conductivity?

Palmer - Direct

1   A.    It's a measure of that ionic strength.  In fact, it's

2   technically a measure of the ability of the water to conduct

3   an electrical current, but that's determined by ions.

4           MR. LOVETT:  Well, the report, Your Honor, does say

5   that it -- the paper indicates that conductivity affects the

6   macroinvertebrates, resulting in impacts higher up the food

7   chain.

8       I mean, to me that includes birds, and it was a small

9   point.

10          MR. MCLUSKY:  Your Honor, I don't doubt there's

11  background information in the report, but there's no opinions

12  in the report offered about this site.

13          MR. LOVETT:  All she offered just now is an opinion

14  that this affects life higher up the food chain, the loss of

15  insects, like birds --

16          THE COURT:  All right.

17          MR. LOVETT:  -- which is essentially what her report

18  says, except it doesn't say "like birds."

19          THE COURT:  All right.

20  BY MR. LOVETT:

21  Q.    And what is the relationship between ionic pollution and

22  conductivity?

23  A.    Well, the more ionic pollution, the higher the

24  conductivity.

25  Q.    And are we only talking about -- let's limit ourselves --

Palmer - Direct

 1  would you limit your testimony, please, to ionic pollution and

 2  conductivity related to surface mining in the Appalachian

 3  region?

 4  A.    Yes.

 5  Q.    And does that conductivity have a particular makeup,

 6  generally, ionic composition?

 7  A.    Yeah.   There's a fairly characteristic makeup of --

 8  dominated by particularly sulfates but also bicarbonate and

 9  often calcium, magnesium.   There can be other constituents in

10  smaller amounts, like sometimes potassium, sometimes chloride,

11  little bit.

12  Q.    Does surface mining in Appalachia create ionic pollution

13  and increased conductivity?

14  A.    Yes, it does.

15  Q.    Okay.   And why?

16  A.    Well, when -- so let's take, for example, when mining

17  occurs and the material is brought up from depths hundreds of

18  feet often and valley fills are formed or the material is just

19  left sitting on the surface.   It hasn't been exposed to air

20  and water for a long time.   And when it rains and there's

21  oxygen, you tend to mobilize these ions.   Initially you

22  actually get something like sulfuric acid and then it's then

23  neutralized, and these constituents go into solution very

24  readily.

25  Q.    And do high levels of ionic pollution and conductivity

Palmer - Direct

1  cause biological impairment?

2  A.    They do.

3  Q.    And is there any doubt that high levels of ionic

4  pollution and conductivity materially contribute to

5  impairment?

6  A.    If my understanding of the word "material" is correct,

7  yes; and that is, that there is a strong relationship and

8  evidence of causation between high conductivity and

9  impairment.

10  Q.    Okay.  How does the ionic pollution and conductivity

11  cause impairment?

12  A.    Well, the -- most all the evidence to date is pointing to

13  what we have long suspected, which is its osmoregulation, that

14  the organisms have a difficult time maintaining their water

15  balance, their ionic balance in their bodies, and that that

16  ultimately causes probably reduced reproduction but certainly

17  extirpation.

18  Q.    How long have ecologists understood that salts are a

19  problem for osmoregulation, osmotic regulation?

20  A.    Long before I was born.

21  Q.    All right.  But now the science is coming to this region

22  and showing that these insects are having the same kinds of

23  problems that were found with other organisms in the past?

24  A.    Right.  You can't take an organism from salt water and

25  put it in freshwater or vice versa.  They can't osmoregulate.

Palmer - Direct

1   But now there is evidence that the actual mixtures that are

2   characteristic of these mines cause problems with the

3   organisms which aren't necessarily linked to a specific ion

4   but to the ionic strength, the total ionic strength.

5   Q.   And does the presence or absence of those insects allow

6   ecologists to determine whether a stream is healthy or not?

7   A.   That's correct.

8   Q.   Has the relationship between surface mining and

9   biological impairment of downstream waters been, in your

10  opinion, definitively established in the scientific

11  literature?

12  A.   I have at this point absolutely no doubt.  There are so

13  many studies that have been done, using very different methods

14  and very different places that have all reached the same

15  conclusion.

16  Q.   Peer-reviewed studies?

17  A.   Peer-reviewed studies, all of them.

18  Q.   Are there any peer-reviewed papers to the contrary?

19  A.   I do not know of any.

20  Q.   Okay.  Well, I say peer-reviewed papers that have been

21  published to the contrary.

22  A.   I don't know of any.  I've not seen any.

23  Q.   And as a scientist, when you see tens of journal

24  articles, peer-reviewed journal articles published, all

25  reaching the same conclusion based on different lines of

Palmer - Direct

1    reasoning, on the one side, and no peer-reviewed articles

2    published on the other, is that generally a good indication

3    that the science is a mature science reaching a conclusion

4    that's well-established in the scientific community?

5    A.    Yes.  And, in fact, I mean, one of the things we're

6    taught very early on as a scientist, that the strongest form

7    of inference you can make is if you have multiple ways to

8    reach the same conclusion, if you use multiple methods,

9    different kinds of experiments, observations, and particularly

10   if different people do this work so that you can eliminate

11   potential methodological differences that individuals might

12   impart.

13   Q.    And you think the benchmark is good science, right?

14   A.    I do.

15   Q.    But it's only one of the methods that are used to -- have

16   been used to establish this relationship or this causal effect

17   between conductivity and impairment, right?

18   A.    That's correct.

19   Q.    And even the data that the benchmark relies on aren't

20   relied on by many of the other authors in this area, right?

21   A.    Well, many of the papers that have come out with the same

22   sort of relationship have been experimental approaches,

23   have -- correct, they're not using the benchmark.

24   Q.    Right.  We'll go through this one to establish that early

25   on.

Palmer - Direct

1      Do you know about how many, just off the top of your

2    head, about how many peer-reviewed and published articles

3    there have been on the relationship between ionic stress and

4    impairment related to surface mining?

5    A.    My guess would be somewhere between 25 and 30 now.

6    Q.    Okay.  And do you know about how many authors there have

7    been on those published peer-reviewed journal articles?

8    A.    I haven't actually counted them up.  My guess is over 50.

9    Maybe 60.  I don't know.

10   Q.    Have you reached an opinion about whether the scientific

11   literature establishes that there is a causal relationship

12   between surface mines in Central Appalachia and downstream

13   biological impairment?

14   A.    I have.

15   Q.    And what is your opinion?

16   A.    My opinion is that the surface mines that have this

17   alkaline mine drainage in this part of the country result in

18   conductivity levels which exceed those that are able to

19   support the sensitive species, the species you'd expect to

20   find in those streams without the mining.

21   Q.    Have you reached an opinion about whether the scientific

22   literature establishes that there is a causal relationship

23   between discharges of ionic mixture of high conductivity

24   alkaline drainage from mines in Central Appalachia and

25   downstream biological impairment?

Palmer - Direct

1    A.   Yes, I have.

2    Q.   And what is your opinion?

3    A.   Well, my opinion is that the causative factor is the

4    elevated conductivity.

5    Q.   Okay.   What was the first publication that identified the

6    impacts of surface coal mining and conductivity on macro-

7    invertebrates in Central Appalachia?

8    A.   I believe that probably -- well, there's three or four I

9    can think of right off the bat, and I would have to look to

10   see the exact dates.   But there was a programmatic draft

11   Environmental Impact Statement.   There was a paper by Hartman

12   that came out a good while ago.   There was a U. S. --

13   Q.   Let's stop.   Let's start --

14          THE COURT:   We're going to need to take a break at

15   some point.   Is this a good time?

16          MR. LOVETT:   Okay.   Good place, Your Honor.

17          THE COURT:   All right.   We're going to take a

18   recess.   We'll reconvene at 1:15.

19      You may step down, but don't discuss your testimony.

20      (Lunch recess from 12:06 p.m. to 1:18 p.m.)

21

22

23

24

25

Palmer - Direct

1                    AFTERNOON SESSION

2          THE COURT:   Ready to proceed?

3          MR. LOVETT:   Yes, Your Honor.

4          THE COURT:   Go ahead.

5    BY MR. LOVETT:

6    Q.   Good afternoon, Dr. Palmer.  We were just beginning to

7    talk about the scientific literature establishing the

8    relationship between conductivity and impairment, and I asked

9    you about the mountaintop mining valley fill EIS.

10         Do you recall that?

11   A.   Yes.

12   Q.   And that was published in 2003; is that right?

13   A.   That sounds right.

14   Q.   Okay.  What did the EIS identify to be the downstream

15   impacts from valley fills?

16   A.   They looked at a variety of things, but specifically

17   pointed out changes in water chemistry, including

18   conductivity, and also changes in biological, you know,

19   assemblages.

20   Q.   And did it find an increased concentration of sulfates,

21   dissolved solids, TDS?

22   A.   Yes, it did.

23   Q.   Okay.  And did the EIS also notice an increase in

24   specific conductance was associated with the decrease in

25   sensitive taxa in the streams?

Palmer - Direct

1    A.   That's correct.

2    Q.   Okay.  So that was 2003, right?

3    A.   Yes.

4    Q.   And then in 2004, was there a paper by Kennedy et al.?

5    Do you recall that?

6    A.   Yes.  I wasn't positive of the exact date, but, yes, I

7    know the Kennedy paper.  Yes.

8    Q.   Do you know what that paper established?

9    A.   I believe it was Kennedy and Cherry, and they did, as I

10   recall, maybe a combination of sampling, but they also exposed

11   organisms to elevated conductivity levels, elevated mixtures,

12   and showed, you know, loss of those.

13   Q.   And then in 2005 did Hartman again show the specific

14   conductance was elevated below fills?

15   A.   He did, and I think that was a field study --

16   Q.   Uh-huh.

17   A.   -- a laboratory study.

18   Q.   Did he find that mayfly richness was affected?

19   A.   Yes.  Hartman did, yes.

20   Q.   Okay.  And then were you in this courtroom in 2006 when

21   Dr. Bruce Wallace testified in, I believe -- I can't remember

22   which case it was.  Highland Reylas, maybe?

23   A.   It was Aracoma.

24   Q.   Aracoma?  Okay.

25   A.   I remember.

Palmer - Direct

1   Q.   Okay.  Were you here when he testified about

2   conductivity?

3   A.   I did.  I mean, I was.

4   Q.   And what did he testify to?

5   A.   He testified that --

6            MR. MCLUSKY:  Your Honor, I object.  This is

7   hearsay.  She can rely on hearsay, but she can't parrot the

8   hearsay and bootstrap her way into it.

9            THE COURT:  I agree.

10  BY MR. LOVETT:

11  Q.   Okay.  Did you read the opinion from the Court that came

12  from that hearing?

13  A.   I did read that opinion.

14  Q.   And you heard Dr. Wallace testify?

15  A.   I heard him testify, yes.

16  Q.   Okay.  And did the Court's opinion cite Dr. Wallace's

17  testimony, if you recall?

18  A.   It did cite Dr. Wallace's testimony.

19  Q.   Okay.  So then in 2008 there was a paper published by

20  Pond; is that correct?

21  A.   Yes, in the *Journal of the North American Benthological*.

22  Q.   Do you have the joint exhibits up there with you?

23  A.   Yes.

24            MR. LOVETT:  Your Honor, we have here, I think, an

25  agreed-to list of excerpts.

Palmer - Direct

1          THE COURT:  I can't hear you very well.

2          MR. LOVETT:  We have an agreed-to list of excerpts

3    by the parties, just to prevent Dr. Palmer and any other

4    witness from having to read extensive comments into the

5    record.  So we've stipulated -- I believe this is right -- to

6    all of the parts that are in this, that are in this packet.

7       I'm going to have Dr. Palmer go through it quickly and

8    she'll note some parts of it, without having to read

9    everything.  But all of the text that is reproduced here I

10   believe will be admitted into evidence without objection.

11      And so I think it's easier to go through the testimony

12   with this packet, rather than go through each paper itself.

13         THE COURT:  All right.  I have no problem with that.

14      Is this packet one -- is this going to be an exhibit?

15         MR. LOVETT:  Yes.  It will be Plaintiffs'

16   Exhibit 173.

17         THE COURT:  And Plaintiffs' Exhibit 173 will consist

18   of, it looks like, three --

19         MR. LOVETT:  No, this is three copies of 173.  It's

20   essentially that.  (Indicating)

21         THE COURT:  All right.  I've got you.

22         MR. LOVETT:  Mr. McLusky has a problem.

23         MR. MCLUSKY:  Your Honor, I think our understanding

24   of the agreement -- and there may be some misunderstanding --

25   we have no objections, to the extent these are otherwise

Palmer - Direct

1  admissible, that the written document come in rather than

2  taking time reading, but we do have problems with two or three

3  of these papers.  I'm happy to take them up now or as they

4  come in.

5           THE COURT:  It would be clearer for me if we dealt

6  with them as they came in and came up.

7           MR. MCLUSKY:  If you'll give me a minute, I can tell

8  Mr. Lovett what they are.

9           THE COURT:  That's fine.

10      (Mr. McLusky and Mr. Lovett conferred privately off the

11  record.)

12           MR. LOVETT:  Let's just wait.  I think it will be

13  easier.

14      May I approach, Your Honor?

15           THE COURT:  You may.

16  BY MR. LOVETT:

17  Q.   So at JE 0185 in Exhibit 173, you find the Pond, Passmore

18  et al. 2008 paper, correct?

19  A.   I'm sorry?  875?

20  Q.   It's the first paper in Exhibit 173.  If you look at the

21  bottom at the page number --

22  A.   I see 182.

23  Q.   Really?  It's not the first page?  Do you see "Downstream

24  effects of mountaintop coal mining"?

25  A.   That's it.  At the bottom it says JE 185.

Palmer - Direct

1   Q.   Yes, JE 185.

2   A.   Oh, I'm sorry.  I must have misunderstood you.

3        Go ahead.  Sorry.

4   Q.   Anyway, before you is an excerpt from the Pond article,

5   right?

6   A.   Yes.

7   Q.   You've read the whole article several times?

8   A.   I have, yes.

9   Q.   Okay.  What does this article conclude?

10  A.   He -- well, he looked at sites below mined areas and

11  valley fills and sites that were reference sites but were

12  unimpacted and concluded that there was strong evidence that

13  you had loss, you know, changes in species assemblages and

14  loss of taxa, particularly mayflies, and that that was

15  associated with water chemistry.

16  Q.   So he found strong evidence of a causal link between

17  biological impairment and conductivity; is that right?

18  A.   He concluded there was a link, yes.

19  Q.   Okay.  And he used a method different from the EPA

20  benchmark, didn't he?

21  A.   Yes, he did, because this was direct field sampling,

22  comparing sites with and without mine and valley fills.

23  Q.   He didn't rely on the DEP database at all.

24  A.   No, he did not.

25  Q.   The next -- anything else about this paper that's

Palmer - Direct

1   important?

2   A.   Well, just that it's been cited a lot, good experimental

3   field work, taking a very different approach.

4   Q.   All right.

5   A.   Well, I should say he found 93 percent of the mine

6   streams were impaired, which is a large number.

7   Q.   Let's turn to the next Pond article, which is a 2010

8   article at PE 1526.

9        Do you see that?

10  A.   Yes.

11  Q.   Okay.  And did Pond there find that -- well, what did

12  Pond find?

13  A.   Well, in this case he was specifically looking at loss of

14  mayflies --

15  Q.   Uh-huh.

16  A.   -- from streams in Kentucky.

17  Q.   Uh-huh.

18  A.   And what he showed was that -- so he looked across 92

19  sites, and a fraction of these were reference sites.  Some of

20  them were mine sites and some were a combination of different

21  land uses, specifically residential development, mixed land

22  uses.

23       And in this, he shows that taxa richness, that is, the

24  number of different groups of mayflies and their relative

25  abundance, were much higher in reference sites compared to all

Palmer - Direct

1    the other categories, and that mine sites were significantly

2    lower than the other categories, even compared to residential

3    or mixed -- excuse me -- mined and residential sites.

4    Q.   Okay.  And did he find that the abundance of mayflies was

5    more closely related to conductivity than to habitat?

6    A.   That's my recollection, yes.

7    Q.   Okay.  Again, did he use a data and method different from

8    the EPA benchmark?

9    A.   He did.  He, again, used a field-based approach, and he

10   went to a region that was totally different from his prior

11   study in 2008.

12   Q.   Okay.  The next paper is from *Science Policy Forum*.

13   You're an author of this paper, right?  That's at "Mountaintop

14   Mining Consequences"?

15   A.   That's correct.

16   Q.   And what was the finding of this paper?

17   A.   The paper put together material from a variety of

18   sources, as well as pulling data directly from DEP, and looked

19   at the relationship between water chemistry and mining and

20   also looked at the relationship between West Virginia indices

21   and mayflies and mining and showed that there was a

22   significant decline, you know, poor water quality, higher

23   conductivity, including the dissolved constituents, and fewer

24   taxa.

25   Q.   Including a decline in mayflies, right?

Palmer - Direct

1    A.   Yes, including a decline in mayflies.

2    Q.   And, again, did that use the -- did that rely on the DEP

3    database or on the benchmark?

4    A.   We did use some of the DEP database data for that, but,

5    no, we didn't use the benchmark.  We didn't have the

6    benchmark.

7    Q.   You didn't sort the DEP database or use it in the same

8    way that the EPA did when it came up with the benchmark, did

9    it -- did you?

10   A.   We did not.  We were not looking for threshold effects or

11   anything like that.

12   Q.   The next paper is 1667.

13       No.  Let's see.  That's not for this.  That's for the

14   next witness.  I'm sorry.

15       Let's go on to JE 0162, the Merriam paper.

16       MR. MCLUSKY:  What was the page, Joe?

17   BY MR. LOVETT:

18   Q.   I thought we had this down.  I'm trying to find it in

19   this notebook.

20       You have to skip way ahead to JE 0 --

21   A.   I did find it.

22   Q.   -- 162.  Did you find it?

23   A.   Yes.

24   Q.   Okay.  It's Merriam et al.?

25   A.   Yes.

Palmer - Direct

1   Q.   Okay.

2           THE COURT:  Where did you find it?

3           THE WITNESS:  It was after that one that he said was

4   for another witness.  So it was after PE 1720.

5           MR. LOVETT:  There are many pages, Your Honor,

6   between the last exhibit and this one.

7           THE COURT:  All right.  Go ahead.

8   BY MR. LOVETT:

9   Q.   Okay.  Anyway, this is called "Additive effects of mining

10  and residential development on stream conditions in central

11  Appalachia" by Merriam et al., right?

12  A.   Yes.

13  Q.   Published where?

14  A.   This was published in the *Journal of the North American*

15  *Benthological Society*.

16  Q.   Okay.  A peer-reviewed journal?

17  A.   Yes, very rigorous.

18  Q.   All the previous papers were also peer-reviewed journals;

19  is that right?

20  A.   That's correct.

21  Q.   Thank you.

22           And what did Merriam find?

23  A.   Well, they -- once again, they looked at the combined

24  effects of -- well, distinguished between mined -- streams

25  that had mining in the watershed versus ones that had some

Palmer - Direct

1   form of development and mining versus ones that did not.   And

2   they found that both had impacts, some impacts; but when you

3   looked at mining and residential or development, that there

4   were additive effects, and so both were contributing to

5   changes in the community structure.

6   Q.   So another article essentially confirming the theory that

7   you've testified here about the linkage between conductivity

8   and impairment, right?

9   A.   That's correct.

10  Q.   And, again, this did not rely on the DEP database or on

11  the methodology used in the benchmark, right?

12  A.   That's correct.

13  Q.   Okay.   Next, let's turn to -- that's the benchmark.

14  Okay.

15       All right.   We're going to use the entire -- the

16  benchmark is a joint exhibit, and so I apologize for going

17  back and forth in the notebooks.   But if you'd turn to the

18  joint exhibits, it is Exhibit --

19            MR. HECKER:   17.

20  BY MR. LOVETT:

21  Q.   -- 17.   Do you recognize that?

22  A.   Yes.

23  Q.   And that's the EPA benchmark, correct?

24  A.   Correct.

25  Q.   Okay.   You've read the benchmark and are very familiar

Palmer - Direct

1    with it; is that right?

2    A.   I have.

3    Q.   And do you believe the benchmark is good science?

4    A.   I do think it's very good science.

5    Q.   Okay.  This is the first time that -- so we're now in

6    2011, and we started in 2002, and this is the first time that

7    the DEP database has been used in the way that Dr. Garabrant

8    criticized the other day, yesterday; is that right?

9    A.   That's correct.

10   Q.   Okay.  Do you believe that even before the benchmark came

11   out, there was a link established in the published literature

12   between conductivity and impairment in Appalachian headwater

13   streams as related to surface mining?

14   A.   There was established such a relationship.

15   Q.   What did the benchmark find, generally?

16   A.   Well, the benchmark generally found that when

17   conductivity was, you know, below 300, that this was

18   protective of about 95 percent of the genera.

19   Q.   Okay.  Let's turn to page A36.

20          THE REPORTER:  I'm sorry.  Did you say "A36"?

21          MR. LOVETT:  A36.

22          THE WITNESS:  Okay.

23   BY MR. LOVETT:

24   Q.   Is it the table we looked at --

25          (Mr. Lovett and Mr. Hecker conferred privately off the

Palmer - Direct

1   record.)

2   BY MR. LOVETT:

3   Q.    This is the table we've looked at several times in this

4   courtroom, right?

5   A.    I think so, yes.

6   Q.    And the last sentence above that, could you read that,

7   please?

8   A.    "At the benchmark of 300" --

9   Q.    No, no, I'm sorry.  It starts, "Using logistic

10  regression."  It's the sentence that is just before the figure

11  A-9.  Maybe you're on the wrong page.

12  A.    Yes, I found it.

13  Q.    Okay.

14  A.    "Using logistic regression, the probability of impairment

15  at 500 microsiemens per centimeter is .72."

16  Q.    And?

17  A.    "And at 300 microsiemens, it's .59."

18  Q.    So that means that when stream levels reach 300

19  microsiemens per centimeter, it's 59 percent likely that there

20  will be impairment.

21  A.    Correct.

22  Q.    Is that right?  And that when it reaches 500 microsiemens

23  per centimeter, it's 72 percent likely.

24  A.    Yes.

25  Q.    And that continues, that percentage continues to increase

Palmer - Direct

1  as the conductivity increases, right?

2  A.    That's correct.

3  Q.    Did the benchmark consider -- strike that.  I don't want

4  to be cumulative, and I think Dr. -- I think we'll have

5  testimony about that later.

6      So let's turn to the next exhibit, which is the EPA

7  Scientific Advisory Board review of the benchmark.  And that

8  should be attached -- part of the same exhibit, I think.

9      No, I'm wrong.

10     (Mr. Lovett and Mr. Hecker conferred privately off the

11  record.)

12  BY MR. LOVETT:

13  Q.    Plaintiffs' 128, which is the SAB review of the

14  benchmark, do you see that?

15  A.    Yes.

16  Q.    Okay.  On page 1 -- this is a letter from EPA.  It's in

17  the form of a letter from EPA, right, to -- from the

18  Scientific Advisory Board to the administrator of EPA?

19  A.    That's correct.

20  Q.    Would you read the last paragraph on that page?

21  A.    "Mountaintop mining and valley fills are important

22  sources of stress to aquatic systems in the Central

23  Appalachian region, both from the perspective of localized and

24  cumulative regional impacts.  In a companion report, the Panel

25  provides a review of EPA's assessment of the impacts

113

Palmer - Direct

1   associated with mountaintop mining and valley fills.  There is

2   clear evidence that valley fills are associated with increased

3   levels of conductivity associated with changes in the

4   composition of stream biological communities."

5   Q.   Okay.  I think you might have missed a line there.

6   A.   I missed a line?

7   Q.   All right.  Does yours say, "There is clear evidence that

8   valley fills are associated with increased levels of dissolved

9   ions"?

10  A.   Yes.  Yeah.  I'm sorry.  I guess I spaced -- "There is

11  clear evidence that valley fills are associated with increased

12  levels of dissolved ions (measured as conductivity)" --

13  Q.   Okay.

14  A.   -- "in downstream waters, and that these increased levels

15  of conductivity are associated with changes in the composition

16  of stream biological" --

17  Q.   I just wanted to make sure we were reading from the

18  same --

19  A.   Sorry.

20  Q.   Okay.  And then I don't want to ask you to read that much

21  from this, but it's an important document.  So there are two

22  or three passages.

23       Would you read the next sentence, please?  "The SAB

24  applauds."

25  A.   "The SAB applauds the Agency's efforts to assess the

Palmer - Direct

1      linkages between measured levels of conductivity and the

2      presence or absence of native aquatic insects in Appalachian

3      streams.  The field-based methodology for establishing a

4      conductivity benchmark provides greater realism than

5      traditional laboratory-based methods because it includes

6      native taxa and a range of life stages."

7      Q.    Okay.  So EPA was aware of the fact that the benchmark --

8      or the Scientific Advisory Board was aware that the benchmark

9      was not based on laboratory data, right?

10     A.    That's correct.

11     Q.    They actually saw that as a benefit.

12     A.    They did.

13     Q.    Okay.  And then would you turn to page 3, please, and

14     read the first sentence of the -- the first two sentences of

15     the "Causality between Extirpation and Conductivity" section.

16     A.    Beginning, "The field-based approach"?

17     Q.    No, beginning "Building a strong case."  It's page 3.

18     A.    I don't believe I have that.

19     Q.    Do you have page 3 of that letter?

20     A.    Well, it goes 1419 to 1420.

21          (Mr. Hecker and Mr. Lovett conferred privately off the

22     record.)

23     BY MR. LOVETT:

24     Q.    Okay.  I'm sorry.  Would you turn to tab 128 in the

25     plaintiffs' exhibits?

115

Palmer - Direct

1          THE COURT:  I think this is tab 128.

2          THE WITNESS:  That's what we were on.

3    BY MR. LOVETT:

4    Q.   Are you in the plaintiffs' exhibits?  Now you're not.

5    A.   I am.

6         (Mr. McLusky and Mr. Lovett conferred privately off the

7    record.)

8    BY MR. LOVETT:

9    Q.   Turn to page 1431, please.

10   A.   Okay.

11   Q.   Now, this is a different document.  It's the -- this is

12   the Panel statement itself, right?  Starts on 1422?

13   A.   Yes, that looks to be the case.  Yes.

14   Q.   Would you read the sentence, then, that says, "Building a

15   strong case"?

16   A.   It's entitled "Causality between Extirpation and

17   Conductivity."

18       "Building a strong case for causality between

19   conductivity and loss of genera requires that two linkages be

20   demonstrated:  (1) a strong relationship between stream

21   conductivity and the amount of mountaintop mine valley fill in

22   the upstream catchment, and (2) a strong relationship between

23   elevated stream conductivity and loss of benthic macro-

24   invertebrate taxa.  The EPA document presents a convincing

25   case for both linkages.  To further strengthen the scientific

Palmer - Direct

1   basis for the benchmark, the Panel recommends that the

2   document include more information on the constituent ions that

3   contribute to conductivity at the sampled sites, and on the

4   likely mechanisms of extirpation produced by the constituent

5   ions."

6   Q.   Okay.  Do you agree that the benchmark builds a -- that

7   there has been a strong relationship shown between stream

8   conductivity and the amount of mountaintop removal valley

9   fills in the upstream catchment?

10  A.   Yes.

11  Q.   Do you also agree that there has been a strong

12  relationship shown between elevated stream conductivity and

13  the loss of benthic macroinvertebrate taxa?

14  A.   Yes, it does.

15  Q.   EPA recommends strengthening it by including more

16  information on the constituent ions, right?

17  A.   They did.

18  Q.   Has that been done since then?

19  A.   Yes.  It's in the final benchmark report.

20  Q.   Okay.  And would you turn lastly to the next page, 1432,

21  where -- and read the last -- the full paragraph there

22  beginning, "The Panel recommends."

23  A.   You mean "The Panel concluded"?

24  Q.   "Concluded."  I'm sorry.

25  A.   "The Panel concluded that the field-based method used to

Palmer - Direct

1   develop the conductivity benchmark was quite general and

2   sufficiently flexible to allow the approach (though not the

3   benchmark value) to be transferred to other regions with

4   different ionic" --

5   Q.   I'm sorry.  I had the wrong -- the next paper in the

6   Exhibit 173 is Bernhardt et al. at JE 0001.

7   A.   Yes.

8   Q.   Are you familiar with this paper?

9   A.   I am.

10   Q.   And are you co-author of it?

11   A.   Yes.

12   Q.   When was it published?

13   A.   It was published in 2011.

14   Q.   And where was it published?

15   A.   *The Annals of the New York Academy of Sciences*.

16   Q.   What did it conclude?

17   A.   Pardon me?

18   Q.   What did it conclude?

19   A.   It concluded that there was a significant relationship

20   between mining and chemical changes in the water and streams

21   below these and that that was strongly associated with

22   biological impairment.

23   Q.   Okay.  Did that rely on the same methodology and data

24   that the benchmark did?

25   A.   No, it didn't.  This was really more of a synthesis of

Palmer - Direct

1   studies and summarizing the evidence.

2   Q.    Okay.   Next is PE 1759 in the same exhibit, "Cumulative

3   impacts of mountaintop mining on an Appalachian watershed" by

4   Lindberg, Bernhardt at al.?

5   A.    Yes.

6   Q.    Okay.   Are you familiar with that paper?

7   A.    I've read it, yes.

8   Q.    Okay.   Can you turn to page 1761, and you'll see there a

9   series of figures, and explain those figures to the Court.

10  A.    Well, this study was particularly compelling because they

11  went into a watershed to sample where they could look at

12  sub-watersheds of the overall watershed that had different

13  amounts of mining.   And as they moved to larger and larger

14  watersheds, basically they were getting a larger fraction of

15  the watershed area mined.   But they sampled each of those

16  points separately.

17       And so they were able to show that as you go from

18  essentially no mining, all the way up to a watershed that's

19  extensively mined by an aerial measurement, that the -- you

20  had tremendous changes in sort of an almost additive way.   It

21  asks -- it appears that at some point, although it's not for

22  sure, conductivity increases, sulfate increases, and generally

23  selenium increased.

24       So the relationship between conductivity and the percent

25  of the watershed mined was highly significant.   And the same

Palmer - Direct

1    with sulfate and selenium.

2    Q.    And why is that important?

3    A.    Because it clearly establishes the cumulative impacts;

4    the more and more area that's mined in a watershed, the worse

5    the conditions get.

6    Q.    Okay.  Again, did this rely on the methodology from EPA?

7    A.    It did not.  This was direct field sampling in a way that

8    had not been done previously.

9    Q.    Okay.  Next paper, 1765, Pond paper.

10        Oh, by the way, where was that last paper published?

11   A.    I believe *Proceeding of the National Academy of Science*.

12   Q.    Okay.  Peer-reviewed?

13   A.    Very rigorously.

14   Q.    All right.  Pond 2011, do you see that one?

15   A.    Yes.

16   Q.    What did that paper show?

17   A.    Well, this is another example of Pond going into

18   Kentucky, and this time the focus was largely looking at

19   stoneflies and caddisfly communities in headwater streams and

20   looking at the relationship between both coal mining and

21   residential development, that is, disturbance to the land, and

22   what happens to stoneflies and caddisflies.

23        And he showed that the core caddisfly genera were

24   extirpated from most of the disturbed sites, but he also

25   remarked that there were no habitat factors that were really

Palmer - Direct

1    able to explain this pattern.

2    Q.   And is this based on field sampling that Pond performed?

3    A.   That's my recollection.

4    Q.   Not on -- obviously, not on the West Virginia --

5    A.   It's not, correct.  Correct.  And I don't -- it's not

6    based on a Kentucky database to my knowledge at all.  I'd have

7    to go look.

8    Q.   So it's science done independent from the benchmark.

9    A.   Correct.

10   Q.   Reaching the same conclusion as the benchmark.

11   A.   Pardon me?

12   Q.   Reaching the same conclusion as the benchmark.

13   A.   Reaching exactly the same conclusion.

14   Q.   The next paper is another Pond paper, at PE 1786,

15   "Calibration and validation of a regionally and" --

16             THE REPORTER:  I'm sorry.  Say that again.

17             MR. LOVETT:  Let's just call it "Calibration and

18   Validation" paper.

19   BY MR. LOVETT:

20   Q.   Do you see that one?

21   A.   Yes, I do.

22   Q.   Where was that published?

23   A.   This was published in *Environmental Monitoring and*

24   *Assessment*.

25   Q.   Okay.  A good journal?

Palmer - Direct

1   A.   It is a good journal.

2   Q.   And what did it find?

3   A.   It was describing the development and also the validation

4   of a genus-level index for assessing streams in West Virginia.

5   Q.   And did it essentially find that GLIMPSS is better than

6   WVSCI in detecting impairment and loss of taxa?

7               MR. MCLUSKY:   Your Honor, I question the relevance.

8   I think the Court has previously ruled that WVSCI is the

9   appropriate test in these cases.   It may be of some interest,

10  but I don't know that it's --

11              THE COURT:   Well, we'll see what the plaintiff is

12  trying to do with it.

13              MR. MCLUSKY:   I think he may be finished.

14              THE COURT:   Overruled.

15              THE WITNESS:   Yeah, the reason it was significant

16  was just pointing out that a genus-level index is much more

17  appropriate to use because the family-level index is not

18  adequately sensitive enough because it lumps genera that have

19  very different tolerance levels.

20  BY MR. LOVETT:

21  Q.   Let's next turn to JE 0020.

22  A.   Yes.

23  Q.   "How Many Mountains" by Bernhardt et al., right?

24  A.   Yes.

25  Q.   And what did that paper find?

Palmer - Direct

1   A.    Well, they looked at the relationship between the area

2   surface mines.  This was done through mapping using GS spatial

3   analysis.  There was a relationship between that and the water

4   chemistry, specifically the ionic strength and also the

5   sulfate concentrations.

6   Q.    Okay.  And let me have you read from the abstract the

7   last sentence from the abstract.

8   A.    "We find this" --

9   Q.    Well, read the sentence before, "Generalized additive

10  models."

11  A.    "Generalized additive models were used" --

12  Q.    Sorry.

13  A.    Is that right?

14  Q.    Yes, you're right.  I'm sorry.

15  A.    "Generalized additive models were used to estimate the

16  amount of watershed mining, stream ionic strength, or sulfate

17  concentrations beyond which biological impairment (based on

18  state biocriteria) is likely.  We find this threshold is

19  reached once surface coal mining -- mines occupy more than

20  5.4 percent of their contributing watershed area, ionic

21  strength exceeds 308 microsiemens per centimeter, or sulfate

22  concentrations exceed 50 milligrams per liter."

23  Q.    Okay.  So the 308 microsiemens per centimeter number is

24  slightly different from the EPA benchmark but essentially the

25  same; is that fair?

Palmer - Direct

1    A.   Yes, it is, remarkably similar.

2    Q.   And that number was reached using a different methodology

3    from the one used by EPA in the benchmark; is that right?

4    A.   That's correct.

5    Q.   Though it did rely on data from the DEP database, they

6    used it in a different way.

7    A.   Yes.  They didn't generate the -- determine the threshold

8    using the same methods.  They used --

9    Q.   Is it also --

10   A.   -- TITAN it's called.

11   Q.   I'm sorry.  Would you also turn to the next page, JE 022?

12   A.   Yes.

13   Q.   And then there's a -- on the gray squares on the

14   right-hand column, after the second gray square, there's a

15   sentence beginning, "Finally, GAMS."  Do you see that?  Would

16   you read that, please?

17   A.   "Finally, GAMs, general additive models, allowed us to

18   model the stressor-response relationship after controlling the

19   effect of instream habitat quality, a variable that influences

20   community metrics independently of catchment mining and stream

21   chemistry."

22   Q.   Okay.  So this paper found that even -- that it

23   eliminated habitat as the cause, right?

24   A.   Well, it took it into account, yes, and eliminated it

25   statistically; that's right.

Palmer - Direct

1    Q.   And that's just what the benchmark did too, didn't it?

2    A.   Well, the benchmark was able to determine that habitat

3    was a confounding factor that was a problem using a variety of

4    approaches, one of which was statistical, yes.

5    Q.   Okay.  So this is consistent with the benchmark.

6    A.   It is consistent, yes.

7    Q.   All right.  The next paper is PE 1812, Cormier and Suter.

8    A.   Is it in this packet?

9    Q.   It should be, right after "How Many Mountains" in the

10   packet.  "A Method for Deriving Water-Quality Benchmarks."

11   A.   I found it.

12   Q.   Now, there's a series of papers from Cormier and Suter

13   that have much of the data in them from the benchmark, right?

14   A.   Correct.

15   Q.   We'll go through these quickly.

16        The first one is "A Method for Deriving Water-Quality

17   Benchmarks."

18        What does that paper show?

19   A.   It's essentially describing the method that allowed them

20   to use data, observational data from the field, on genera and

21   estimate the point at which 5 percent are adversely affected.

22   Q.   Would you --

23   A.   It describes the method.

24   Q.   Would you read the last sentence from the abstract

25   beginning "Observations."

Palmer - Direct

1    A.    "Observations from field studies include the full range

2    of conditions, effects, species, and interactions that occur

3    in the environment and can be used to model some causal

4    relationships that laboratory studies cannot."

5    Q.    Okay.  And where is it published?

6    A.    This is published in *Environmental Toxicology and*

7    *Chemistry*.

8    Q.    Okay.  Let's move on to the next one, "Derivation of a

9    Benchmark."

10   A.    Yes.

11   Q.    Do you remember what that paper generally does?

12   A.    This talks more specifically about how they develop the

13   benchmark for specific conductance, which was a measure of the

14   ionic strength, and specifically the benchmark that would

15   prevent extirpation of about 95 percent of the species in the

16   specific setting they were referring to, the alkaline mine

17   drainage.

18   Q.    And like the benchmark, it set that level at 300

19   microsiemens per centimeter; is that --

20   A.    That's correct.

21   Q.    The next one is "A Method for Assessing Causation of

22   Field Exposure-Response Relationships."

23          Do you see that one?

24   A.    Yes.

25   Q.    Okay.  And -- but do you remember what's the importance

Palmer - Direct

1   of this paper?

2   A.   Well, this was another methods description paper; and in

3   this case, they're talking about use of the weight of evidence

4   system, which is --

5   Q.   Uh-huh.

6   A.   It's similar to what I referred to earlier when I said

7   the best science is when you approach something from a variety

8   of different directions.  But in this case, the idea is that

9   multiple lines of evidence are used to establish causation, in

10  this case the relationship between conductivity and impairment

11  or loss of taxa.

12  Q.   Okay.  Next, let's turn to "Assessing Causation of the

13  Extirpation of Stream Macroinvertebrates by a Mixture of

14  Ions."

15  A.   Okay.

16  Q.   Okay.  Would you read the first, say, half or little more

17  than half of the abstract?

18  A.   "Increased ionic concentrations are associated with the

19  impairment of benthic invertebrate assemblages.  However, the

20  causal nature of that relationship must be demonstrated so

21  that it can be used to derive a benchmark for conductivity.

22  The available evidence is organized in terms of six

23  characteristics of causation: co-occurrence, preceding

24  causation, interaction, alteration, sufficiency, and time

25  order.  The inferential approach is to weight the lines of

Palmer - Direct

1    evidence using a consistent scoring system, weigh the evidence

2    for each causal characteristic, and then assess the body of

3    evidence.  Through this assessment, the authors found that a

4    mixture containing the ions calcium, magnesium, bicarbonate,

5    and sulfate as measured by conductivity, is a common cause of

6    extirpation of aquatic macroinvertebrates in Appalachia where

7    surface coal mining is prevalent."

8    Q.    Thank you.  And would you turn to the last page of that,

9    on JE 088?

10   A.    Okay.

11   Q.    Do you see the conclusion?

12   A.    Yes.

13   Q.    Would you read the first sentence of the conclusion?

14   A.    "The evaluation of the body of evidence showed that the

15   available evidence supports a causal relationship between

16   mixtures of matrix ions in streams of ecoregions 68, 69, and

17   70 and resulting biological impairments."

18   Q.    And do you agree with that conclusion based on the papers

19   that -- at least that paper and the paper that preceded it by

20   Suter and Cormier?

21   A.    I do agree with that, yes.

22   Q.    The next one is "A Method for Assessing the Potential for

23   Confounding Applied to Ionic Strength in Central Appalachian

24   Streams."

25         Do you see that one?

Palmer - Direct

1    A.    Yes.

2    Q.    Would you turn to JE 0094, please?

3    A.    Okay.

4    Q.    Do you see the sentence in the second column beginning,

5    "Habitat score"?

6    A.    "Habitat score had a very slight effect on the intercept

7    and the slope for conductivity in a multiple regression.   In

8    addition, Ephemeroptera occur even when habitat is poor.   The

9    weight of the scored body of evidence indicated habitat was

10   not a substantial confounder."

11   Q.    Okay.  So Suter and Cormier considered habitat as a

12   confounder and rejected it, right?

13   A.    That's correct.

14   Q.    And is that also what Bernhardt just did?

15   A.    Correct.

16   Q.    Different --

17   A.    And Pond, yes.

18   Q.    All different methods.

19   A.    All different methods.

20   Q.    All published in different journals.

21   A.    Yes.

22   Q.    All peer-reviewed journals.

23   A.    Yes.

24   Q.    All top-flight journals in their fields.

25   A.    Yes.

Palmer - Direct

1   Q.   Okay.  Would you read the next sentence?

2   A.   "No evidence supported embeddedness as a confounder."

3   Q.   Okay.  So, again, Suter and Cormier considered

4   specifically embeddedness and rejected it as a confounder,

5   right?

6   A.   Correct.

7   Q.   Okay.  Would you turn again to JE 0096?

8   A.   Yes.

9   Q.   And do you see -- would you read the sentence in the

10   second column?

11   A.   "The weight of evidence for confounding from ponds is

12   uniformly negative, so we conclude that the presence of ponds

13   has little or no effect on invertebrate response to

14   conductivity."

15   Q.   Again, eliminating ponds as well as the other factors as

16   confounders, right?

17   A.   Correct.

18   Q.   Okay.  The last one, the last Suter and Cormier, let's

19   skip that one and move on to the next Pond article, which is

20   Pond 2014 at page 1825.

21   A.   Okay.

22   Q.   What did Pond do in that study?

23   A.   Here, Pond took a different approach.  So he went to

24   headwater streams that had valley fills in them that had been

25   reclaimed previously, some reclaimed as long ago as 33 years

Palmer - Direct

1    prior to 2011, and then sampled -- also sampled local

2    reference streams that had no valley fills and then he

3    compared what he found in those two.

4    Q.    Okay.  And would you turn to PE 1835?

5    A.    Okay.

6    Q.    Would you read the sentence that begins with the numeral

7    3?

8    A.    "Water quality is most likely the primary barrier to

9    recovery but proximity to clean sources (intervening tribs)

10   may include some sensitive taxa that increase the biological

11   indices used to measure condition."

12   Q.    What does that mean?

13   A.    Well, what it means is that water quality will cause

14   extirpation, but if you have a tributary that flows into a

15   stream with high conductivity but the tributary is healthy,

16   then you can get drifting organisms moving into that.  So

17   you're sometimes going to get organisms you don't expect.

18   Q.    So if you have one stream high in conductivity and

19   another stream that's low in conductivity beside one another,

20   you're likely to get drift of organisms into the high

21   conductivity stream.

22   A.    That's correct.  No question.

23   Q.    Would you turn the page to 1836?  And in the first

24   column, the second -- I think it's the second sentence

25   beginning "Habitat," do you see that?

Palmer - Direct

1    A.    Yes.

2    Q.    Would you read that, please?

3    A.    "Habitat can be a limiting factor, but by design, we

4    removed significant habitat degradation factors by selecting

5    sample reaches with relatively good habitat and intact

6    riparian vegetation at reference and valley fill sites."

7    Q.    So Pond here, in essence, did the same thing that the

8    benchmark and Bernhardt did and removed habitat as a

9    confounder.

10   A.    Yes.  He did it in a different way; by his experimental

11   design, removed it so that it wouldn't confound the results.

12   Q.    Right.  He didn't do the same statistical analysis that

13   EPA did.  He gathered different data and went at it in a

14   different way.

15   A.    Right.  He didn't need to remove the effect through

16   statistical methods because he did it in his experimental

17   design.

18   Q.    And would you read, on the second column there at the

19   bottom, beginning "Overall," to the end of the page?

20   A.    "Overall, biological variation was strongly correlated

21   with water chemistry and less by reach-scale habitat and

22   landscape conditions.  Since ion concentrations explained the

23   greatest amount of biological impacts and were the most

24   altered (compared to reference), this suggests that recovery

25   is potentially hindered by ions, even in forested regions long

Palmer - Direct

1   after reclamation."

2   Q.    Just continue to the end, if you would.

3   A.    "Causal analyses by Suter and Cormier (2013) provided

4   evidence that ions (measured as specific conductance)

5   negatively affected invertebrates despite other stressors

6   present."

7   Q.    So Pond here finds that even in forested, reforested

8   ecosystems with high conductivity, you still have impairment.

9   A.    That's correct.

10  Q.    Okay.  And then turn to the next page, please, and the

11  second passage there beginning "Cormier and Suter" -- or

12  "Cormier et al."

13  A.    "Cormier et al. (2013b) and Suter and Cormier (2013)

14  provided strong causal evidence that Appalachian

15  macroinvertebrate extirpation is linked to increasing ions (as

16  specific conductance), a finding supported by our study."

17  Q.    So here Pond is saying that his study supports the

18  benchmark and Suter and Cormier, right?

19  A.    That's correct.

20  Q.    And he uses a completely different method to do it.

21  A.    Correct.

22  Q.    Came to the same conclusion.

23  A.    Yes, that conductivity caused impairment.  Yes.

24  Q.    Just like Bernhardt did.

25  A.    Correct.

Palmer - Direct

1   Q.   Let's turn to the next page, "Temporal changes in

2   taxonomic and functional diversity of fish assemblages

3   downstream from mountaintop mining," a Hitt article.

4   A.   Yes.

5          MR. MCLUSKY:   Your Honor, this is one we do object

6   about.  The title of the article is "Temporal changes in

7   diversity of fish assemblages."  She's rendered no opinion in

8   her opinion here, the report, about fish.  And she said at her

9   deposition she would not be rendering one.  So I'm not quite

10  sure what this is about.

11         THE COURT:  All right.

12         MR. LOVETT:  Actually, it's different.  She's not --

13  well, first of all, I think her opinion does say that she has

14  an opinion about fish, but this isn't about fish.  It's about

15  the method that Hitt used to determine that fish were

16  impacted; namely, that insects were missing.

17      So it really establishes that the aquatic insects are

18  missing --

19         THE COURT:  Well, all right.

20         MR. LOVETT:  -- and that affects fish.

21         THE COURT:  I will allow it at least for that

22  limited purpose, but now we seem to have a debate about

23  whether in her report she disclosed opinions about impacts to

24  fish.

25         MR. LOVETT:  We don't care about fish.  We'll give

Palmer - Direct

1   up on the fish.  We care about fish.  Don't get me wrong.  But

2   for this case, this is not about fish.

3          THE COURT:  All right.

4   BY MR. LOVETT:

5   Q.   Okay.  Would you read on page 129 beginning, "The

6   transition from reference to exposure fish assemblage."  Do

7   you see that?

8   A.   Yes.

9   Q.   Read to the end of that.

10  A.   "The transition from reference to exposure fish

11  assemblage composition occurred at conductivities between

12  about 600 and 1000 microsiemens per centimeter (Figure 2A).

13  These values exceed conductivity levels expected to reduce

14  benthic macroinvertebrate diversity in Appalachian streams.

15  USEPA (2011a) identified a protective benchmark for benthic

16  macroinvertebrate assemblages at 300 microsiemens per

17  centimeter, and our results suggest that the thresholds for

18  fishes will be somewhat higher."

19  Q.   Read on.

20  A.   "Decreases in abundances of obligate invertivores at TE

21  suggest that changes in fish assemblages might be a

22  consequence of decreased availability of invertebrate

23  prey."

24  Q.   And the invertebrate prey are insects.  Is that what

25  that's determining?

Palmer - Direct

1    A.    Invertebrate prey are insects.  Invertivores are

2    organisms that eat insects.

3    Q.    So Hitt et al. are also noting the loss of insects from

4    the streams.

5    A.    That's correct.

6    Q.    And let's turn to the next one, JE 0133.

7    A.    Yes.

8    Q.    That's a Kennedy paper?

9    A.    Yes.

10   Q.    Would you read in the abstract, about halfway down, the

11   sentence beginning, "In the Leading Creek Watershed."

12   A.    "In the Leading Creek Watershed (southeast Ohio), an

13   aggregated approximately 99 percent reduction in mean mayfly

14   abundance for all impacted sites was observed below a coal-

15   mine effluent with mean specific conductance of 8,109."

16   Q.    Okay.

17   A.    Continue?

18   Q.    Yeah, continue, please.

19   A.    "The mayfly, *Isonychia*, was exposed for 7 days to a

20   simulation of this effluent, in lotic microcosms.  Based on

21   lowest observable adverse effect concentrations, *Isonychia*

22   survival was a more sensitive endpoint to specific conductance

23   (1,562 microsiemens) than were 7-day *C. dubia* survival and

24   fecundity (3,730 microsiemens)."

25   Q.    So Isonychia is a mayfly, right?

Palmer - Direct

1    A.    It is.

2    Q.    It's a very tolerant -- it's a mayfly that's very

3    tolerant to conductivity, right?

4    A.    It is.

5    Q.    And how do we know that?

6    A.    Well, it's one of the mayflies that the benchmark

7    developed an XC95 for.

8    Q.    Do you remember what XC95 the benchmark developed for

9    that mayfly?  If you don't --

10   A.    Is it 1092?  I'm not positive.  I'd have to go back and

11   look.

12   Q.    We'll do that in the next paper.

13         Okay.  But in any event, that sensitive mayfly in a lab

14   when exposed to water, the conductivity is at 1562?  Is that

15   the level at which the mayfly died in a lab?

16   A.    That was what they found, yes, the lowest concentration.

17   Q.    So that very sensitive -- or very insensitive mayfly was

18   killed when water reached 1062 conductivity in a lab -- or,

19   excuse me -- 1562 in a lab?

20   A.    Well, the lowest observable adverse effect

21   concentrations.

22   Q.    Okay.

23   A.    And I'd have to look at the paper because I can't

24   remember if they looked at mortality as well as reproduction.

25   They may have had multiple end points.

Palmer - Direct

1   Q.   Okay.  Let's turn to the Kuntz paper, which is the next

2   one.

3        And the Kuntz paper also -- what did it do?

4   A.   So this is another example where organisms are exposed to

5   mixtures with different ionic strengths to toxicity testing in

6   a seven-day toxicity testing.  And they did this with both

7   *Ceriodaphnia*, which is a cladoceran, a crustacean, and they

8   did it with a mayfly, *Centroptilum triangulifer*.

9        And do you want me to go on?

10  Q.   Yes.

11  A.   And they used water -- the ionic composition that they

12  put together to expose them to was representative of what you

13  find in alkaline mine drainage areas associated with

14  mountaintop removal and valley fills.  And they also used a

15  different reconstituted water that was more representative,

16  neutralized mine drainage.  And the waters that had similar

17  conductivities but with different ionic compositions, they had

18  different effects on the organisms, but they were consistently

19  toxic.  And that was true for mussels, anthropods, and

20  mayflies.

21  Q.   Okay.  At what level -- let's turn to JE 0160.

22       And do you see that where it says, "The Winding Shoals

23  and Boardtree reconstituted waters"?

24  A.   Yes.

25  Q.   So did Kuntz actually use water from Boardtree, or do you

Palmer - Direct

1   understand what he did here?

2        What is reconstituted water?

3   A.   I don't remember if the water came directly from

4   Boardtree or if he established the mixture of ions that was

5   almost identical to what was in Boardtree.  I'd have to look

6   back.

7   Q.   Okay.  In any event, he subjected *C.* -- is it *triang* --

8   how do you say that?

9   A.   *Triangulifer*.

10  Q.   Okay.  What is that?

11  A.   It's a mayfly.

12  Q.   And it's a relatively tolerant mayfly, tolerant to high

13  conductivity, right?

14  A.   It is.  It's not that different from Isonychia.

15  Q.   Okay.  We know -- so would you read that passage there

16  beginning, "The Winding Shoals"?

17  A.   "The Winding Shoals and Boardtree reconstituted waters

18  were toxic to *C. triangulifer* at a conductivity of about 800

19  to 1300 microsiemens with elevated concentrations of

20  magnesium, calcium, sodium, potassium, sulfate, or

21  bicarbonate.  It is interesting to note that the regional

22  95 percent extirpation concentration based on conductivity for

23  the genus *Centroptilum*," which is the *triangulifer*, "in the

24  benthic community field surveys was determined to be 1092."

25       So there's that number I remember.

Palmer - Direct

1    Q.    So 1092 is what the benchmark found for that particular

2    organisms to be the extirpation point?

3    A.    Yeah.   I'm assuming reference 35 is to the benchmark.

4    Q.    Okay.   Here, let's make sure we have it right.

5          May I approach, Your Honor?

6              THE COURT:   You may.

7    BY MR. LOVETT:

8    Q.    So, Dr. Palmer, do you have the benchmark before you now?

9    A.    I do.

10   Q.    And are you looking at a page that has the numbers for --

11   well, what does it have?

12   A.    Well, I see a number for Isonychia, the one I couldn't

13   remember, which is 1180 microsiemens is the extirpation.

14   Q.    1180.   And Kennedy in his labs showed 1562.

15   A.    That's correct.

16   Q.    Okay.   So -- and here we have -- do you see the *C.* -- the

17   one we're talking about now, *C. triangulifer*?

18   A.    I don't see it on this page, but I'll look more.   I'm

19   sure it's here.

20   Q.    1092 is the number.

21         May I approach, Your Honor?

22             THE COURT:   Yes.

23   BY MR. LOVETT:

24   Q.    So --

25         (Mr. Lovett and Mr. Hecker conferred privately off the

Palmer - Direct

1    record.)

2    BY MR. LOVETT:

3    Q.    On page D3 of the benchmark is the first one.

4    A.    There it is. *Centroptilum* is a Baetidae fly and it has

5    an extirpation concentration of 1092 microsiemens.

6    Q.    So the benchmark found, through its science and analysis

7    of the DEP database, that 1092 was the number for that

8    organism, right?

9    A.    Correct.

10   Q.    And Kuntz found that it's between 800 and 1300 in a

11   laboratory.

12   A.    That's correct.

13   Q.    So they essentially -- Kuntz essentially corroborates the

14   benchmark's field data through lab tests; is that right?

15   A.    That's correct.  And as I recall, Kuntz may have had

16   different instars.  So you would expect to get a range if you

17   have early and late instars.

18   Q.    Okay.  So we have several lines of evidence now all

19   reaching the same conclusion, right?

20   A.    That's correct.

21   Q.    Starting with the EIS way back in 2003 and proceeding all

22   the way to these lab tests in 2014?

23   A.    That's correct.

24   Q.    With different methods from field data to EPA -- or to

25   DEP data analyzed by EPA, to DEP analyzed -- data analyzed a

Palmer - Direct

1  different way by Bernhardt, all reaching the same conclusion,

2  aren't they?

3  A.   That's correct.  There's field data.  There's lab data.

4  There's field observational data.  There's field experimental

5  data.  There's toxicity testing.  So, yes, lots of different

6  lines of evidence.

7  Q.   And there's not a single peer-reviewed study to the

8  contrary, is there?

9  A.   I know of none.

10  Q.   Okay.  When you see a publication history like this one,

11  do you -- I mean, is this -- does this show you as an expert

12  in your field that the evidence is in that conductivity is

13  causing impairment below valley fills?

14  A.   I would say there's no doubt.  What surprised me is that

15  the studies continue to go on.  I can only assume that's

16  because there's controversy, because it's been so well-

17  established.

18  Q.   Have you reviewed -- let's shift gears here now and turn

19  to the mines at issue in this case.

20       Have you reviewed the data and maps associated with the

21  mines and waters at issue in the instant case?

22  A.   I have.

23  Q.   Okay.  And have you reached an opinion based on the

24  review of those data and information?

25  A.   I have.

Palmer - Direct

1   Q.   And do you believe that each of the three -- well, what's

2   your opinion about each of the three mines?

3   A.   Well, it's very clear that in all -- for all three of the

4   mines, that there's elevated conductivity that's occurred

5   since the mines -- the Fola Mines have been put in and that

6   this is associated with extirpation or loss of taxa.

7   Q.   And impairment under the WVSCI?

8   A.   Impairment, yes.

9   Q.   Okay.  Do you believe that the ionic mixture in the water

10  discharged from each of the three mines is causing biological

11  impairment in the streams that are downstream from those

12  discharges in the three tributaries of Leatherwood Creek?

13  A.   Yes.

14  Q.   And do you use -- did you use information and data to

15  prepare the figures and tables in your expert report?

16  A.   I did.

17  Q.   And we'll go through those now.

18  A.   Okay.

19  Q.   All right.  Let's start with Plaintiffs' Exhibit 34.

20  A.   Okay.

21  Q.   Okay.  Is that figure 1 a topographic map of the Fola

22  Surface Mines 4A, 2, 6?

23  A.   It is.

24  Q.   In Leatherwood Creek?

25  A.   Leatherwood Creek, three mines.

Palmer - Direct

1   Q.   So Fola 4A is on the left-hand side of the page, correct?

2   A.   Correct.

3   Q.   And that's Right Fork?  Explain the streams there, if you

4   would.

5   A.   Fola 4A, which is the furthest to the west --

6   Q.   Okay.

7   A.   -- is Right Fork.  Fola 2, which is sort of in the middle

8   there, is Road Fork.  And these are tributaries to

9   Leatherwood.

10       And Fola 6 is Cogar Hollow, which is also a tributary to

11  Leatherwood.  And the sort of white squiggly above the -- on

12  the page above those three mines is Leatherwood.

13  Q.   So each of these -- so Right Fork -- I mean, excuse me --

14  Fola 4A has a tributary to Leatherwood called Right Fork.

15  A.   Correct.

16  Q.   And Fola 2 has a tributary to Leatherwood Creek called

17  Road Fork.

18  A.   Yes.

19  Q.   Fola 6 has Cogar Hollow tributary.

20  A.   Right.

21  Q.   And Road Fork is the white squiggly through the middle of

22  the page.

23  A.   Right, slightly top middle, yes.

24  Q.   Okay.  Do you know what percentage of the Road Fork and

25  Right Fork watersheds are disturbed by Mines 2 and 4A?

Palmer - Direct

1   A.   I think overall in Leatherwood, it's, like, 40.  But in a

2   couple of them, it's up to 80 percent has been disturbed by

3   mining.  So it's probably 4A and 2.

4   Q.   You don't remember?  That's okay.

5   A.   Sorry.  I don't remember which go with which, but I think

6   that's right.

7   Q.   In any event, you remember that two of them have

8   80 percent and one of them has 40 percent.

9   A.   I think the overall watershed was 40 percent, but that's

10  my recollection.

11  Q.   Okay.

12  A.   Bottom line is there's a lot of mining and it's the

13  dominant land change.

14  Q.   Let's turn to Joint Exhibit 20.  That's a different book.

15  A.   Okay.

16  Q.   And what is that?

17  A.   This is the 2012 Final West Virginia Integrated Water

18  Quality Monitoring and Assessment Report.

19  Q.   Okay.  Would you --

20       THE COURT:  Excuse me.  I don't think I have a set

21  of the joint exhibit notebooks.  I've had my own copy of the

22  benchmark.  I've got volumes, let's see -- three notebooks

23  titled Defendant's Exhibits, these three, and then --

24       MR. LOVETT:  It says Judge's Copy on it, so it must

25  be yours.

Palmer - Direct

1                THE COURT:  Okay.

2                MR. LOVETT:  Sorry about that.

3                THE COURT:  That's all right.

4                THE CLERK:  Judge, there should be a law clerk copy

5    as well.

6                MR. LOVETT:  Let's give this to the judge.  I'll

7    give you mine.

8                THE CLERK:  And there should be a third for the law

9    clerk.

10               THE COURT:  Do you have another copy?

11               MR. LOVETT:  Do we have another copy?

12       I have a copy I'm using, Your Honor.  Your Honor, the one

13   Dr. Palmer has will be the clerk's copy.

14       Is that okay if she uses it and give it to you after

15   that?

16               THE COURT:  Fine.

17               THE CLERK:  Are you giving me all of the exhibits as

18   originals on a disk, then?

19               MR. BECHER:  Yes.

20               THE WITNESS:  So what was the number again you asked

21   me to turn to?

22               MR. LOVETT:  20.

23               THE WITNESS:  Okay.  Yes, I've got it.

24   BY MR. LOVETT:

25   Q.   Let's turn to pages 10 and 11 of that, or 1067 and 1068.

Palmer - Direct

1    It's the 303(d) list.

2    A.    Pages 10 and 11 of --

3    Q.    10 and 11 --

4    A.    The report numbers?

5    Q.    -- of the actual documents or --

6          (Mr. Hecker and Mr. Lovett conferred privately off the

7    record.)

8    BY MR. LOVETT:

9    Q.    It says List Page 10.  It's page 10.

10   A.    Okay.  Of the West Virginia document --

11   Q.    Yes.

12   A.    -- not page 10 of the exhibit?

13   Q.    It's page 10 of the document.  It says at the top "2012

14   Section 303(d) List."

15         (Mr. Lovett and Mr. McLusky conferred privately off the

16   record.)

17              THE WITNESS:  That's not what I have.

18         Did you find it?

19              THE COURT:  This is upside down, but this is what I

20   got.  (Indicating)

21              THE WITNESS:  Right, but he said at the top --

22              MR. LOVETT:  Bob is telling me if you go on -- I

23   don't think those are numbered.

24         Do you have Bates numbers on --

25              THE WITNESS:  No, there aren't exhibit numbers.

Palmer - Direct

1           THE COURT:  There's the original document page

2    number at the bottom, page 10 of the original document.

3           MR. LOVETT:  Yes, it's page 10 of the original

4    document.

5           THE WITNESS:  I've got that.

6           MR. LOVETT:  Well, except this is confusing, and I

7    don't know how these exhibits were made, so I apologize.  But

8    if you turn to the back of the document, I think there's an

9    appendix or some appendices, and it's page 10 of one of those.

10          THE COURT:  Which appendix?

11          MR. LOVETT:  It says --

12          THE WITNESS:  303(d) list?

13          MR. LOVETT:  Yes.  It says List Page 10.  Do you see

14   that at the bottom?

15          THE WITNESS:  Yes, I do.  At the top of the page, it

16   says "2012 Section 303(d) List."

17          MR. LOVETT:  Okay.  All I can say, Your Honor, is I

18   apologize.  Plaintiffs did not prepare these notebooks.

19   BY MR. LOVETT:

20   Q.   Page 10, List Page 10, 2012 303(d) List, right?

21   A.   Yes.

22   Q.   And there it has Elk Watershed - Huc#05050007 at the

23   bottom?

24   A.   Yes.  Elk Watershed, yes.

25   Q.   Do you see Leatherwood Creek listed there?

Palmer - Direct

1    A.    I see Right Fork/Leatherwood Creek.

2    Q.    Well, there's Leatherwood Creek right above that, right?

3    A.    There's Leatherwood above that and then there's Right

4    Fork -- yes.

5    Q.    Okay.  So Leatherwood itself, that's the main stem?

6    A.    That's correct, that would be the main stem.

7    Q.    And is it listed as impaired?  It is because it's on this

8    list, right?

9    A.    It's on the 303(d) list, correct.

10   Q.    And does it --

11   A.    The entire length it says.

12   Q.    And for what criterion?

13   A.    For biological criterion.

14   Q.    Okay.  Caused by?

15   A.    Mining.

16   Q.    Okay.  Just out of curiosity, I mean, if you look at

17   Bullpen Fork or Sutton Lake above, they're both also impaired,

18   right?

19   A.    They are.

20   Q.    And Bullpen is impaired for selenium, right?

21   A.    It is.

22   Q.    So the DEP knows how to determine if something is

23   impaired for biological impairment or for selenium, because

24   they're distinct, right?

25   A.    That would appear so, yes.

Palmer - Direct

1    Q.   Okay.  Leatherwood is impaired for biological reasons.

2    A.   Correct.

3    Q.   Okay.  And is that also true of the Right Fork of

4    Leatherwood Creek?

5    A.   Yes, it's impaired for biological.  The source is mining.

6    Q.   And would you turn the page, please, to this page 11?

7    A.   Okay.

8    Q.   And do you see Road Fork?

9    A.   I do.

10   Q.   And is it also impaired?

11   A.   It is impaired biologically.  Source is mining.

12             THE COURT:  What does "CNA" mean?  Do you know?  It

13   says "CNA - Biological."

14             THE WITNESS:  I don't --

15   BY MR. LOVETT:

16   Q.   Do you know?

17   A.   I don't recall.

18             MR. MCLUSKY:  Conditions Not Allowable.

19             MR. LOVETT:  Conditions Not Allowable.  Thank you.

20   BY MR. LOVETT:

21   Q.   Now, let's turn to Joint Exhibit 16.  I hope this works.

22   I hope that the exhibits -- and that should be EPA Approved

23   Report for TMDLs for May 2012.

24        Do you see that?

25   A.   Is it in this same volume?  No.

Palmer - Direct

1    Q.   It should be.

2    A.   Oh.  60 or 16?

3    Q.   16, one-six.

4    A.   No, it's not in this.

5    Q.   Joint Exhibit 16.

6    A.   This is Volume 1.

7         All right.  I've got it.

8    Q.   Is it U. S. -- does it -- is it called May 2012 TMDL

9    Report?

10   A.   May 2012 Total Maximum Daily Loads for Selected Streams

11   in the Elk River Watershed.

12   Q.   Okay.  I hope this is right.  Will you turn -- does that

13   have Bates numbers on it, you know, like JE numbers at the

14   bottom?

15   A.   No.

16   Q.   It does not?  Okay.

17        Would you turn to page 24 of the Elk River Watershed TMDL

18   Report?  Do you see that?

19   A.   The first paragraph starts "In certain waters"?

20   Q.   Yes.  Good.

21   A.   Got it.

22   Q.   Would you read about the first third of that paragraph?

23   A.   "In certain waters (Leatherwood Creek" -- I'm not going

24   to read all the letters.  Is that okay?

25   Q.   That's fine.

Palmer - Direct

1  A.   Okay.   "Leatherwood Creek, Right Fork/Leatherwood Creek,

2  Road Fork/Leatherwood Creek, Big Branch, Birch River, and

3  Jacks Run) the SI process determined ionic toxicity to be a

4  significant stressor.   A strong presence of sulfates and other

5  dissolved solids exists in those waters and in all other

6  streams where ionic toxicity has been determined to be a

7  significant biological stressor."

8  Q.   That's sufficient.   And so this is prepared for the

9  West Virginia DEP, right?

10  A.   That's my understanding, yes.

11  Q.   And this report found itself that these streams are

12  impaired for -- because of ionic stress.   And that's what you

13  just read, right?

14  A.   It says it determined it to be a significant stressor.

15  In what I just read, I don't see it mentioning -- well, yes,

16  it does.   I'm sorry.   "To be a significant biological

17  stressor."   It does end in that.

18  Q.   This also says, "A strong presence of sulfates and other

19  dissolved solids exists in those waters and in all other

20  streams where toxicity has been determined to be a significant

21  biological stressor," right?

22  A.   That's correct.

23  Q.   Okay.   Let's now look at data for the mines individually

24  and start with Mine No. 2 at Road Fork.   And, I'm sorry, but

25  would you get the plaintiffs' exhibit book?

Palmer - Direct

```
 1    A.    Okay.  What number?

 2    Q.    Let's turn to Plaintiffs' 35.  That's the map again.

 3    A.    Okay.  I'm already there.

 4    Q.    Okay.  And this is the same map that we saw before,

 5    right?

 6    A.    Yes, it is.

 7    Q.    And does it show the location of the No. 2 Mine?

 8    A.    Yes, Fola 2, right in the middle.

 9    Q.    And you've showed us already where Road Fork is, right?

10    A.    Correct, that it's in the middle.

11    Q.    And then the next -- let's turn to 36.

12          And does that depict the valley fills -- well, what does

13    it depict?

14    A.    This is a sort of close-up view of Road Fork.  And just

15    above the yellow sort of polygon towards the bottom of the

16    page, you see the valley fills, which are double blue lines in

17    triangular shapes, and there are three valley fills.

18    Q.    Okay.  And can you show us where -- well, it's hard to do

19    with the judge -- hold that up so the judge can see it.

20              THE COURT:  I can see it.

21    BY MR. LOVETT:

22    Q.    Would you point to where the outlets are to the valley

23    fills?

24    A.    And there is an outlet here and over on the red triangle.

25    (Indicating)
```

Palmer - Direct

1          THE COURT:  All right.

2          THE WITNESS:  And further down, there's another one,

3  007.  (Indicating)

4          THE COURT:  All right.

5  BY MR. LOVETT:

6  Q.   Are those all the outlets, then?

7  A.   Yes.  Outlet 1 is the red triangle at the left corner,

8  and -- yeah.

9  Q.   All below valley fills, right?

10 A.   Yes.

11 Q.   Is there --

12 A.   I think that outfall is from that pond there that --

13 where the valley fills all empty into that.

14 Q.   Is there any other development activity than mining in

15 the Road Fork watershed?

16 A.   No, there's not.

17 Q.   Okay.  Let's turn to Plaintiffs' Exhibit 118,

18 one-one-eight.

19 A.   Okay.

20 Q.   Is this the CHIA for the mine?

21 A.   It is.

22 Q.   And what is a CHIA, if you know?

23 A.   It's the hydrologic impact assessment.

24 Q.   Prepared by the DEP?

25 A.   That's correct.

Palmer - Direct

1    Q.    Okay.   Would you look at pages 1209 and 1210?

2    A.    Okay.

3    Q.    And would you read at the bottom of 1209 where it says,

4    "Road Fork does not."

5    A.    "Road Fork does not appear heavily impacted by extensive

6    past mining which has occurred in this area.   This is

7    indicated by low metals and sulfates that are less than

8    30 milligrams per liter."

9    Q.    Okay.   So when DEP prepared this report before mining

10   began, that was its conclusion, right?   Is that right?

11   A.    That is correct.

12   Q.    And that's from 1994?

13   A.    This is related to, I believe, the application for the

14   Fola Surface Mine 2.

15   Q.    Right.

16   A.    So it will be prior to the mining, yes.

17   Q.    This SMCRA permit?

18   A.    Exactly, I guess --

19   Q.    If you turn the page, I think you'll see it was prepared

20   in 1994.

21         Do you see that?   It's the last page there.

22   A.    Yes.   June 28, 1994.

23   Q.    Let's turn to Plaintiffs' Exhibit 37.

24   A.    Okay.

25   Q.    And that is figure 4, right?

Palmer - Direct

1    A.    That's correct, figure 4 from my report.

2    Q.    Did you prepare that?

3    A.    I did.

4    Q.    And did you do it after reviewing data comparing the

5    levels of conductivity and sulfate in Road Fork before and

6    after mining?

7    A.    That's correct.  That was the purpose of this, these

8    graphs, to show the data.

9    Q.    Okay.  All right.  So explain to me or the Court what the

10   graphs and the data show.

11   A.    Well, the most relevant ones are the top two that have

12   red lines and dots.

13   Q.    Okay.

14   A.    And if you notice the dashed line, horizontal line, near

15   the bottom of those two panels --

16   Q.    Uh-huh.

17   A.    -- that is the conductivity benchmark level.  So on the

18   horizontal axis is date, and the vertical axis is

19   conductivity.  And what you see is that over time, prior to

20   mining at Road Fork, the conductivity every time it was

21   measured was well below the benchmark of 300 microsiemens.

22   Q.    Right.

23   A.    And then post mining, what you see is, with the exception

24   of perhaps looks like two sampling times, the conductivity was

25   significantly elevated above the benchmark.  It looks like it

Palmer - Direct

1    reaches levels, at least at one point in time, of over 5000

2    microsiemens.

3    Q.   5000.  Okay.

4    A.   Yes.

5    Q.   And sulfates -- the next two panels are similar, right?

6    A.   Yes.  You would expect that because sulfate is one of the

7    major contributing ions to conductivity, and so it follows the

8    same sort of pattern.

9    Q.   Let's next turn to Plaintiffs' Exhibit 38.

10       Again, have you reviewed data showing the ionic mixture

11   of the post mining discharges from Outlet 001 at Mine 2?

12   A.   Yes.  The pH was 8.28 from that outlet, and the

13   conductivity was 3290 microsiemens, with a sulfate level of

14   over 400.

15   Q.   Okay.  So those are -- did you prepare table 1?

16   A.   Yes.

17   Q.   Okay.  And these are -- are these all post mining?

18   A.   That's correct.

19   Q.   Okay.  So at Road Fork, conductivity 3290; Boardtree,

20   2367; and Road Fork, again 2710 conductivity?

21   A.   Uh-huh.

22   Q.   Okay.  How does that mixture compare to alkaline mine

23   drainage associated with streams affected by mountaintop

24   mining and valley fills in Central Appalachia?

25   A.   It's very comparable, and that's the reason that the

Palmer - Direct

1    Boardtree Branch example was put in there.  It's a different

2    stream.  It's not in this mix.  And yet if you notice, the

3    same constituents are elevated; conductivity, hardness,

4    sulfate, etcetera, calcium, magnesium.

5    Q.   And how does that -- if you look at the Boardtree Branch,

6    out of curiosity, how does that -- that's the very water that

7    Kuntz was studying in the --

8    A.   That's correct.

9    Q.   -- in the paper.

10   A.   It's the one that he used to come up with the

11   reconstituted water that he exposed organisms to.

12   Q.   And did he come up with the number 1090 in the lab?  Is

13   that what it was?

14   A.   I think that's correct.

15   Q.   And what is the number here for Boardtree Branch?

16   A.   The number here is -- the conductivity --

17   Q.   Yes.

18   A.   -- is 2367.

19   Q.   Much higher than Kuntz found would basically kill the

20   tolerant mayfly.

21   A.   Correct.  Yes.

22   Q.   Turn to Plaintiffs' Exhibit 39.

23        Now, did you prepare this?

24   A.   Yes.

25   Q.   And does it summarize data showing a level of

Palmer - Direct

1   conductivity discharge from Outlets 001 in 2011 and '12?

2   A.   That's correct.

3   Q.   Okay.  What do those data show about the conductivity

4   level during that time?

5   A.   Well, so these more recent times, it simply shows that

6   the conductivity has remained elevated, so, again, up to above

7   4000 microsiemens at least at one point in time, but always

8   well above the benchmark.

9   Q.   And almost always above 2000?

10  A.   Yes, almost always above 2000.  Pretty much 3000 would be

11  the most common.

12  Q.   Okay.  Let's turn to Plaintiffs' Exhibit 40.

13       Did you prepare these?

14  A.   I did.

15  Q.   And did you prepare them by looking at WVSCI scores for

16  Road Fork from Outlets 001?

17  A.   Yes.  It shows what is happening in the stream downstream

18  and upstream of the outlet.

19  Q.   And explain what's happening.

20  A.   Actually, I misspoke.  It shows what's happening

21  downstream of the outlet.  That would be the X.  And then it

22  shows what happens in Leatherwood before upstream and

23  downstream of when the water from Road Fork enters

24  Leatherwood.

25       And so it shows you that basically in the outlet, you

Palmer - Direct

1   have failing WVSCI scores as you do as well in Leatherwood.

2            MR. LOVETT:  Your Honor, all of these data are in

3   Plaintiffs' Exhibit 73, which is a stipulation by the parties.

4   I don't think there will be any controversy about the data.

5            THE COURT:  All right.

6            MR. LOVETT:  I'm not going to take you to the

7   stipulation every time --

8            THE COURT:  That's fine.

9            MR. LOVETT:  I just want you to be aware.

10           THE COURT:  We'll need to take a break at some point

11  when it's convenient.

12           MR. LOVETT:  This is a fine time, Your Honor.

13           THE COURT:  All right.  We'll take a ten-minute

14  recess.

15       (Recess from 2:47 p.m. to 2:57 p.m.)

16  BY MR. LOVETT:

17  Q.   Okay.  Dr. Palmer, you were looking at Exhibit 40, page

18  119, right?

19  A.   Yes.

20  Q.   Okay.  Do those data indicate biological impairment in

21  Road Fork downstream from Outlet 001?

22  A.   Yes, they do show that.

23  Q.   Were conductivity, sulfate, and RBP, or rapid

24  bioassessment protocol, also measured when the WVSCI scores

25  were measured?

Palmer - Direct

1    A.   That's correct.  And the conductivity scores are up to, I

2    don't know, 3200 or something.

3    Q.   In your opinion, would the rapid bioassessment protocol

4    scores cause those low WVSCI scores?

5    A.   No, they could not.  The RBP scores are anywhere from

6    perhaps 110 to 130 or something like that, which is

7    suboptimal, but it's not marginal.

8    Q.   So if I recall, the levels are optimal, suboptimal,

9    marginal, and poor.

10   A.   That's correct.

11   Q.   So suboptimal is like a B.

12   A.   Yes, I guess.

13   Q.   Okay.  So we have habitat like that in these tables,

14   right?

15   A.   That's correct.

16   Q.   In your opinion, that could not cause the impairment.

17   A.   Not what we're seeing here, no.

18   Q.   Just tell me briefly why you think that, in your

19   experience.

20   A.   Well, I actually have done extensive work myself showing

21   that if there are water chemistry problems, it doesn't matter

22   typically how good the habitat is; the factor that will trump

23   all other things is going to be that chemistry.

24   Q.   Okay.  Turn to Exhibit -- Plaintiffs' Exhibit 25.

25   A.   Okay.

Palmer - Direct

1    Q.    Now, these are WVSCI scores taken recently by Dr. Swan, a

2    plaintiffs' witness that will probably be next, correct?

3    A.    That's correct.

4    Q.    Okay.  And did you prepare this table?

5    A.    I believe he prepared the table and then I put it in my

6    report as an appendix.

7    Q.    I see.  Okay.  Did Dr. Swan -- what did Dr. Swan find to

8    be the WVSCI score when he sampled Road Fork in May of 2014?

9    A.    The WVSCI score was -- let me find it -- 39.66, impaired.

10   Q.    Okay.  And he did a GLIMPSS score too, right?

11   A.    He did.  20.22.

12   Q.    Okay.  Just out of curiosity, what is the GLIMPSS cutoff

13   for impairment?

14   A.    I think it's 52.

15   Q.    And did he also do an RBP?

16   A.    I'm sure he did, yes.

17   Q.    Okay.  That's not on this exhibit, is it?

18         Let's turn to Plaintiffs' Exhibit 31.  Is that a rapid

19   bioassessment protocol performed by Dr. Swan at Road Fork?

20   A.    Yes, it is.

21   Q.    And what date is on it?

22   A.    May 9th, 2014.

23   Q.    And what score did he come up with for the habitat?

24   A.    He did not sum his scores on his RBP sheets, but I summed

25   them up, and I believe this one was 170.

Palmer - Direct

1    Q.   One-seven-zero?

2    A.   I believe so.

3    Q.   And what --

4    A.   I'd have to look back at my report to verify, but I'm

5    pretty sure that's right.

6    Q.   And is 170 suboptimal or optimal?

7    A.   It's suboptimal, but it's in the high end of suboptimal.

8    Q.   Okay.  Could those RBP scores cause the low WVSCI score

9    that you found there?

10   A.   No, no, not possibly.

11   Q.   Why not?

12   A.   Well, the scores are not bad at all.  So there's many,

13   many streams you find that don't have what is considered the

14   ideal habitat that have very healthy invertebrates.

15   Q.   I think to be sure that -- you can retotal if you'd like,

16   but I think the total is 163.

17   A.   I believe you.

18   Q.   Okay.  Does that change your opinion?

19   A.   No.

20   Q.   Okay.  Let's turn back to Exhibit 25.

21        Did Dr. Swan find any mayflies in Road Fork?

22   A.   No.  I know he didn't.  I remember that.

23   Q.   None, right?

24   A.   No mayflies, zero.

25   Q.   Now, let's turn to 4A, Fola 4A, the second of the three.

Palmer - Direct

1       Let me do one thing before we do that.  I got mixed up

2  with exhibits for a minute there and I -- at the break, I took

3  the opportunity to find the part of the benchmark that I

4  wanted you to read that I couldn't find before.

5       Would you turn to Plaintiffs' Exhibit 128?  It should be

6  in the same notebook, I think.  One-two-eight.

7  A.   Okay.

8  Q.   And is that the benchmark?

9  A.   Yes.

10 Q.   And would you turn to Bates page 1449.

11      I'm sorry.  It's the SAB letter, not the benchmark.

12      Look to make sure that's right.

13 A.   It is, yeah.  I was thinking maybe it was behind that,

14 but, yes, it is the SAB.

15 Q.   Okay.  And does that page begin "Addressing Confounding

16 Factors"?

17 A.   This page?  Yes, it says, "Addressing Confounding

18 Factors."

19 Q.   Would you read the paragraph -- the second paragraph that

20 begins, "The Panel commends."

21 A.   "The Panel commends the authors for carefully considering

22 factors that may confound the relationship between

23 conductivity and extirpation of invertebrate genera.  This is

24 accomplished by: (1) removing some potentially confounding

25 factors from the data set before determining the benchmark

Palmer - Direct

1   concentrations; and (2) considering weight-of-evidence of a

2   suite of other potentially confounding factors that were not

3   excluded from the data set - using correlations between

4   potential confounding factors, conductivity, and aquatic

5   genera (mayflies).  The report has done a credible job in

6   isolating the major, potential confounding factors and

7   providing a basis for their assessment relative to the

8   potential effect associated with conductivity."

9   Q.   And the Scientific Advisory Board is made up of very

10  eminent stream ecologists, among others, right?

11  A.   It is, absolutely.

12  Q.   Would you read the following sentence too, please?

13  A.   What page?

14  Q.   14 -- 1449.

15  A.   Okay.

16  Q.   "The use of mayflies."

17  A.   "The use of mayflies as the aquatic response variable in

18  the analyses of confounding factors was appropriate.  It would

19  be helpful to reiterate in Appendix B" --

20  Q.   That's enough.

21       All right.  Let's move on to Fola 4A, the Road Fork --

22  the Right Fork, okay?

23  A.   Uh-huh.

24  Q.   And let's turn to Plaintiffs' Exhibit 42.

25  A.   Okay.

Palmer - Direct

1    Q.   And, again, this is the map, right?

2         Would you show the Court -- does the map show the

3    location of Fola 4A?

4    A.   Yes.  This is a map just of 4A.

5    Q.   Could you point out where Outlets 022, 023, and 027 are,

6    just to the Court?

7    A.   Yes.  So Outlet 022 is the small red -- it's probably a

8    triangle, on the left side, which is the main stem of the

9    Right Fork trib.

10        THE COURT:  022?

11        THE WITNESS:  That's 022 over here.  And then to the

12   right of that is 023, which drains Rocklick Fork, which is a

13   trib that comes into Right Fork, and then --

14        THE COURT:  Is that 009 and 023?

15        THE WITNESS:  I guess it is.  We've always --

16        THE COURT:  One of those outlets that has duplicate

17   numbers?

18        THE WITNESS:  Duplicate names.  And then 027 is on

19   Cannel Coal tributary, which is above that.  Again, it's the

20   red dot.  So it's another major trib.

21        THE COURT:  All right.

22        MR. LOVETT:  Let me warn the Court that this mine is

23   the most complicated of the three.  The other two are pretty

24   simple.  And this will take a little longer and I'm afraid be

25   a little more confusing, but we'll try to get through it as

Palmer - Direct

1    quickly as we can.

2    BY MR. LOVETT:

3    Q.   Let's look at Plaintiffs' Exhibit 43, and there's figure

4    9.  There are monitoring points downstream from the discharge

5    points, right?

6    A.   That's correct.  Those are monitoring points.

7    Q.   Would you show the Court where the three monitoring

8    points are at P-11, P-10, and P-9?

9    A.   So the monitoring point P-9 is furthest at the bottom of

10   the page, and it's in the orange diamond, and it's sort of

11   right where Cannel Coal tributary comes into the main stem of

12   Right Fork.

13       Further downstream on the main stream -- main stem is

14   P-10, which is the second orange triangle, and that's on the

15   main stem of Right Fork clearly after Cannel Coal comes in.

16       And then almost towards the confluence with Leatherwood

17   is P-11, which is that orange triangle towards sort of the --

18   almost the top of the figure.

19   Q.   And --

20   A.   But it's still on the main stem of Right Fork.

21   Q.   These are pre-mining monitoring points; is that right?

22   A.   I believe so.

23   Q.   Okay.  Let's turn to Plaintiffs' Exhibit 89.

24       It should be the CHIA for this mine.  Do you have that?

25   A.   Yes, it is, Surface Mine 4A.

Palmer - Direct

1    Q.   Let's turn to page 562, PE 0562.  Do you see that?

2    A.   I do.

3    Q.   Okay.  Let me move a little forward.  Go to page -- I'm

4    sorry -- PE 0574, or 16 of the CHIA itself.

5    A.   Okay.

6    Q.   Do you see where it says "Right Fork of Leatherwood

7    Creek" down at the bottom?

8    A.   Yes.

9    Q.   And will you read where it begins, "The two sites"?

10   A.   "The two sites on the upper reaches of the Fork, before

11   its confluence with Rocklick, show low buffered stream with

12   low metals and low sulfates, indicative of no previous mining

13   impact in the watershed in its upper reaches.  The other two

14   sites are further downstream after mined tributaries enter the

15   stream."

16   Q.   Let's continue to the end of the next sentence, "The

17   analyses shows."

18   A.   "The analysis shows that the manganese and sulfates are

19   elevated from previous mining."

20   Q.   Okay.  So that's what DEP said about that site before

21   mining, right, in the CHIA?

22   A.   That's correct.

23   Q.   Now, let's look at the same exhibit, pages 577 and 578,

24   or page 19 of the CHIA.  At the bottom it says, "In general,

25   all stations."

Palmer - Direct

1   A.   "In general, all stations provide adequate habitat and

2   contain populations of benthic macroinvertebrates.  All the

3   stations have high EPT indices."

4   Q.   Okay.  Would you read the sentence before that beginning

5   "The habitat assessment scores from those sites"?

6   A.   "The habitat assessment scores from these sites ranged

7   from 117 to 160."

8   Q.   Okay.  And remind me, if you would again, what -- these

9   are suboptimal and optimal scores?

10  A.   They're suboptimal.

11  Q.   All right.  So, again, that's the state of the streams

12  pre-mining, right?

13  A.   That's right; very -- you know, a lot of pollution-

14  intolerant taxa.

15  Q.   Now let's look at the CHIA on page 562 and 563.

16  A.   Okay.

17  Q.   Does the CHIA indicate that there was some mining in the

18  Right Fork watershed before the mining started?

19       And if you'll especially turn your attention to the last

20  sentence in the --

21  A.   "Other permitted mining within the Cumulative Impact Area

22  are four S & K Corporation permits in the Right Fork of

23  Leatherwood Creek watershed."

24  Q.   Okay.  And then go down to the next paragraph and read

25  the first sentence.

Palmer - Direct

1  A.   "Along the east side of the Right Fork of Leatherwood

2  Creek and Cannel Coal Hollow, there are four pre-law deep

3  mines."

4  Q.   Okay.  So that's the state on the ground before mining

5  began.

6  A.   That's correct, before Fola mining began.

7  Q.   You're right, before Fola mining began.

8       Let's turn, if we could, to Plaintiffs' Exhibit 44.  It

9  should have figure 10.

10       Do you have that?

11 A.   No, I don't.

12            THE COURT:  44?

13            MR. LOVETT:  44.

14            THE COURT:  That's figure 9.

15            MR. LOVETT:  Okay.

16            THE WITNESS:  I don't have a figure --

17            MR. LOVETT:  And mine says 10.

18            THE WITNESS:  Oh, I have figure 9 under 43.

19            MR. LOVETT:  Yes.  43 should be figure 9.  44 should

20 be figure 10.  Is it not in your book?

21            THE WITNESS:  I have it in 45.  I have figure 10 --

22 from my report?  Is that what we're looking at?

23            MR. LOVETT:  It is.  45 should be figure 11.

24            THE WITNESS:  No.  Let's see.  So it turns out 10

25 and 11 are under 45.  So could I just move this one to 44?

Palmer - Direct

1        (Mr. Hecker and Mr. Lovett conferred privately off the

2   record.)

3   BY MR. LOVETT:

4   Q.   Okay.  Well, let's look at the page -- so what I'm trying

5   to find is --

6   A.   Do you want figure 10?

7   Q.   -- PE 0124.

8   A.   124?

9   Q.   Uh-huh.

10  A.   Yes, I've got that now.

11  Q.   And just out of curiosity, which exhibit is that?  It's

12  45 for you?

13  A.   I moved it to 44 because there were two pages --

14  Q.   Okay.  All right.  So we've got it figured out.

15       All right.  So, anyway, PE 0124, did you prepare that?

16  A.   Yes.  This is from my report.

17  Q.   And does it show the levels of sulfate and conductivity

18  in 1999 and 2000 prior to the beginning of Fola 4A?

19  A.   That's correct, it does.

20  Q.   And what does it show about the level of water quality in

21  Right Fork?

22  A.   Well, if you look at SC, there's conductivity in P-9,

23  P-10, and P-11.  You see that particularly in 9 and 10 --

24  Q.   Uh-huh.

25  A.   -- conductivity is usually below the benchmark, but

Palmer - Direct

1   there's certainly times when it is above the benchmark,

2   getting as high as, on one date, you know, maybe 1500,

3   often -- well, there's three points that are above that in

4   P-9.  And those range from 500 to a little over 1000.  So it's

5   sporadic.

6   Q.   So before Fola 4A on this particular mine site, there was

7   already some high conductivity levels from time to time,

8   right?

9   A.   In certain places.  It really depended on where you

10  sampled because the mining was in certain places, the pre-Fola

11  mining.

12  Q.   That's because of mining pre-Fola.

13  A.   That's correct.

14  Q.   Okay.

15  A.   Or I should say the inputs were from pre-mining.

16  Q.   Okay.  Let's turn to Joint Exhibit 23.  Remember, it's

17  joint exhibit.  It should be the last exhibit in the first

18  book, the joint exhibits.

19  A.   Okay.

20  Q.   And this should be "An Ecological Assessment of the Elk

21  River Watershed" prepared by the West Virginia Department of

22  Environmental Protection.  Is that right?

23  A.   That's correct, in 1997.

24  Q.   Again, before Fola 4A, right?

25  A.   Correct.

Palmer - Direct

1   Q.   Would you turn to JE 1375, which is the last page of that

2   exhibit?

3        "Upper Elk River Watershed Sites."  Do you see that?

4   A.   Well, I don't have those numbers, so I'm trying to find

5   where you are because I'm trying to get --

6   Q.   I'm sorry.  Of the three pages in Exhibit 23, it's the

7   last one.

8   A.   There's three pages?

9   Q.   In mine.

10  A.   There's a whole bunch in mine.

11  Q.   Well, it's 68 --

12  A.   What's the page number in the report for --

13       MR. LOVETT:  May I approach, Your Honor?  I'll just

14  show the witness what I have.

15       THE COURT:  Yes, you may.

16  BY MR. LOVETT:

17  Q.   It's that chart.  It's JE -- you don't have a JE number.

18  A.   I don't, but I think I can go to page 68 probably of the

19  report.

20       Okay.  I'm with you now.

21  Q.   Do you have it?

22  A.   Yes.

23  Q.   Let me make sure the record is as clear as mud, if we

24  can.  This is page 68, which is Bates number JE 1375, which

25  you don't have, I understand, and it's the Upper Elk River

Palmer - Direct

1    Watershed sites pre-mining data, right?

2    A.    Yes, it is.

3    Q.    And do you see where it says "Right Fork/Leatherwood" --

4    A.    I do.

5    Q.    -- about halfway down?  And what does that show for a

6    WVSCI score?

7    A.    84.49.  Excellent.

8    Q.    An excellent WVSCI score.  And what does it show for

9    habitat?

10   A.    197.  Also excellent.

11   Q.    So pre-mining, Right Fork/Leatherwood, excellent shape

12   all around, right?

13   A.    That's correct, where these samples were taken, correct.

14   Q.    Now, let's turn to Plaintiffs' Exhibit 73, which is the

15   stipulations of the parties.

16   A.    Okay.

17   Q.    And let's look at paragraph 31 on page 18 of the joint

18   stipulation.

19   A.    Okay.  Potesta results?

20   Q.    Potesta data.  And what years are these from?

21   A.    2001 it appears to be.

22   Q.    Okay.

23   A.    2000 and 2001.

24   Q.    And this is prior, again, to 4A, right?

25   A.    That's correct, it's prior to that.

Palmer - Direct

1    Q.    Now, are the WVSCI scores, RBP scores, and conductivity

2    levels from those reports shown in this paragraph?

3    A.    They are.

4    Q.    Okay.  Could you focus on Fola 6 and Fola 7?

5    A.    Yes.

6    Q.    And where are those two sites located in the Right Fork,

7    if you know?

8    A.    I believe they correspond to 9 and 10 that we were just

9    talking about, the sampling sites --

10   Q.    Uh-huh.  Okay.  And --

11   A.    -- the 9 and 10.

12   Q.    Do you want to get that map?

13   A.    Yeah.  If I could see the map, it would help.

14   Q.    Put a Google Earth depiction up.  This will help everyone

15   orient ourselves.

16        Can you explain that map, as well as you can?

17   A.    Yes, to the best of my knowledge.  So the 9 and 10 are

18   down to the upper -- they're in the upper left part of the

19   image.  And I believe that is on the main stem part of the

20   river network.

21   Q.    Uh-huh.

22   A.    And then Fola 18, 19, 20 is over near --

23   Q.    Okay.

24   A.    -- one of the -- yeah, one of the tributaries.  I'm

25   trying to remember now if it's Cannel or if it's Rocklick.

Palmer - Direct

1    I'll have to look -- let me look at another map.

2            THE COURT:  So you're saying 9 and 10 are on

3    Leatherwood Creek?

4            THE WITNESS:  No.  I'm sorry.  Main stem of Right

5    Fork.

6            THE COURT:  Right Fork?

7            THE WITNESS:  That's correct.  And I'm sorry.

8    Rocklick is the one that's in where 19, 20 -- 18, 19, and 20

9    are in Rocklick, which is a tributary to Right Fork.

10   BY MR. LOVETT:

11   Q.   Okay.  So let's look at these data on this table because

12   I'd like you to explain some things about it.  For instance,

13   in many cases, we have very good WVSCI scores and high

14   conductivity.

15        Do you see some of those?

16   A.   Yes.  So a good example would be --

17   Q.   Yeah.

18   A.   -- if you look at -- so Fola 19 --

19   Q.   Uh-huh.

20   A.   -- you see -- look at that conductivity.  2025.  Very

21   high.  But the WVSCI scores are very good, 87 and 92.

22   Q.   Right.

23   A.   And if you look at Fola 20, though, you see a very low

24   conductivity and good WVSCI scores.  One is a little marginal.

25        No, it's not.  I'm sorry.  75.  They're all good.  And so

Palmer - Direct

1   what is going on there is that you've got parts of the

2   watershed impacted by mining -- remember, this is pre-Fola's

3   mining -- but parts of the watershed that aren't.

4   Specifically where 20 is has not been impacted by mining, and

5   so there's healthy individuals in that that undoubtedly drift

6   downstream.  And so you could get healthy organisms because

7   they're drifting through in sections of what 20, that little

8   bitty trib, flows into, just because they're drifting, even

9   though --

10  Q.   That's exactly what the Pond 2014 paper predicted would

11  happen.

12  A.   It is.  It is widely known.  I mean, drift has been

13  studied in streams for 50 years.

14  Q.   So you don't even have it from Pond, but you know it from

15  your general ecological experience, right?

16  A.   Oh, yeah.  I spent years studying invertebrate drift

17  myself.  I know it's a function of flow, a function of all

18  sorts of things.

19  Q.   This isn't a particular case you would really expect

20  that.  It's not like this is an all-purpose explanation every

21  time you have the --

22  A.   No, it's not -- that's right.  It's not like I'm just

23  saying, oh, well, maybe it's because they're drifting.

24  Q.   Explain one more time how -- why in this particular

25  situation you attribute it to drift, whereas you may not

Palmer - Direct

1   somewhere else.

2   A.   Because the small trib that drains into Rocklick, which

3   is at 20, Fola 20, is an area that hasn't been disturbed by

4   mining.   It's got healthy organisms.   Organisms always enter

5   the drift.   A certain fraction of them is always in the water

6   column.   And so those could easily be entering the samples

7   that are collected at Fola 18 and 19.

8   Q.   Okay.   Let's look at, particularly, at 6 and 7 since

9   those are the ones that we're interested in here.   They have

10  relatively high conductivity, right?

11  A.   That's correct.   So if you go much further downstream

12  where Fola 6 and 7 is, which is down near those other P-9 and

13  P-10 sites we talked about earlier, you see that conductivity

14  is much lower but it's elevated, and you get, you know, WVSCI

15  scores that are fairly good, except for Fola 6 in the spring

16  is low.

17       So you can get results that are counterintuitive if you

18  don't understand where trib inputs are and where mining is.

19  Q.   So on a site-specific basis, these are explained by

20  drift.

21  A.   That's what I would -- that would be my explanation.   It

22  doesn't make sense otherwise.

23  Q.   Okay.   Thank you.   Let's turn to Plaintiffs' Exhibit 45.

24  A.   Okay.

25  Q.   And is this figure 11 that you prepared?

Palmer - Direct

1   A.   It is figure 11 from my report.

2   Q.   Okay.  Did you prepare this after reviewing data showing

3   the levels of sulfates and conductivity at monitoring points

4   P-10 and 11 after the beginning of mining at 4A?

5   A.   That's what these figures are intended to show, what the

6   numbers look like, the conductivity and sulfate --

7   Q.   Okay.

8   A.   -- look like after Fola mining began.

9   Q.   And did those data show an increase in sulfate and

10  conductivity since the mining began?

11  A.   They do, significant increases at these same very sites,

12  8, 9, and 10 and so forth where we just said that

13  conductivities were, in some cases, up to 700 but not terribly

14  high, and you see that at P-9, for example, conductivities

15  reached over 3000.  Same thing at site P-10.  They're over --

16  they're at 2000 or over.  And the same thing at P-11.

17  Q.   As far as you know, is coal mining the only developed

18  land use in the Right Fork watershed?

19  A.   As far as I know, yes, sir.

20  Q.   Okay.  Let's turn to the next exhibit, 40, which should

21  be figure 12.

22      Did you prepare that?  Is that right?

23  A.   This was in my report, yes.

24  Q.   And you prepared it after reviewing the data showing the

25  levels of conductivity discharges from Outlets 022, 023, and

Palmer - Direct

1   027 in years 2012 and '13, right?

2   A.   That's correct.   This figure is analogous to the one we

3   looked at for Road -- Road Fork.

4   Q.   Right.   And what are the levels of conductivity in those

5   discharges, generally?

6   A.   So the conductivity levels in, between 2011 and 2014, in

7   Road Fork are up to as high as, I don't know, three thousand

8   and one hundred or two hundred.   Very high conductivity.

9   Q.   How does that compare to the conductivity prior to Mine

10  4A?

11  A.   The -- it's significantly higher, much, much higher.

12  Even due to areas -- even in areas where you had some pre-Fola

13  mining, this is higher.

14       THE COURT:   I'm sorry to interrupt you.   I've been

15  trying to keep up with these, and I don't see Exhibit 40 that

16  looks like what Dr. Palmer is testifying about.   In fact, my

17  Exhibit 40 has a PE number 0119, and it's already been

18  different --

19       MR. LOVETT:   It's 46, Your Honor.

20       THE COURT:   46.

21       THE WITNESS:   Well, that explains why I'm looking at

22  this for Road Fork.

23       MR. LOVETT:   I apologize.   Let's just strike that

24  whole line of questioning.

25       THE WITNESS:   I thought it was a little odd.

Palmer - Direct

1   BY MR. LOVETT:

2   Q.   Let's turn to 46.

3   A.   Okay.  46.  Now we're looking at outfall data.

4   Q.   Okay.  So --

5            THE COURT:  Figure 12?

6            MR. LOVETT:  Figure 12.

7            THE WITNESS:  From my report.

8   BY MR. LOVETT:

9   Q.   From your report.  And this is after reviewing data

10  showing the levels of conductivity in discharges from Outlets

11  022, 023, and 027, right?

12  A.   That's correct.

13  Q.   And, again, level of conductivity, is it high?

14  A.   The levels of conductivity are very high.  In 022 you see

15  it reaching up to over 4000 microsiemens.  Similarly in 023 it

16  reaches that level at least once, and the same with 027.

17  Very, very high levels of conductivity compared to pre-mining.

18  Q.   Okay.  Now, let's look at the biological sampling

19  downstream in 2012.  Let's start at Plaintiffs' Exhibit 48 at

20  PE 0128, figure 14.

21  A.   Yes.

22  Q.   Did you prepare that?

23  A.   It was from my report.

24  Q.   Yes.  And do they show the WVSCI scores in Right Fork

25  downstream from Outlets 022, 23, and 27 in the Spring of 2012?

Palmer - Direct

1    A.    Yes, it does, and it shows that the WVSCI scores are very

2    low, even as low as below 20.

3    Q.    Okay.  So that's showing significant impairment, right?

4    A.    That's on Right Fork.  Yes, sir, significant impairment.

5    Q.    Okay.  Let's go back to Exhibit 73, paragraph 36.

6    Exhibit 73 is the stipulation.  36 I think is that same

7    paragraph that we were --

8    A.    What's the page number, please?

9    Q.    I'll find you the Bates number.

10   A.    PE --

11   Q.    The Bates number is PE 0218.

12   A.    Okay.

13   Q.    Paragraph 31.

14         Do you remember that?  36.  Paragraph 36.

15         THE COURT:  Well, wait.  Paragraph 31 is what we

16   talked about earlier that's at 218.

17         MR. LOVETT:  You're right.  I want to go to

18   paragraph 36 on PE 0222.

19         THE WITNESS:  The chemistry results at those sites?

20   Is that where you want to be?

21   BY MR. LOVETT:

22   Q.    Yes.  Should be on pages 222 and 223.

23   A.    Okay.

24   Q.    How does the ionic signature shown by those chemical

25   concentrations compare to the ionic signature of alkaline mine

Palmer - Direct

1   drainage in streams affected by mountaintop mining and valley

2   fills in Central Appalachia?

3   A.   Well, it's consistent in terms of the ionic constituents

4   that are elevated, like calcium, magnesium, you know,

5   particularly sulfate, and pH indicates it's alkaline, and the

6   conductivity is highly elevated.

7   Q.   Let's turn to paragraph 38 at PE 0225.

8   A.   Okay.

9   Q.   Do you see the table there?

10  A.   I do.

11  Q.   What does it show?

12  A.   Well, it shows the -- some chemistry in pre-mining

13  samples, which would be the Fola 6 and 7 taken in '01 and

14  '02 --

15  Q.   Uh-huh.

16  A.   -- and in samples taken by Fola from just downstream of

17  their outlets after they had started mining, so sort of pre

18  and post.

19  Q.   Okay.

20  A.   The first two rows are pre, and the second two rows are

21  post.

22  Q.   Is there a significant increase in ionic chemicals and

23  conductivity?

24  A.   There's a very significant increase, from, you know, 367

25  to 461, all the way up to, after mining, 1538 to 1689

Palmer - Direct

1   microsiemens.

2   Q.   Okay.  So mark this with your finger, if you would, and

3   let's turn to paragraph -- table 6, which is at Plaintiffs'

4   Exhibit 49.

5        I want you to compare Plaintiffs' Exhibit 49 numbers with

6   these.  Table 6, which is PE 0129 --

7   A.   Okay.

8   Q.   Do you see that?  That adds four rows below the ones that

9   we just looked at in paragraph 38, right?

10  A.   Yes.  It appears that the first four rows are exactly

11  what we were looking at, but now there's four more rows that

12  have --

13  Q.   I guess we don't need to save our place if they're --

14  A.   Look to be the same.  Yeah, they are.

15  Q.   So what do those new rows show?

16  A.   Well, it just shows that the chemistry of the water

17  coming from the outlets is quite elevated; and, of course, not

18  surprisingly, the conductivity is even higher than in the

19  stream because you have a little dilution when outlet water

20  flows into the stream.

21  Q.   So these were measured in 2014 by Evan Hansen, right?

22  A.   Yes.

23  Q.   And Mr. Hansen, as far as you understand, was hired by

24  the plaintiffs to do this sampling.

25  A.   That's my understanding from the report --

Palmer - Direct

1   Q.   Okay.

2   A.   -- that was shared with me that he had done.

3   Q.   So, in addition, how do they compare to the levels at

4   Boardtree Branch measured by Kuntz in his 2013 paper?

5   A.   So what you see is that the conductivity levels in

6   Boardtree Branch were comparable to what was going on in the

7   outlet.   In other words, elevated levels.

8   Q.   Uh-huh.

9   A.   Alkalinity is elevated.   Calcium, magnesium elevated.   In

10  other words, you have that characteristic signature again of

11  high sulfate, high -- other ions that are high, and then

12  elevated conductivity.

13  Q.   So this has the same ionic signature as the water that

14  Kuntz used, right?

15  A.   That's correct, the water that Kuntz reconstituted to

16  test some mayflies in and other organisms.

17  Q.   Let's turn to Plaintiffs' Exhibit 25, which should be

18  PE 048.

19  A.   Okay.   This looks like Dr. Swan's data.

20  Q.   Again, Dr. Swan will testify probably right after you.

21  He's a witness for the plaintiff, right?

22       What did Dr. Swan find the WVSCI score to be when he

23  sampled Right Fork in May of 2014?

24  A.   The WVSCI score was 38.21, and the GLIMPSS was 25.79.

25  Q.   Okay.   Did he measure -- let's also look at the RBP at

Palmer - Direct

1    Plaintiffs' Exhibit 32 that he did.

2        Plaintiffs' 32 is an RBP that Dr. Swan did on that

3    stream.

4    A.   Yes.

5    Q.   Do you see that?

6    A.   I do.

7    Q.   And he didn't total it, I think, again, right?

8    A.   Maybe it's the one that was 172.  I remember --

9    Q.   It was 172.

10   A.   They were not bad.  I remember that.

11   Q.   Okay.  If it does total to 172, which I'll represent to

12   you it does, what does that tell you about the habitat at that

13   stream?

14   A.   It's good habitat.

15   Q.   Good habitat?

16   A.   It's fine.  It's not a problem.

17   Q.   So could the RBP score cause the low WVSCI score that we

18   saw in, just now, in Exhibit 25 at PE 0048?

19   A.   No.  No.  It's good habitat.  So it would not have caused

20   it.

21   Q.   Again, did he find any mayflies in Right Fork?

22   A.   No.  I remember clearly that none of these mine sites had

23   any mayflies when he sampled.

24   Q.   So do you attribute the cause of the impairment to

25   conductivity and not to habitat?

Palmer - Direct

1    A.    I have no doubt it's conductivity and not habitat.

2    Q.    Okay.  And last was -- we're almost finished.  Let's look

3    at Plaintiffs' Exhibit 50 and 51.

4          Is Plaintiffs' Exhibit 50, which is figure 15, something

5    you prepared?

6    A.    This is from my report, yes, showing the habitat scores.

7    Q.    Okay.  And let's also look at 51, table 7.

8          Do you see that?

9    A.    I do.

10   Q.    So would you explain the relationship between those two

11   exhibits?

12   A.    Well, this is just showing that, you know, okay, in the

13   graph, figure 15, you know, you see that in Right Fork,

14   habitat is generally around -- looks like 130 to 140, but in

15   Leatherwood, you know, it's a little -- it appears to be a

16   little more variable; sometimes higher, sometimes slightly

17   lower.

18         And if you look at data that include older numbers, you

19   know, what you see is the same sort of range, that is, you

20   know, sometimes like excellent habitat in 1997 of 195, and

21   yet habitat that is suboptimal, you know, on another date

22   later.

23         So it varies, but none of these are, like, marginal or

24   poor, not a single one.

25   Q.    All decent habitat?

Palmer - Direct

1    A.    That's right, all decent habitat; yes.

2    Q.    So in your opinion, that habitat cannot be responsible

3    for the low WVSCI scores.

4    A.    Correct.

5    Q.    And, again, it's your opinion that the low WVSCI scores

6    are caused by the conductivity or the ionic mixture in the

7    streams, right?

8    A.    It is my opinion.

9    Q.    Let's move to the last mine, No. 6, at Cogar Hollow

10   tributary.  Start with Plaintiffs' Exhibit 52, getting back to

11   the map.

12   A.    Okay.

13   Q.    Does this map show the location of Mine 6?

14   A.    It does.  It shows Cogar Hollow.

15   Q.    Uh-huh.

16   A.    And it shows the valley fills.  There's three valley

17   fills.

18   Q.    Right.

19   A.    And they all empty into Cogar Hollow, which drains into

20   Leatherwood.

21   Q.    Could you point to the Court and show the Court where

22   monitoring point S3-1A is?

23   A.    It doesn't have any colors on it, so it's a little hard

24   to see, but it's right here.  (Indicating)

25             THE COURT:  1A?

Palmer - Direct

1    THE WITNESS:  53-1A, yes.

2    BY MR. LOVETT:

3    Q.   Let's turn to Plaintiffs' Exhibit 53.  Does this map show

4    a close-up of the three valley fills?

5    A.   Yes, it does.

6    Q.   And could you point out on the map where Outlets 15, 13,

7    and 17 are?

8    A.   Sure.  So Outlet 15 -- so here's one valley fill, and

9    Outlet 15 looks to be perhaps right below that pond.  And then

10   113 is further on downstream in Cogar Hollow.

11   And then, I'm sorry, what was the third one you wanted me

12   to show?  15, 13, and was it 17?

13   Q.   17.

14   A.   And so 17 is over here and drains -- looks like it gets

15   receiving water from the pond that's draining the valley fill

16   of this site.  (Indicating)

17   Q.   And those outlets drain the three valley fills on the

18   mine, right?

19   A.   That looks to be the case.  013 it's a little harder to

20   tell if it's right at the base of the pond, but from this map,

21   it is anyway.  But it is just below that valley fill where it

22   comes in presumably.

23   Q.   Okay.  Let's turn to Plaintiffs' Exhibit 126,

24   one-two-six, which should be the CHIA for this mine.  It's

25   Bates number 1337.  Do you see that?

Palmer - Direct

1    A.   I do.

2    Q.   CHIA performed in 2000 by DEP?

3    A.   Yes.

4    Q.   Okay.  Let's turn to page 1353.

5         Do you see that?

6    A.   I do.

7    Q.   And do you see where it describes Cogar Hollow water or

8    the Cogar Hollow watershed?

9    A.   Yes, under -- where it says "S-31A (Cogar Hollow)"?

10   Q.   Uh-huh.

11   A.   Yes.

12   Q.   And one thing it points out is that it's above the

13   influence of any mining, right?  It's the first sentence.

14   A.   It says it's above the influence of any mining, S-31A.

15   Q.   So as of --

16   A.   This would be at that time.

17   Q.   It's no longer the case, is it?

18   A.   Right, it's no longer.

19   Q.   But in --

20   A.   '99 it was.

21   Q.   Yeah.  When the CHIA was performed, it was above all

22   mining.

23   A.   That's correct.

24   Q.   And then let's turn to page 1361 of the CHIA.  And these

25   are the baseline benthic monitoring results from pre-mining.

Palmer - Direct

1   Do you see that for Cogar Hollow?

2   A.   I do.

3   Q.   Would you read the paragraph that begins "In general."

4   It's the second full paragraph on the page.

5   A.   "In general, all stations provide adequate habitat and

6   contain populations of benthic macroinvertebrates.  All

7   stations have high EPT indices."

8   Q.   Just continue and read the paragraph, if you would.

9   A.   "This index relates the total number of organisms found

10  to the number of organisms which belong to the orders

11  Ephemeroptera (Mayflies), Plecoptera, or stoneflies, or

12  Trichoptera (Caddisflies)."

13  Q.   Go ahead.

14  A.   "Pollution intolerant, high water quality organisms are

15  represented by these three orders.  If the percentage is high,

16  it is safe to say in most cases that the water is of high

17  quality."

18  Q.   Do you agree with that?

19  A.   I do agree with that.

20  Q.   Okay.  So that's pre-mining.

21       Let's turn to Plaintiffs' Exhibit 54.  Again, you

22  prepared these, right, that figure 18?

23  A.   Yes.  This is from my report.

24  Q.   Okay.  And these are from your review of levels of

25  conductivity and sulfate in Cogar Hollow at point S-31A prior

Palmer - Direct

1    to mining, right?

2    A.    That's correct.

3    Q.    Prior to Mine 6.

4    A.    Prior to Fola's mining, yes.

5    Q.    Is the data supporting that figure -- I'm sorry.  What do

6    those data show?

7    A.    The data show that conductivity is almost always well

8    below the threshold level of 300 microsiemens, and the

9    sulfates are quite low as well.

10   Q.    Okay.  Let's look at Plaintiffs' Exhibit 55, figure 19.

11        And those are data showing the levels of conductivity and

12   sulfate in Cogar Hollow at point S-31A after mining at 6 has

13   begun; is that true?

14   A.    Yes, it is.

15   Q.    And what do those data show?

16   A.    It shows that after Fola mining, the conductivity levels

17   are very high, between four and maybe fifty-five hundred

18   microsiemens.  Sulfates are high.  This is among the highest

19   sulfate levels I've ever seen, over 3000 milligrams per liter

20   at one point.  And so it's got water quality problems.

21   Q.    Okay.  And is mining the only land use in Cogar Hollow

22   watershed?

23   A.    That's correct.

24   Q.    Okay.  Let's look at Plaintiffs' Exhibit 56, figure 20.

25        And are those -- was that prepared with data showing

Palmer - Direct

1    levels of conductivity and sulfate discharge from Outlets 13,

2    15, and 17 from Mine 6 in 2011 and 2012?

3    A.    That's correct.  This shows the levels in those outfalls.

4    One of each is associated with those valley fills or the

5    ponds, below the ponds.

6    Q.    Post mining, obviously.

7    A.    Post mining.

8    Q.    And what do those data show?

9    A.    It just shows that the conductivity is very elevated, so,

10   you know, similar to what, you know, we saw at the sites.  You

11   see conductivity levels in Outfall 13, for example, of nearly

12   5000 on one date.  They're all highly elevated, nowhere near

13   the benchmark level.

14   Q.    Okay.  Let's turn to the next exhibit, table -- which is

15   table 8 in Plaintiffs' Exhibit 57 at PE 137.

16        Do you see that?

17   A.    Yes.

18   Q.    Have you reviewed the data showing the mixture -- showing

19   the ionic mixture of the chemicals discharged here from

20   Outlets 13, 15, and 17?

21   A.    Yes, that's correct.

22   Q.    Okay.  And are those in different years?  Are those in

23   years 2007, '12, and '14?

24   A.    Yes.  And they all have conductivity levels well over --

25   in this case, well over 1800, at 1800 or above.

Palmer - Direct

1    Q.   So Mr. Hansen's conductivity number from 2014 is --

2    A.   I apologize.  I was looking at hardness.  I'm sorry.

3         The conductivity is present for Mine 6 outlet a number of

4    3420 in 2007.

5    Q.   Right.

6    A.   And Hansen in 13 measured 4200.

7    Q.   Okay.  And then on Boardtree Branch too, is there --

8    A.   It just shows the same characteristic signature for a

9    comparison point.

10   Q.   Uh-huh.  Okay.  Extremely elevated in 2014, though,

11   right?

12   A.   Very elevated.

13   Q.   And just the last row of Boardtree Branch, again how does

14   that compare to what Kuntz measured in 2013?

15   A.   Well, once again, he reconstituted the water that had a

16   characteristic ionic signature like Boardtree Branch and then

17   showed that it significantly impacted mayflies.

18   Q.   At 1090?

19   A.   At 1090.

20   Q.   Now it's --

21   A.   -- four times that almost.

22        THE REPORTER:  I'm sorry.  I'm sorry.  Did you say

23   "four times"?

24        THE WITNESS:  Almost four times, yeah.

25   BY MR. LOVETT:

Palmer - Direct

1   Q.   This may be the last exhibit.  Would you turn to

2   Plaintiffs' Exhibit 25.  Again --

3   A.   Dr. Swan's samples.

4   Q.   These are Dr. Swan's WVSCI scores, right?

5   A.   That's correct.  Cogar Hollow WVSCI was 41.81 when he

6   sampled and the GLIMPSS score was 20.03, both showing high

7   levels of impairment biologically.

8   Q.   So a big change before and after mining at Cogar Hollow.

9   A.   Huge change.

10  Q.   Both in water quality and in WVSCI.

11  A.   Correct.

12  Q.   They go together, right?

13  A.   They go together.  The change in water chemistry was the

14  cause of the biological impairment.

15  Q.   Of course, I didn't tell the truth.  Let's do one more

16  thing.  Let's look at Plaintiffs' Exhibit 30, which is

17  Dr. Swan's RBP.

18  A.   And you get to tell me when you added it up what it is.

19  I don't remember.

20  Q.   Has anyone added this one?

21       If it's 145, what does that tell you about the site?

22  A.   It tells me that it's, you know, it's suboptimal, almost

23  optimal, but not quite.  So it's a fine habitat score.  It's

24  not at all an uncommon score to get in streams.

25  Q.   Could that habitat score have caused the impairment?

Palmer - Direct

1    A.    Absolutely not.

2    Q.    Do you have any doubt that in Cogar Hollow again that it

3    is the elevated conductivity and the associated ions that are

4    causing the impairment?

5    A.    That's correct.  I feel certain that that is what is

6    going on.

7          (Mr. Hecker and Mr. Lovett conferred privately off the

8    record.)

9    BY MR. LOVETT:

10   Q.    So just to sum up, is it your opinion that at all three

11   mines, there's impairment?

12   A.    It is my opinion that at all three mines, there's

13   impairment, and that in two of those mines, there was no prior

14   impairment from earlier mining, and the -- and they are

15   impaired now.  In one of them, there were some low WVSCI

16   scores or higher conductivities at select sites, but there

17   were also sites that were sampled after mining pre-Fola that

18   were good, and yet post-Fola mining there showed impairment at

19   all the sites and elevated conductivity throughout, much

20   higher.

21   Q.    Just to finish, Road Fork and Cogar Hollow, pre-mining,

22   the streams were in good condition and the habitat was in good

23   condition.

24   A.    That's correct.

25   Q.    There was no mining in those -- no significant mining in

Palmer - Direct

1    those watersheds.

2    A.    Correct, my understanding.

3    Q.    After mining, that had completely changed so that we have

4    impairment and high conductivity.

5    A.    That's correct.

6    Q.    You have no doubt that that conductivity -- that that

7    impairment is caused by the conductivity, right?

8    A.    I have no doubts.

9    Q.    And in Right Fork, there was some pre-mining elevated

10   conductivity, correct?

11   A.    That's correct, there were at some particular spots.

12   Q.    And WVSCI scores varied from time to time.

13   A.    They varied.

14   Q.    But since mining, the conductivity has become much more

15   elevated than it was before mining.

16   A.    Correct.

17   Q.    And the WVSCI scores have gotten worse too.

18   A.    That's correct.

19   Q.    Okay.  And, again, you think that's caused by -- that the

20   impairment there is caused by conductivity.

21   A.    I do.

22   Q.    Okay.  Do you hold all the opinions that you've testified

23   to to a reasonable degree of scientific certainty?

24   A.    I do.  I hold them to a level of high certainty.

25              MR. LOVETT:  That's all.

Palmer - Cross

1          THE COURT:  All right.  We'll take a ten-minute

2    recess before cross.

3          (Recess from 3:53 p.m. to 4:07 p.m.)

4          THE COURT:  All right.

5                      CROSS-EXAMINATION

6    BY MR. MCLUSKY:

7    Q.   Let's get the important thing out of the way first.  When

8    you say you have a home in West Virginia on a river, you're in

9    Paw Paw, West Virginia, somewhere thereabouts?

10   A.   I am.

11   Q.   On what river?

12   A.   It's the Cacapon, which is a major tributary to the

13   Potomac.  Is that -- that's in West Virginia.

14   Q.   Not very far in West Virginia, is it?

15   A.   No.

16   Q.   Let's put up -- Mr. Tyree, if you could -- Plaintiffs'

17   Exhibit 42, page PE 122, which, Dr. Palmer, I put up on the

18   screen.  And I'll have Mr. Tyree blow it up, if you'd like, on

19   either screen.  But I think this is your figure 8 from your

20   report.

21        Does that look right?

22   A.   It does look correct.

23   Q.   I have a couple questions here.  This is the Right Fork

24   watershed is my understanding; is that correct?

25   A.   Yes.

Palmer - Cross

1   Q.   Okay.  And you pointed out earlier we had Outlets 022,

2   023, and then -- in the Right Fork; and then over in Cannel

3   Coal Hollow, I think it's called, Outlet 027; is that correct?

4   A.   Right.

5   Q.   Those are the three outlets at issue in the Right Fork

6   watershed?

7   A.   These are ones for which we had data that we talked about

8   at various points.

9   Q.   Okay.  And then you talked about Dr. Swan's WVSCI

10  sampling.  Do you recall that?

11  A.   I do.

12  Q.   Okay.  Do you know how and where on figure 8 he did his

13  WVSCI sampling?

14  A.   I do not.

15  Q.   Do you know whether it was below the confluence of Cannel

16  Coal Hollow and the main stem of Right Fork so that he could

17  pick up the discharges from all three of the outlets you just

18  mentioned?

19  A.   I don't recall.

20  Q.   Okay.  If you assume that he sampled below the

21  confluence, he'd have to sample below the confluence to get

22  the drainage from all three of the outlets you just mentioned,

23  wouldn't he?

24  A.   That's correct.

25  Q.   Okay.  And if he did so -- I'm just looking in the Right

199

Palmer - Cross

1  Fork watershed between Outlet 022 and the confluence with

2  Cannel Coal Hollow.  And at least on your map, I see Outlet

3  024, Outlet 021, Outlet 025, Outlet 020, and 028 that are

4  located between Outlets 023, 022, and the confluence with

5  Cannel Coal Hollow; is that correct?

6  A.    Yes.

7  Q.    Okay.  So if his sampling was done below the confluence,

8  it didn't isolate the effects of just discharges from 022 and

9  023 in the main stem of Right Fork, did it?

10 A.    No, that would be correct.

11 Q.    Okay.  Let's talk about Cannel Coal Hollow.  The same

12 thing is true in Cannel Coal Hollow.

13        If he sampled -- his benthic scoring was done in the main

14 stem below the confluence and his goal was to pick up or

15 isolate the effect of Outlet 027, he failed at that because he

16 also picked up the effect of other outlets shown in Cannel

17 Coal Hollow in your map as 001, 002, 020, 26, 031, 003, 030,

18 and 004; isn't that right?

19 A.    You would be correct, and I don't know if his goal was to

20 try and isolate individual outlet impacts.

21 Q.    I think in the Stillhouse trial, which I think was our

22 last visit here, among many, I think you testified there that

23 you suggested particular pollutants such as selenium and

24 manganese can themselves cause stress to aquatic organisms by

25 getting in the food web; is that correct?

Palmer - Cross

1   A.   I don't recall exactly what I said.  I'll be happy to

2   look at it if you would show me the passage.

3   Q.   Mr. Tyree, could you put up the Stillhouse trial

4   transcript, page 126, please, and line 13, if you could.

5        The question I asked you then, Dr. Palmer, was, "Have you

6   suggested that particular pollutants such as selenium and

7   manganese can themselves cause stress to aquatic organisms by

8   getting in the food web?"

9        And your answer was?

10  A.   "I know selenium can."

11  Q.   Okay.  And I go on to say, "Have you said that some of

12  the more toxic ions, especially selenium, manganese, are known

13  to accumulate at high concentrations in stream biofilm where

14  they may enter the food web?"

15       And your answer was, "I think -- I know that to be the

16  case.  I can't remember if I said that in the report.  That's

17  a fair statement.  I think that's so."

18       Is that true?

19  A.   I know that to be the case for selenium.  But you're

20  correct, that is what I said in the trial.

21  Q.   Did you do any food web work here?

22  A.   In these streams, no, sir.

23  Q.   And, well, we didn't go over it before.  How many visits

24  did you make to this site?

25  A.   I was unable to visit this site --

Palmer - Cross

1    Q.    So --

2    A.    -- which is why I don't know where the sampling --

3    Q.    So you haven't been to these sites at all.

4    A.    No.  I was unable to visit the sites.

5    Q.    Let me turn to -- I think it was Joint Exhibit 20, if I

6    might have just a minute, Your Honor.

7              THE COURT:  Certainly.

8    BY MR. MCLUSKY:

9    Q.    I think, Dr. Palmer, that's the large notebook.

10             May I approach, Your Honor?  Maybe I can speed this up.

11             THE COURT:  Yes, go ahead.

12   BY MR. MCLUSKY:

13   Q.    Instead of you looking for it, I can find it.

14             Dr. Palmer, Joint Exhibit 20 I think is the -- I don't

15   have my copy -- 2012 303(d) list; is that correct?

16   A.    That's correct.

17   Q.    For the Elk River watershed?

18   A.    It appears to be.

19   Q.    Okay.  And I've tabbed a page.  It's called List 11.  Is

20   that the page number?

21   A.    Yes.

22   Q.    Okay.  Can you confirm that on that page that Cannel Coal

23   Hollow, which drains out at 027, is not listed for biological

24   impairment but is listed for selenium impairment?

25             THE REPORTER:  Listed for what?

Palmer - Cross

1          MR. MCLUSKY:  Selenium impairment.

2    A.   I can confirm that.

3    Q.   Okay.  Did you know that before you came here?

4    A.   I don't know.  I probably saw this, but I don't remember

5    for sure if I have.  So perhaps the best answer is no.

6    Q.   Were you aware -- I take it you were not aware of the

7    fact, then, that the plaintiffs in this case also sued Fola

8    Coal Company for selenium discharges coming from Outlet 027.

9    A.   I know nothing about that.

10   Q.   Okay.  Mr. Tyree, could you put up a copy of what we'll

11   call Defendant's Exhibit --

12          MR. TYREE:  193.

13   Q.   -- 193, which you don't have yet.

14          May I approach, Your Honor?

15          THE COURT:  You may.

16   BY MR. MCLUSKY:

17   Q.   Dr. Palmer, I will represent that this is a motion for

18   summary judgment filed by the same plaintiffs in this case in

19   an earlier case against Fola Coal Company and ask, if you turn

20   to page 3 and 4 of that document --

21   A.   Okay.

22   Q.   -- and ask if you can't confirm by looking at the

23   bottom -- the last paragraph on the bottom of page 3 -- Mr.

24   Tyree has it up on the screen too if you'd like to see it --

25   if it doesn't identify selenium sampling points in Cannel Coal

Palmer - Cross

1    Hollow as DCCH (P-9).

2         Do you see that?

3    A.   I'm looking at the bottom paragraph?

4    Q.   The bottom on page 3, continued over to page 4.

5    A.   Yes, I do see that.

6    Q.   They identify a sampling point DCCH (P-9) in Cannel Coal

7    Hollow.

8    A.   Yes.

9    Q.   And they allege that they've exceeded the chronic

10   criterion for selenium at least 41 times between July 2008 and

11   July 2012.

12        Do you see that?

13   A.   I do see that.

14   Q.   And the acute standard at least 15 times during the same

15   period, correct?

16   A.   Correct.

17   Q.   If you continue, they go on to say -- they also alleged

18   violations of the selenium chronic concentrations in the Right

19   Fork of Leatherwood Creek at a spot they identify as DRFLC

20   (P-10).

21        Do you see that?

22   A.   I do, yes.

23   Q.   And then another one further down is DRFLC --

24   A.   P-11.

25   Q.   -- (P-11).

Palmer - Cross

1   A.   Yes.

2   Q.   And if you read on, you'll see that they alleged that

3   those -- the information is set out in Exhibit 4 to the motion

4   for summary judgment.

5        Do you see that?

6   A.   Would that be -- yes, I do see that.  Yes.

7   Q.   And then, Mr. Tyree, we have Defense Exhibit 194, which

8   will be Exhibit 4 to the motion for summary judgment.

9        Your Honor, let me get these marked, if I might --

10              THE COURT:  Yes.

11              MR. MCLUSKY:  -- before I overstep my bounds.

12       May I approach, Your Honor?

13              THE COURT:  You may.

14  BY MR. MCLUSKY:

15  Q.   Dr. Palmer, I hand you what has been marked as, I think,

16  Defense Exhibit 194 and represent that is Exhibit 4 to the

17  motion for summary judgment that the plaintiffs filed in a

18  selenium case against Fola.

19       And do you see on this document there is a number of

20  selenium data, and you'll see at the top of the exhibit, for

21  example, Instream Monitoring Point P-9 -- Mr. Tyree can

22  highlight that -- (DCCH)?

23       Do you see that on the screen?

24  A.   Well, I see it here, yes.

25  Q.   Okay.  And that would appear to be the same one we just

Palmer - Cross

1    talked about, which is downstream Cannel Hollow, correct, P-9?

2    A.   P-9.  There is such a site in Cannel Coal.

3    Q.   Okay.  What we have on here are measurements of selenium,

4    all of which exceed 5 parts per billion; is that correct?

5    A.   It appears that way, yes.

6    Q.   And some of them are -- I see one --

7    A.   Some are very high.

8    Q.   Yes.  Are these some of the highest numbers you've seen

9    in West Virginia?

10   A.   I haven't looked at selenium data in depth in West

11   Virginia, so I can't say that, no.

12   Q.   Have you looked at selenium data anywhere?

13   A.   A little bit.  I mean, I've looked at a little bit in

14   association with mining, yes, but I can't say what the highest

15   numbers are in West Virginia.

16   Q.   Are these -- you've done work in the Mud River area?

17   A.   I have not worked in Mud River.

18   Q.   The chronic criterion you know to be 5 parts per billion?

19   A.   I think it is 5, yes.

20   Q.   And then if you turn forward, there's similar data both

21   for the instream monitoring points P-10 and P-11, both of

22   which are in the Right Fork of Leatherwood; is that correct?

23   A.   That's correct.

24   Q.   And all of these numbers exceed the 5; is that correct?

25   A.   I'll take your word for it.  It certainly looks like it

Palmer - Cross

1   from perusing it.

2   Q.   Did anyone tell you what is going on in these watersheds

3   as a result of this lawsuit?

4   A.   I'm not sure what your question is.

5   Q.   Do you know how one goes about treating selenium?

6   A.   No, I do not.

7   Q.   Have you ever heard of a biochemical reactor?

8   A.   I've heard of bioreactors.

9   Q.   Have you ever seen one built?

10  A.   No.

11  Q.   Can you imagine a very large pond filled with hay, horse

12  manure, and other organic materials?

13  A.   I'd rather not, but I could.

14  Q.   Is that the type of thing that can have impacts on

15  aquatic organisms?

16  A.   It could, yes.

17  Q.   You didn't take any of that into account in this case,

18  did you?

19  A.   I don't -- I'm not aware of whether there are hay bales

20  and horse manure in these ponds.  I have no knowledge of that.

21          MR. MCLUSKY:  May I approach, Your Honor?

22          THE COURT:  Yes.

23  BY MR. MCLUSKY:

24  Q.   Dr. Palmer, I've handed you what will be marked as

25  Defense Exhibit 195 and represent that is a report to the

Palmer - Cross

1   Court by Fola's consulting -- or part of Fola's report to the

2   Court on what actually will be built in some of these

3   watersheds.

4        Mr. Tyree, could you scroll forward in that document?

5   A.   What page are you going to?

6             MR. TYREE:   Page 5.

7   BY MR. MCLUSKY:

8   Q.   Page 5.

9   A.   Okay.

10  Q.   And ask if this doesn't show above Outlets 022 and 023 a

11  BCR or biochemical reactor plan to be constructed.

12  A.   It is so labeled on the figure that.  I don't know other

13  than what's labeled on the figure.

14  Q.   And there's, further up in the watershed, aeration and

15  polishing pond.

16       And, Mr. Tyree, could you show anything at Cannel Coal

17  Hollow as well?

18       All right.  What page is this, Mr. Tyree?

19             MR. TYREE:   Page 9.

20  BY MR. MCLUSKY:

21  Q.   At page 9 of the report, Dr. Palmer -- it's up on the

22  screen -- you can see these drawings showing a series of

23  trenches, ponds, aeration ponds, polishing ponds.

24       I assume all of this is news to you.

25  A.   It's not in page 9 of my report.

Palmer - Cross

1    Q.   Okay.   Page 7.   I'm sorry.

2    A.   Okay.   I'm sorry.   What did you ask me?

3    Q.   Do you see pictures of an aeration/polishing pond,

4    collection trenches?

5    A.   I see circles and rectangles labeled as such, yes.

6    Q.   Okay.   And I take it none of these were things that you

7    took into account in your opinions of what might occur or is

8    occurring in this watershed.

9         Is that a fair statement?

10   A.   I'm not aware of this information, correct, so I did not

11   take it into account.

12   Q.   Mr. Tyree, could you put up Cogar Hollow?   And I'm not

13   sure what exhibit it would be.

14        Let's go back to Joint Exhibit 20.   I'm sorry, not 20.

15   Plaintiffs' Exhibit 42, that Palmer figure 8.

16   A.   22?   22?

17   Q.   42.   Mr. Tyree -- it's your figure 8.   He'll blow that up

18   again.

19   A.   Yes.

20   Q.   All right.   Does this show the -- this shows just Right

21   Fork and Cannel Coal Hollow.   Does it show the other -- does

22   it show Road Fork and Cogar Hollow as well?

23   A.   It shows where Cannel Coal comes into Right Fork.

24   Q.   All right.

25        I'll come back to this in a minute, Your Honor.

Palmer - Cross

1        Dr. Palmer, let's kind of go back to some more basic

2    stuff.  You've testified before, I think it's true, that

3    you're not a toxicologist; is that correct?

4    A.    That's correct.

5    Q.    Okay.  You're also not a chemist.

6    A.    No, I'm not a chemist.  We do a lot of biogeochemistry,

7    stream biogeochemistry in my lab; a lot.

8    Q.    You're not a chemist, right?

9    A.    I wasn't trained as a chemist.  It doesn't mean I don't

10   know any chemistry.

11   Q.    In fact, your Ph.D. was in what?

12   A.    Oceanography.

13   Q.    And I think you told us before that you're not an

14   epidemiologist.

15   A.    I'm not.

16   Q.    You're not an eco-epidemiologist as well --

17   A.    No, I'm not.

18   Q.    Okay.  You've done no field or lab testing to validate or

19   invalidate the work of the benchmark.  Is that fair?

20   A.    Specifically to validate the benchmark, no, I have not;

21   that's correct.

22   Q.    You've done no original lab work investigating the

23   toxicity of alkaline mine drainage on insects at all; is that

24   correct?

25   A.    No, I have not.

Palmer - Cross

1  Q.   You haven't published papers in what's necessary to

2  establish either a general or specific relation -- causal

3  relationship in the field of aquatic toxicity.

4  A.   I'm sorry.  I don't understand your question.

5  Q.   Have you published anything in the field of aquatic

6  toxicity?

7  A.   Well, I'll probably just say no because I'm not exactly

8  sure what you might include in that.  I've certainly published

9  in *Environmental Science and Technology* and journals like that

10  with a lot of chemistry in it, but not -- we have not done

11  toxicological testing in my lab.

12  Q.   You haven't done any work to verify or rework any of the

13  statistics that were run as part of the benchmark, have you?

14  A.   I have not run them myself.  I've looked at a lot that

15  has been done by colleagues, by Ryan King, Emily Bernhardt, by

16  others, but I did not run them.

17  Q.   And none of that is in your report in this case.

18  A.   No, it is not.

19  Q.   And while you have used statistics in your work, you

20  don't hold yourself out as a statistician in either, do you?

21  A.   No, I do not hold myself as a statistician.

22  Q.   Okay.  You've done no independent work to determine which

23  constituents comprising conductivity might be responsible for

24  the effects observed by EPA?

25  A.   Individual constituents?

Palmer - Cross

1   Q.   Correct.

2   A.   No, I have not worked on that.

3   Q.   Isn't it fair that the benchmark itself does not claim

4   that sulfate or any other particular ion is the primary cause

5   or presence -- or primary cause of the absence of any

6   particular insect?

7   A.   The benchmark points to the ionic mixture as the

8   causative agent.

9   Q.   And the SAB asked that it could improve its work by

10  looking at the elements of the mixture that might actually be

11  causative; is that not true?

12  A.   I seem to recall that that was read, yes, in the

13  testimony.

14  Q.   All right.  Turning to Joint Exhibit 13, which is Pond

15  2008 -- wait till Mr. Tyree gets there.

16  A.   Okay.

17  Q.   Mr. Tyree, can you get us to the abstract?

18       Dr. Palmer, is it fair to say that in the -- this is

19  Joint Exhibit 13, the Pond 2008 paper -- that nothing in this

20  abstract claims that either conductivity or sulfate caused any

21  particular effect anywhere?

22  A.   Let me read, look at it again.

23       You are correct, it's not in the abstract.

24  Q.   And, in fact, Pond simply used conductivity as a

25  surrogate for mining in this paper, did he not?

Palmer - Cross

1    A.    I don't know.  Let me look again.

2    Q.    I direct your attention to page 188 or page 720 of the

3    article, first column.

4    A.    I'll get there.  Just a minute.

5    Q.    It's not a trick question.  I asked you this last year.

6    And I can put your answer up, if you'd like, from the

7    Stillhouse case.

8          Would that help?

9    A.    I'd like to have time just to look at this.

10         Yes, you're correct.  They assigned the ranges based on

11   conductivity because they said the land use data was

12   insufficient to characterize the amount of mining.

13   Q.    Okay.  Could you turn to page JE 194, which is page 726

14   of the article?

15   A.    Okay.

16   Q.    There should be a table of correlation coefficients.

17   A.    Yes.

18   Q.    And I'll ask if Pond in 2008 didn't find a .74

19   correlation coefficient between West Virginia Stream Condition

20   Index scores and RBP habitat scores.

21   A.    That's correct; he did.

22   Q.    And that's a relatively high correlation, isn't it?

23   A.    It is relatively high.  I'd want to see the P value, but

24   it's relatively high, yes.

25   Q.    And he found for embeddedness a correlation coefficient

Palmer - Cross

1   of .57; is that correct?

2   A.   That's correct.

3   Q.   Also relatively high.

4   A.   Pretty high, yeah.

5   Q.   And then if you turn to page 198 of the article, which is

6   page -- or page 198 of the exhibit, page 730 of the article --

7   A.   Okay.

8   Q.   -- about midway through the first full column.

9   A.   Uh-huh.

10  Q.   Paragraph -- the second column.  I'm sorry.  It begins

11  with "Howard."

12       Mr. Tyree has it up.

13       Do you see that?

14  A.   It's on page 730 of the article?

15  Q.   It's on page, yes, 730 of the article, and I have --

16  A.   Left column?

17  Q.   Do you see that?  It's the second column, first full

18  paragraph.

19  A.   Yes, I do.  I'm sorry.

20  Q.   It begins with "Howard."  Could you read that sentence,

21  please?

22  A.   "Howard et al. (2001) and Pond (2004) reported that

23  habitat indicators (chiefly sedimentation and embeddedness)

24  were strongly correlated with MMIs and particular metrics in

25  Kentucky headwater streams."

Palmer - Cross

1    Q.    And "MMI" is a multi-metric index; is that correct?

2    A.    Yes.

3    Q.    Just like the WVSCI is, right?

4    A.    It's comparable.

5    Q.    And then if you turn back to page 194, which is page 726

6    of the article, toward the end of that page --

7    A.    Yes.

8    Q.    -- you'll see the word "Alternatively." Do you see that?

9          Mr. Tyree has it up if you'd like to see it. It's at the

10   very end of the page.

11   A.    "Alternatively, elevated specific conductance might

12   simply be an indicator of mining disturbance, and other

13   mining-related variables (e.g., metal concentrations) might be

14   causing or contributing to the impairment."

15   Q.    Could you go on and continue reading the next sentence?

16   A.    "Our bioassessment indicators were not strongly

17   correlated with dissolved or total metals concentrations in

18   the water column, but these results do not rule out possible

19   exposure to metals via dietary intake or microhabitat

20   smothering by metal hydroxide precipitate."

21   Q.    Okay. Is it fair to say that Pond here in 2008, then,

22   could not rule out dietary uptake of metals, nor could he rule

23   out smothering of insects from metal hydroxide precipitation?

24   A.    He had not ruled those out completely, correct.

25   Q.    So let me make sure I understand. In 2008, if I'm

Palmer - Cross

1    working in Clay County, West Virginia, at the Fola Mine and I

2    run out to my mailbox to pick up my copy of Pond from the

3    *Journal of North American* --

4    A.    *North American Benthological* --

5    Q.    Along with *Rods and Reels* and *Guns and Ammo* out there --

6    A.    Yes.

7    Q.    -- and I pick up and read this article, I'm going to find

8    that he used conductivity as a surrogate for mining; is that

9    correct?

10   A.    Correct.

11   Q.    Okay.  He did not claim that conductivity or any

12   particular component of mine drainage caused any particular

13   impacts.

14   A.    He speculated in the discussion, but he -- I agree with

15   you; he could not rule everything out.  This was just the

16   study was too early.

17   Q.    He found a relatively high correlation between RBP, that

18   is, physical habitat, and the WVSCI or multi-metric indices

19   scores.

20   A.    That's correct.

21   Q.    He concluded that changes to the multi-metric index

22   scores could be due to dietary uptake, metals, or smothering

23   from metal hydroxide precipitation.

24   A.    He speculated.  It's purely speculation.  And he admits

25   he has no idea if that's possible.

Palmer - Cross

1  Q.   And he did not do a confounding factors.

2  A.   He did not.

3  Q.   All right.  I think we went over Plaintiffs' Exhibit 131,

4  which is Pond 2010.  Tell me if I --

5  A.   2008 you mean?

6  Q.   No, 2010.

7  A.   Oh, I'm sorry.

8  Q.   "Patterns of Ephemeroptera taxa loss."  Did you go over

9  this one earlier with Mr. Lovett?

10 A.   Yes.

11 Q.   They kind of run together in my head.

12 A.   Me, too.

13 Q.   Is it fair to say, Dr. Palmer, that likewise in Pond

14 2010, the abstract at least, there's no statement that

15 conductivity, sulfate, or any other chemical constituent can

16 or have caused any particular effect to --

17 A.   Can you tell me what the exhibit is, please?

18 Q.   I'm sorry.  It's Plaintiffs' Exhibit 131.

19 A.   Correct.  There's no mention of conductivity.

20      Is that what you asked?  I think it is.

21 Q.   The question was, is it fair to say that nowhere in the

22 abstract does it claim that conductivity or any constituent of

23 conductivity actually causes any particular impacts?

24 A.   That's correct.  It talks about mining, not about

25 conductivity, in the abstract.

Palmer - Cross

1  Q.   And if we turn to page PE 1536 of the same article and

2  look at line 593 --

3  A.   Yes.

4  Q.   -- is it fair to say here -- could you read this line for

5  us, please, beginning with "Although Pond"?

6  A.   "Although Pond (2008) did not find strong correlations of

7  mayfly abundance and richness with mining-related trace metals

8  in the water column (except selenium) they state that possible

9  exposure to metals through dietary uptake or potential micro-

10  habitat smothering by metal hydroxide precipitate or iron

11  bacteria blooms could not be ruled out."

12  Q.   Okay.  So this is Pond in 2010 reiterating what he says,

13  at least in part, in 2008; is that correct?

14  A.   Reciting 2008.

15  Q.   But with one important additional statement here.  He

16  actually says in 2010 he found in 2008 a strong correlation

17  between mayfly abundance and selenium; is that not correct?

18  A.   Well, it's not clear if it's mayfly abundance or

19  richness, but, yes, it does say except selenium, so that's

20  correct.

21  Q.   All right.  Let's turn to Plaintiffs' Exhibit 141, which

22  is Pond 2014.

23  A.   Okay.

24  Q.   I think this is the paper in which Pond compared some

25  reference streams to some valley filled sites that had been

Palmer - Cross

1   minded quite sometime ago; is that correct?

2   A.   Yeah, these are the -- he went back to reclaimed sites

3   and sampled streams below those where they had good habitat --

4   Q.   Right.

5   A.   -- had biological impairment.

6   Q.   I'll ask you the same question.  Isn't it true that

7   nothing in the abstract of this article says that conductivity

8   or sulfate have caused or can cause any particular effects to

9   macroinvertebrates?

10  A.   Frequently that is the kind of things in the discussion.

11  It is not in the abstract, you're correct.

12  Q.   Now, is it fair to say that all the temperature data for

13  this article were taken in April?

14  A.   I don't recall.  I can look.

15  Q.   I direct your attention to page 1830.  There's a legend

16  on the left.

17       Mr. Tyree has it up.

18  A.   It's on page 1830?

19  Q.   I believe that's right.  If not, Mr. Tyree can tell me.

20  A.   Yes, I see that.  "Chemistry and habitat variables shown

21  here are point values collected in April of 2011."

22  Q.   Would it be fair to say also, if you turn to page 1833,

23  the second column -- Mr. Tyree has the full sentence --

24  beginning with "As expected."

25  A.   "As expected, percent forest had moderate to strong

Palmer - Cross

1   negative correlations with biological indicators."

2   Q.   And that means that as the percent of forest went down,

3   the biological indicators went down as well?

4        Is that a fair statement?

5   A.   Well, it's pretty hard to separate forest from mining.

6   Yeah, percent forest goes down, it's usually because mining

7   goes up in these.  That's correct.

8   Q.   Did the authors not also find that the percent forest was

9   much higher at reference sites than at the mine sites?

10  A.   I don't know.  I'll look if you point me to where the

11  data are.  I remember they were forested, but --

12  Q.   Mr. Tyree, could you turn to page 1829, column one.

13       Dr. Palmer, Mr. Tyree has it up, if you want to see it,

14  on the lower left.

15  A.   Eighteen --

16  Q.   1829, column one.

17  A.   Percent forest was significantly higher at reference

18  sites, correct, even though other things like catchment area,

19  riffle substrate and so forth were comparable.

20  Q.   All right.  Did Pond not also say in this paper that his

21  valley fills did not encompass the full range of potential

22  source of mining impacts, such as chemical and sediment

23  loadings, or include data from streams draining newer fills

24  because his study was designed to evaluate fills associated

25  strictly with older fills?

Palmer - Cross

1    A.    I don't know.  If you'll point it out, I'll verify --

2    Q.    Okay.  Page 1834, Mr. Tyree, second column.

3    A.    All right.  Let's see.

4          Our valley fills did not encompass the full range of

5    potential sources observed across the region or include data

6    from streams draining newly constructed valley fills because

7    our study was designed to evaluate valley fills associated

8    strictly with older mountaintop mining operations.

9    Q.    So Fola fills wouldn't fall in that category, would they?

10   A.    I don't know their age.  I should, but, no, they're

11   certainly not.  They haven't been reclaimed in all this period

12   of time when these have.

13   Q.    Mr. Tyree, would you go to page 1834, the first column,

14   last paragraph.

15         And, Dr. Palmer, this is a paragraph that starts

16   "Although only 2 out of."  Do you see that?

17   A.    This is 1834?

18   Q.    Yes, I believe that's right.

19   A.    Yes.  "Although only 2 out of the 15 valley fill streams

20   were rated as unimpaired with GLIMPSS or observed to expected

21   (see Figure 5) we conservatively identified two additional

22   valley fill sites as 'nearly passing' GLIMPSS."

23   Q.    All right.  Now, the GLIMPSS, I think we heard earlier

24   testimony is more than just a finer tool.  You think it's a

25   better tool.

Palmer - Cross

1    A.    It is a better tool, yes.

2    Q.    With that aside, it's also a harder test to pass, is it

3    not?

4    A.    It is.

5    Q.    Much harder.

6    A.    It is.

7    Q.    Okay.  So the author here -- I think I'm saying this

8    correctly -- found that four out of the 15 sites either passed

9    or nearly passed the GLIMPSS.

10       These are the valley filled sites.  So it's 16 valley

11   filled sites and four of them passed or nearly passed the

12   GLIMPSS, right?

13   A.    I don't recall the total number, but, yes, some of them

14   nearly did.  So they have numbers of just a little bit above

15   50, and 52 would be the passing.  So they still failed it.

16   Q.    Well, two passed and two almost passed.

17   A.    Well, the ones that -- where I said a little above 50,

18   yes.

19   Q.    Okay.  If a WVSCI had applied, presumably all four would

20   have passed.  Is that a fair statement?  And maybe more.

21   A.    Probably.  But for those four, yeah.

22   Q.    But he didn't use a WVSCI in the article to evaluate

23   them, did he?

24   A.    I don't recall.  I don't think he did.

25   Q.    All right.  And then, Mr. Tyree, if you could direct us

Palmer - Cross

1    to page 1837.

2         Dr. Palmer, there's a paragraph that begins with

3    "Specific conductance as a toxic stressor."

4         Do you see that?

5    A.   Yes.  "As a general matter, aquatic toxicologists do find

6    toxicity in ion rich waters, (Kunz et al. 2013), yet declared

7    that specific conductance alone is too coarse of a measure and

8    thus unreliable to predict toxicity as one cannot identify the

9    responsible toxic ions."

10   Q.   Okay.  So in 2014, Pond -- you may disagree with this

11   statement -- but nonetheless is saying that generally aquatic

12   toxicologists regard specific conductance as too coarse a

13   measure and believe that more works needs to be done to

14   identify the specific constituents that may be responsible for

15   the effects observed in the benchmark.

16        Is that a fair statement?

17   A.   Yeah, that's because toxicologists tend to do WET tests

18   and use mortality measurements from those that have specific

19   ions isolated --

20   Q.   I just asked a very simple question.  Is that not what

21   Pond said in 2014?

22   A.   My interpretation of what is in the paper is what I just

23   stated.

24   Q.   Dr. Palmer, you testified earlier about Plaintiffs'

25   Exhibit 129, which is a 303(d) list, and I'm not going to go

Palmer - Cross

1    back to it.  I am going to get another defense exhibit,

2    Defense Exhibit 196.

3         Your Honor, may approach?

4             THE COURT:  You may.

5    BY MR. MCLUSKY:

6    Q.   Dr. Palmer, I've handed you what's been marked as Defense

7    Exhibit 196 and ask if you can identify this as a letter to

8    Mr. Mandirola of the West Virginia DEP from EPA Region III,

9    dated May of 2012, which includes EPA's decision rationale for

10   the total maximum daily load for selected streams in the Elk

11   River watershed.

12   A.   That appears to be what it is, yes.

13   Q.   I'm going to direct your attention to page 3 of the

14   rationale document.

15        And Mr. Tyree has highlighted a sentence here, or a

16   paragraph.

17        Do you see where it says, "In certain waters"?

18   A.   Yes.  "In certain waters, the stressor identification

19   process determined ionic stress to be a significant stressor.

20   During the TMDL development period, there was insufficient

21   information available regarding the causative pollutants and

22   their associated impairment thresholds for TMDL development

23   for this pollutant.  West Virginia DEP is deferring TMDL

24   development for biological impairments caused by ionic stress

25   and will retain those waters on the Section 303(d) list."

Palmer - Cross

1   Q.   So here, DEP declined to use conductivity to regulate

2   ionic toxicity because specific causative pollutants had not

3   yet been identified, correct?

4   A.   That was what DEP did, yes.

5   Q.   Nor had the threshold of the specific substances that

6   might cause impairment been adequately developed either, were

7   they?

8   A.   That is their opinion.  It's not -- yes, I'm not saying

9   that there has not been evidence at this time.  I'm saying

10  that DEP chose to interpret it that way.

11  Q.   And EPA approved that approach in its decision document

12  approving the TMDL.  That's what Exhibit 194 is, right?

13  A.   I haven't read the whole thing, but I will take your

14  word.  If this is accepting and deferring a TMDL, then that is

15  what it is.

16       MR. MCLUSKY:  Your Honor, if I might have a minute,

17  I've got a big stack of articles and need to get some numbers

18  squared away.

19       THE COURT:  That's fine.

20  BY MR. MCLUSKY:

21  Q.   Dr. Palmer, Plaintiffs' Exhibit 137 I think is Pond 2012.

22  I got it chronologically out of order, and I apologize.

23  A.   Okay.  Yes.

24  Q.   It's "Biodiversity loss in Appalachian headwater

25  streams."

Palmer - Cross

1   A.   Correct.

2   Q.   I think you testified about this earlier.

3   A.   I did, yes.

4   Q.   I'll ask you here again is it fair to say that the

5   abstract, despite noting a correlation between conductivity

6   and impacts, does not state that conductivity nor sulfate can

7   or have caused any particular impacts to aquatic life

8   anywhere?

9   A.   The O/E index was highly correlated with habitat and

10   chemical stressors, including conductivity.

11        But, yes, it doesn't say "causal effect."  It doesn't use

12   those words.

13   Q.   Right.  And in 2008 he found a high degree of correlation

14   with RPB factors and multi-metric indices, right?

15   A.   We can look back at that paper if you want me to verify

16   that.

17   Q.   Well, that's the .74 correlation coefficient.  Remember

18   that?

19   A.   I do.

20   Q.   Turning back, then, to the Pond 2012, second column of

21   the abstract, doesn't the author say that the -- see this

22   highlighted segment, "The O/E index was highly correlated with

23   individual habitat"?

24   A.   That's what I just read.  Yes.

25   Q.   Okay.  Sorry.  That's the observed/expected?

Palmer - Cross

1   A.   Correct.

2   Q.   Okay.  And what that means, the bugs you found versus the

3   bugs you expected is some type of metric that --

4   A.   Yeah, usually you're comparing it to what you find in

5   reference streams.  That's your expectation.  You're comparing

6   what you observed to that.

7   Q.   So whatever this index is, then, it bore a high degree

8   of -- a high correlation to individual habitat, correct?

9   A.   It says it is highly correlated, yes.

10  Q.   Joint Exhibit 11, which I think is the Merriam, Petty

11  additive effects paper you testified about.

12  A.   Okay.

13  Q.   I take it it's also true that in the abstract of this

14  article, there's no claim that conductivity or any of its

15  constituents caused WVSCI impairment.

16  A.   So they state in the abstract that mining was strongly

17  associated with acute changes in water chemistry, whereas

18  residential development was affected by habitat, but it

19  doesn't mention acute water chemistry for habitat.

20      They're primarily looking at the type of land use and the

21  effect that that has on the bugs, but they are also looking

22  at, you know, what potentially is underlying that by looking

23  at other factors.

24  Q.   Could you look at page 407 of that article?  And I don't

25  have the exhibit page.

Palmer - Cross

1    A.   Okay.

2    Q.   I'm waiting for Mr. Tyree to catch up.

3         Page 407, Mr. Tyree, if you could.  Joint Exhibit 11 is

4    the Merriam and Petty paper.

5         Dr. Palmer, can you confirm for your lawyer this is the

6    2011 paper?

7    A.   Where are you in this on that page?

8    Q.   Well, let's go to page 407.

9    A.   Okay.  I'm on 407.

10   Q.   The first full paragraph.

11   A.   On the left, okay, "Residential development."

12   Q.   "In addition, macroinvertebrate communities," do you see

13   Mr. Tyree has highlighted on the screen?

14   A.   Yes.  "In addition, macroinvertebrate communities were

15   significantly altered along the residential gradient."

16   Q.   So, here, bug scores, or whatever measurement they chose

17   to make of the insects, significantly changed as there was a

18   change in residential development.

19        Is that a fair statement?

20   A.   It's well-known they both influence the invertebrates.

21   What is significant is mining and residential development had

22   additive effects.

23   Q.   Right.  But the residential development, was that

24   caused -- did they contribute to conductivity or was it just

25   land disturbance?

Palmer - Cross

1    A.    They didn't -- I don't recall that they came up with a

2    specific -- probably, since it was the abstract, pointed

3    towards habitat.  My guess is it may have been more related to

4    habitat.  Siltation is common when you have residential

5    development, heavy siltation.

6    Q.    Mr. Tyree, if you would go to page 409, column two,

7    please.

8          Dr. Palmer, look in column two.  Can you confirm -- I may

9    have misread this -- that the linear relationship the author

10   has found between the WVSCI and conductivity had an R square

11   value of .36?

12   A.    That's correct.

13   Q.    And that means that the line they drew through the data

14   did not explain some 64 percent of the variability in the

15   data?

16   A.    It means it explained 36 percent, and it is significant

17   at the .035 level, which is highly significant.

18   Q.    Didn't explain a whole lot of the data variability.

19   A.    It explained a significant amount of the data.  That's

20   why earlier when you were pointing to correlation

21   coefficients, I said I'd have to see some sort of regression

22   and P value, because you can have high correlation and an

23   insignificant slope.

24   Q.    Let's turn to Joint Exhibit 1, which is Bernhardt and

25   Palmer, "The environmental costs of mountaintop mining."

Palmer - Cross

1    2011, I believe.

2    A.    I'm sorry.  Joint Exhibit?

3    Q.    I have Joint Exhibit 1, actually.  But my handwriting was

4    getting a little sloppy late last night.

5    A.    Okay.

6    Q.    And I think you said earlier this was -- original

7    research was not done for this.  This was more of a survey of

8    other research --

9    A.    It was more of a synthesis.

10   Q.    All right.  Would you turn to page 45 of the article.

11   A.    Yes.

12   Q.    And I believe there's a statement that starts with,

13   "Mining also leads to significant changes."  Could you read

14   that, please?

15   A.    "Mining also leads to significant changes in watershed

16   hydrographs.  Recent work analyzing hydrological changes as a

17   function of the amount of a watershed that has been surface

18   mined showed that peak flows increase linearly with the

19   percent of the watershed mined, even if the land has been

20   reclaimed."

21   Q.    If you could go on and just read the rest of that

22   paragraph?

23   A.    "These hydrologic changes persist because reclamation

24   using earth-moving machinery compacts soil layers thus

25   decreasing porosity and water infiltration.  Compared to

Palmer - Cross

1   regions that have not been mined, infiltration may be as much

2   as an order of magnitude lower so that mined sites respond to

3   rainfall more like urban watersheds, where impervious surfaces

4   lead to high surface runoff during storms."

5   Q.   And you have found, I think from some of your own

6   research, when there are large changes of hydrologic signals,

7   that there are significant changes in macroinvertebrates below

8   those areas, haven't you?

9   A.   It's totally dependent on the relationship between the

10   change in peak discharge and the bottom geomorphology, the

11   sediment composition.  If you don't have bed mobilizing flows,

12   if the peak flow doesn't increase significantly to mobilize

13   the bed, then the flow is not a significant disturbance.

14   Q.   Well, is a peak flow that increases linearly with the

15   percent of watershed mined significant?  It seems to me it is.

16   A.   It could be a significant increase statistically but not

17   biologically unless it mobilizes the bed.

18   Q.   Where does it say that in this article?

19   A.   It doesn't go into that level of detail.

20       My degree in oceanography was because I studied hydrology

21   and the relationship between benthic organisms in marine

22   sediment.  So it's an area I know pretty well.

23   Q.   Did you do any work here on whether there had been a

24   change in the peak flows off this site as a result of mining?

25   That is, did the peaks either increase as a result of mining

Palmer - Cross

1   or did they actually decrease as a result of mining?

2   A.   The Fola case?

3   Q.   Yes.

4   A.   I have not looked at changes in discharge pre and post

5   except it is -- some of those information are in our report.

6   The problem is, we don't know if the sites always match up.

7   You can't really analyze that.

8   Q.   Mr. Tyree, would you turn to page 48 of the article,

9   column one?

10      And I think you probably said this earlier, but the

11   article I think says that tests for conductivity toxicity for

12   mayflies have often proved inconclusive.

13      Is that a fair statement?

14   A.   Yes.   And this is relevant to when you kept bringing up

15   the food web effects of metals and so forth, like selenium.

16   Yeah, it gets concentrated in the food web, but they have a --

17   for many of these organisms at this point, they hadn't

18   necessarily been related to toxicity.

19   Q.   Things like selenium getting in the food web?

20   A.   I don't -- to my knowledge, at this point they had not

21   been related to like LD50s or something like that in mayflies,

22   that's correct.

23   Q.   Mr. Tyree, go to page 49, column one.

24      Dr. Palmer, Mr. Tyree has highlighted some language on

25   page 49.   Could you read that for us?

Palmer - Cross

1    A.    "To date, there have been studies that explicitly link

2    the cumulative extent of mountaintop mining to the water

3    quality and biological community structure of impacted

4    streams."

5    Q.    I think you said -- did you say "no studies"?

6    A.    I'm sorry.  Yeah.

7    Q.    It says "no studies."

8    A.    That's correct.

9    Q.    And this is your article written in 2011?

10   A.    That's correct.  The Bernhardt paper wasn't published at

11   that point.

12   Q.    Let's turn to Joint Exhibit 2, which is Bernhardt et al.,

13   "How Many Mountains Can We Mine?"

14   A.    Yes.

15   Q.    All right.  Mr. Tyree, can you get that up, please?

16         Turn to page G of Joint Exhibit 2.

17   A.    Okay.

18   Q.    Page G, Mr. Tyree.

19         Can you confirm that the "How Many Mountains" paper was

20   supported by gifts from the Sierra Club and Appalachian

21   Voices?

22   A.    That's what it says here.

23   Q.    Okay.  Now, as I understand it -- let's go back to

24   page C, please, Mr. Tyree.

25         What were the statistical techniques that were used here

Palmer - Cross

1   by the authors?

2   A.   I'd have to go back and review it again.  I didn't write

3   this paper.  I wasn't involved in it.

4   Q.   Are you aware that they used the general additive

5   regression models?

6   A.   That's my understanding, that it talks about GAMs in

7   here --

8   Q.   Okay.

9   A.   -- but I didn't do the analyses.

10  Q.   If you'd go to page F, Mr. Tyree.

11       Dr. Palmer, is it fair to say, if you look in the first

12  column -- Mr. Tyree has it highlighted -- that based on the

13  GAM models, once a stream conductivity increases above 121 or

14  308 microsiemens, GLIMPSS and WVSCI scores will typically fall

15  below their respective impairment thresholds?

16  A.   That's what it says here.

17  Q.   So if I read this right, if conductivity increases above

18  121, I would typically --

19  A.   Have a failing --

20  Q.   -- fail, fail the GLIMPSS score.

21  A.   That's what it implies, yes.

22  Q.   Okay.  Do you know what background is in West Virginia

23  for conductivity?

24  A.   It's highly variable, depending on where you are.  So it

25  can be as low as 50 and it can be as high as a little over

Palmer - Cross

1    300.

2    Q.    Hasn't -- didn't Suter and Cormier in the benchmark

3    actually look at and calculate a background level?

4    A.    I could look at it and determine that.

5    Q.    Well, Mr. Tyree, could you put up Joint Exhibit 3, which

6    is the Suter and Cormier "Derivative of a benchmark" article?

7    Turn to page 268.

8    A.    Which exhibit is this?

9    Q.    This is Joint Exhibit 3.

10   A.    Okay.

11   Q.    And I have pages 268 of the article, and I think it's

12   page 76 maybe on the exhibit.  You'll see we exhibited, "We

13   also estimated the background of conductivity."

14         Do you see that?

15   A.    I do, yes.

16   Q.    Is it fair to say that if you go over on page 269 of the

17   article, when they combine those numbers, they come up with a

18   background level of conductivity of 150 microsiemens?

19   A.    That's what it says, yes.

20   Q.    So the background level in West Virginia, according to

21   "How Many Mountains Can We Mine," would flunk a GLIMPSS.

22         Is that a fair statement?

23   A.    No, it's not a fair statement.  My understanding,

24   although I would have to read the full article, that again the

25   GAM was not used to identify the threshold.  It was the TITAN

Palmer - Cross

1   that they used to identify the threshold.  So their

2   conclusions based on GAM in that sentence are nothing that I

3   would support.

4   Q.   What threshold did they use using TITAN for a GLIMPSS?

5   Do you know?

6   A.   I don't know.  I could look and see if it's in there.

7   Q.   Turn to Joint Exhibit 4, which is Cormier et al.,

8   "Assessing causation of extirpation."

9   A.   Yes.

10  Q.   And I think -- did we go over this one earlier too?

11  A.   I think we did real quickly, yes.

12  Q.   Mr. Tyree, could you -- well, first of all, was there any

13  effect modification analysis done by Suter and Cormier?

14  A.   You know, I think that they sort of combined confounding

15  and effect modification is my recollection.

16  Q.   Mr. Tyree, go to page 286, top paragraph.

17      Dr. Palmer, can you read the first sentence on page 286?

18  A.   "This causal assessment does not compare the relative

19  importance of ionic-induced extirpation of genera in

20  Appalachia with other known stressors in the region such as

21  metal toxicity, stream bed siltation, or eutrophication.

22  Instead, it determines that addition of the ionic mixture to

23  streams can and does cause extirpation of aquatic

24  invertebrates."

25      So they're basically pointing out that they use streams

Palmer - Cross

1    that go the full range of all these things that vary and so

2    forth and they still found a relationship.

3    Q.   They made no effect in any of these papers -- no attempt

4    in any of these papers to try and parse out what particular

5    constituent or constituents of conductivity may be

6    contributing or causing to the absence of sensitive insects.

7    A.   That was not their goal, and, in fact, they explicitly

8    set out to include the full range of what goes on in the real

9    world, which is why they didn't rely on laboratory toxicity

10   tests.

11        When you get an effect like this on top of the

12   variability and lots of potential stressors, it's surprising.

13   Q.   Mr. Tyree, could we go to Joint Exhibit 5, which is

14   another Cormier paper, "A Method for Assessing the Potential

15   for Confounding."

16        And I think we went over this one too, Dr. Palmer.

17   A.   We did quickly, yes.

18   Q.   You had -- and I lost track of the exhibit number -- but

19   a regression line taken from the benchmark document.

20        Do you recall Mr. Lovett had that?

21   A.   I don't recall.  Sorry.

22   Q.   I think that's the one you used to say that there was a

23   probabilty of -- a 72 percent chance of not passing the WVSCI

24   score --

25   A.   I read directly from the benchmark that, yes.

Palmer - Cross

1    Q.    Now, you're not suggesting that regression line proves a

2    causal relationship, were you?

3    A.    The causal relationship was proven by the causal

4    assessment, not by a single regression line.

5    Q.    Okay.  Joint Exhibit 8, which was the Hitt and Chambers

6    temporal changes in --

7    A.    Yes.

8    Q.    -- fish --

9    A.    Assemblages, yes.

10   Q.    To make sure I understand here, didn't water quality in

11   this case exhibit elevated selenium levels?

12   A.    I don't recall, and I don't recall over what time period

13   because they had data from a long time ago from another study.

14   They had contemporary data and looked at seasonal data,

15   contemporary.

16   Q.    Mr. Tyree, could you go to table 1 in Joint Exhibit 8.

17         Dr. Palmer, Mr. Tyree has up table 1.  Do you see that?

18   I'm afraid I don't have the page.

19   A.    No, I do see there are high levels of selenium.

20   Q.    Don't you think that should have been discussed in any

21   discussion about potential effect of conductivity on fish?

22   A.    That's a good question.  You know, most of the work on

23   selenium in fish has looked at sublethal effects, not the

24   entire disappearance of fish.  So if you look at the work

25   that's been done by people associated with USGS and other

Palmer - Cross

1    groups, U. S. Fish and Wildlife, severe abnormalities, curved

2    spines, somewhat reduced reproduction, but I don't know that

3    there are studies of direct mortality of fish that they would

4    want to use to infer the really significant changes.  It's

5    also not clear why -- well, I'll stop there.

6    Q.    Is it fair to say that Dr. Hitt did not claim there was a

7    causal relationship between either conductivity or any change

8    in the benthic makeup in fish populations; did he?

9    A.    You mean did he use the word "causal"?  Is that what

10   you're asking?

11   Q.    Yes.

12   A.    I can look and see.  I suspect he may not have used that

13   word "cause," but there's a lot of ways to talk about the

14   relationship between dependent and independent variables

15   without using that word.

16   Q.    Well, an easy way is to use the word, isn't it?

17   A.    Well, actually ecologists don't typically use that word.

18   So this is something that I'd have to get used to.  It's more

19   of a toxicological kind of thing, causal.

20   Q.    Does he not say additional research is necessary to

21   assess how reduced diversity of macroinvertebrate assemblages

22   affects the total biomass and how that affects prey selection

23   by fish?

24   A.    Oh, of course.  But he also said that the invertivores

25   were dramatically reduced.  The functional group composition

Palmer - Cross

1  changed.

2  Q.    But he doesn't attribute that to any particular thing.

3  He says it's simply within -- the conductivity was within a

4  range that one might expect a change --

5  A.    He also said -- he talked about reduced invertebrates.

6  Q.    Now, he had less fish numbers but more -- he had bigger

7  fish, didn't he?

8  A.    Right, because he had, as I recall, things like sunfish

9  and things you might not necessarily expect in reference,

10 unimpacted sites.  These are more tolerant species.

11      It's sort of like, you know, getting big rats instead of

12 chipmunks in areas that are urbanized, more biomass, but you

13 don't necessarily want the rats.

14          MR. MCLUSKY:  Your Honor, may I have just a minute?

15          THE COURT:  Yes.

16 BY MR. MCLUSKY:

17 Q.    Dr. Palmer, you are aware, of course, that Dr. Hitt is

18 married to Mary Anne Hitt, who is head of the Sierra Club's

19 Beyond the Coal Campaign?

20 A.    I had no idea, no.

21 Q.    Should something like that be noticed in an article,

22 someone is working for the U. S. Government that draws half

23 their -- or maybe half of their revenue from the Sierra Club?

24 Shouldn't that be noted?

25 A.    I don't know.  I mean, I write about fish sometimes in my

Palmer - Cross

1  papers and I don't say my husband works for the American Sport

2  Fishing Association.  It doesn't imply bias.

3            MR. MCLUSKY:  Your Honor, I think I'm finished.

4            THE COURT:  All right.  Redirect?

5            MR. LOVETT:  Yes, Your Honor.  I'm afraid it's going

6  to take a little while because we're going to have to go

7  through those articles that Mr. McLusky just went through and

8  I think cherry-picked some quotations and I may have to

9  counter.  I'll be happy to start --

10            THE COURT:  So you want to pick some cherries

11  yourself?

12       All right.  I understand.  All right.  Well, we'll pick

13  up tomorrow morning.  Just, generally speaking, how does

14  plaintiff perceive you're doing with the number of witnesses

15  you have and the time we've taken thus far?

16            MR. LOVETT:  I think we're fine, Your Honor.  I

17  think we'll finish Dr. Palmer pretty quickly tomorrow and then

18  one short witness and then a longer witness and then we'll be

19  finished.  And I hope we can finish all that tomorrow.  And

20  then --

21            MR. MCLUSKY:  We have one witness.

22            THE COURT:  Dr. Menzie?

23            MR. MCLUSKY:  Yes.

24            MR. LOVETT:  So the goal is to finish on Thursday.

25            THE COURT:  That would be wonderful.  All right.  So

1    we'll adjourn until 9:00 a.m. tomorrow.

2         You can step down.  Don't talk about your testimony.

3         All right.  We stand adjourned until tomorrow morning.

4         (Proceedings adjourned at 5:20 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                           I N D E X

2    Plaintiffs' Witnesses      Direct   Cross   Redirect   Recross

3    STEVEN WING                    4      55       78        --

4    MARGARET PALMER               81     197

5

6    Joint Exhibit             Admitted

7    No. 17                        3

8

9    Plaintiffs' Exhibits

10   No. 72                        6

11   No. 167                      55

12   No. 170                      55

13

14   Defendant's Exhibits

15   No. 19                        3

16   No. 38                        3

17   No. 43                        3

18   No. 30                        3

19   No. 45                        3

20   No. 32                        3

21   No. 46                        3

22   No. 33                        3

23   No. 47                        3

24   No. 34                        3

25   No. 48                        3
```

```
 1    No. 39                          3

 2    No. 36                          3

 3    No. 40                          3

 4    No. 35                         35

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21         I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24

25              /s/Teresa M. Ruffner              August 12, 2015
```